UNITED STATES DISTRICT COURT

NORTHERN DISTRICT OF CALIFORNIA

SAN JOSE DIVISION

JACOB MCGOVNEY, et al.,

Plaintiffs,

v.

AEROHIVE NETWORKS, INC., et al.,

Defendants.

Case No. 18-CV-00435-LHK

**ORDER GRANTING MOTION TO DISMISS WITHOUT PREJUDICE**

Re: Dkt. No. 47

Lead Plaintiff Andrew Moreau ("Plaintiff"), individually and on behalf of all other persons similarly situated, alleges that Defendants Aerohive Networks, Inc. ("Aerohive"), David K. Flynn, and John Ritchie (collectively, "Defendants") violated federal securities laws. Before the Court is Defendants' motion to dismiss. ECF No. 47 ("Mot."). Having considered the parties' briefing, the relevant law, and the record in this case, the Court GRANTS Defendants' motion to dismiss without prejudice.

## I.      BACKGROUND

### A.  Factual Background

#### 1.  The Parties

Lead Plaintiff Andrew Moreau "purchased Aerohive common shares" and was allegedly

damaged by misrepresentations and omissions made by Defendants. ECF No. 44, Consolidated Amended Class Action Complaint ("Compl.") ¶¶ 17–18, 23. Lead Plaintiff seeks to represent a putative class of "all persons other than Defendants who purchased or otherwise acquired Aerohive common shares between November 1, 2017 and January 16, 2018, both dates inclusive (the "Class Period")." *Id.* ¶ 1.

Defendant Aerohive is a California corporation that is headquartered in Milpitas, California. *Id.* ¶ 24. Aerohive's common stock trades on the New York Stock Exchange under the symbol "HIVE." *Id.* Defendant David K. Flynn ("Flynn") has served as Aerohive's Chief Execute Officer ("CEO") since July 2007, as its President since November 2007, and as its Chairman since July 2013. *Id.* ¶ 25. Defendant John Ritchie ("Ritchie") has served as Aerohive's Chief Financial Officer ("CFO") and Senior Vice President since September 2015, and as Aerohive's Chief Operating Officer ("COO") since February 2017. *Id.* ¶ 26. Flynn and Ritchie are collectively referred to by Plaintiffs as the "Individual Defendants."

### 2. Aerohive's Business

According to Plaintiffs, "Aerohive has designed and developed a cloud networking platform and portfolio of products that enable customers to manage their network systems and to collect and analyze data from users." *Id.* ¶ 2. The Company's products include hardware, such as routers and switches, network management and data collection applications, and maintenance and support services. *Id.* ¶ 29. Aerohive has sold to over 30,000 end-user customers (organizations holding licenses to products and/or software subscriptions or services). *Id.* "Aerohive services the healthcare, education, manufacturing, distribution, and retail industries throughout the United States, Europe, the Middle East, and Asia." *Id.*

Aerohive reaches most of its end-user customer base through "channel partners," who are authorized to resell, distribute, and service Aerohive's technology platform. *Id.* ¶ 30. These channel partners are supported by Aerohive's sales organization, which is comprised of regional sales offices and inside sales teams. *Id.*

By the end of 2016, roughly 40 percent of Aerohive's total revenues came from the

2

education sector, especially through a government-funded program known as E-Rate, which provides subsidies to allow educational institutions to purchase technology. *Id.* ¶ 31.

### 3. Challenges Facing Aerohive in 2016

Aerohive has had historically promising year-over-year increases in revenue from 2013 to 2016. *Id.* ¶ 32. Despite this, Aerohive has never achieved profitability. *Id.* ¶¶ 3, 32. By the end of 2016, Aerohive faced increasing pressure to prove it was a "real player in the industry" and to "maintain the value of its common stock." *Id.* ¶¶ 4, 32. According to Plaintiffs, however, Aerohive faced several "obstacles," including uncertainties surrounding the E-Rate program, which historically generated nearly 40 percent of Aerohive's revenues. *Id.* ¶¶ 3, 33. In addition, Aerohive launched the next generation of its cloud networking platform, HiveManager NG, which, due to delays in product updates, had created what Aerohive called "elongated sales cycles" while customers waited for features and capabilities to be added. *Id.* ¶¶ 3, 33.

### 4. Aerohive's 2017 Sales Restructuring

Plaintiffs allege that in or around 2017, Defendants announced a major overhaul of Aerohive's sales organization and sales strategy, which Defendants promised would improve revenues and profitability. *Id.* ¶ 4. Specifically, Plaintiffs allege that these changes included: (1) installing new sales leadership; (2) "unbundling" Aerohive's product and service offerings; and (3) growing the Company's business with Dell, one of its key strategic partners. *Id.* The Court provides further details about Plaintiffs' allegations regarding Aerohive's changes in turn.

First, Aerohive hired Ron Gill ("Gill") as Vice President of Americas Sales. *Id.* ¶ 34. Gill had previously worked for Ruckus, one of Aerohive's competitors. *Id.* Gill reported to Thomas J. Wilburn ("Wilburn"), then-Senior Vice President of Worldwide Field Operations, "who possessed extensive experience in technology and networking sales and marketing." *Id.* Aerohive also added Alan Amrod ("Amrod"), another industry veteran, in order to make the organization "faster and more nimble." *Id.* Under this new structure, Defendant Flynn stated he would "continue to directly manage sales, marketing, and products." *Id.*

Second, Aerohive announced it would shift away and diversify the customer base from the

E-Rate program by "unbundling" Aerohive's product and service offerings. *Id.* ¶¶ 33, 35. For instance, Aerohive announced a new offering consisting of a lower-priced, entry-level product called "Aerohive Connect," with additional features and upgrades that could be purchased as part of "Aerohive Select," a subscription service that would generate deferred revenues on a going-forward basis. *Id.* ¶¶ 33, 35.

Third, Defendants placed emphasis on their plan to grow Aerohive's business with Dell. *Id.* ¶ 5.

### 5. Defendants' Failing Sales Execution Strategy

Plaintiffs allege that Defendants' sales execution strategy was flawed and that Aerohive concealed these flaws from investors. *Id.* ¶ 40 ("Contrary to Defendants' statements, and unbeknownst to investors, Defendants' plan to achieve profitability by overhauling the sales organization showed signs of failing almost immediately."). In particular, Plaintiffs allege that Aerohive's strategy resulted in: (1) the departure of sales personnel; (2) failure to implement systems that ensured accuracy and predictability in forecasting sales revenues; (3) failures in the plan to offer the lower-priced product, Aerohive Connect, and then upsell the service subscription package, Aerohive Select; and (4) failures in the development of the partnership with Dell. *Id.* ¶¶ 41–46. The Court discusses each of Plaintiffs' allegations regarding failures in Aerohive's sales strategy below.

First, Plaintiffs allege that the introduction of new sales leadership resulted in departures of sales personnel beginning in January 2017. *Id.* ¶ 41. Plaintiffs plead: "[t]he abrupt resignation of Senior Director of Inside Sales Timothy Balistreri and loss of CMO/CSO David Greene, both respected leaders within the sales force, in conjunction with layoffs of existing Aerohive sales representative[s] in favor of VP Ron Gill's hiring of former colleagues from Ruckus, an Aerohive competitor, ultimately hurt morale." *Id.* In support of this allegation, Plaintiffs rely on information from former Aerohive employees, identified by Plaintiffs as "Confidential Witnesses" ("CW"). One witness, identified as CW1, was a former inside sales representative from October 2016 to July 2017. *Id.* CW1 stated: "[Gill] laid off four or five of us at the same time, execution style. We

came into a room and were sent home for doing exactly what we had been told it was our job to do – we were told 'focus on [E-Rate],['] then suddenly it wasn't our focus. . . . Communication was so terrible at that time that the VP of Sales Operations called my cell phone and said he didn't even know [about the layoffs] until afterward." *Id.* Another witness, identified as CW2, was a program director who reported directly to Defendant Flynn and General Manager Amrod from June 2015 to September 2017. *Id.* ¶ 42. According to Plaintiffs, CW2 "confirmed that Gill was too quick to cut E-Rate-experienced sales personnel, who knew the Company's product lines and who were responsible for generating nearly 40 percent of the Company's revenue." *Id.* CW2 reported that neglecting E-Rate caused Aerohive to lose valuable sources of business, and many E-Rate customers stopped listing Aerohive as a preferred provider as they had in the past. *Id.* Finally, CW3, an Aerohive territory manager from August 2015 to September 2017, stated that the rate of attrition in the Summer and Fall of 2017 was "unprecedented" and by the end of Fall 2017, the majority of the regional sales managers had been with the Company less than a year and did not understand Aerohive's products well enough to sell them. *Id.* ¶ 43.

Second, Plaintiffs allege that "Aerohive's failure to implement a system that ensured accuracy and predictability in forecasting sales revenues compounded the employee turnover problem. *Id.* ¶ 44. CW3 reported that because sales quotas had become unrealistic and there was little accountability, representatives frequently inflated their projections, and deals almost never closed when promised. *Id.* CW2 added that "the pipelines were always big, but they didn't true-up as you got closer – they were not accurate at the end of each month. The return was always pushed out." *Id.* Plaintiffs allege that according to CW2 and CW3, the combined effects of unrealistic quotas, poor forecasting, and a diminished sales organization made it apparent by mid-year 2017 that Aerohive would fall short of revenue projections. *Id.* CW3 reported, "[f]or the Americas, there was no way we could hit our number [in the second half of 2017]. We only had two reps on inside sales making their number[s] and the engineers were sitting around twiddling their thumbs." *Id.*

Third, Plaintiffs allege that "by mid-year 2017, it was also clear that Aerohive's plan to increase revenues by offering a lower-priced product, Aerohive Connect, and then upselling a

5

service subscription package, Aerohive Select, was not working." *Id.* ¶ 45. One witness, identified as CW4, who was a sales operations renewals coordinator from September 2016 to June 2017, claimed that when Aerohive "unbundled" its product and support, Aerohive discovered "many breaks in the whole system," meaning that many existing customers had been receiving support services free of charge for many years and were not inclined to start paying separately when the time came for renewals. *Id.* CW4 reported that everyone "from the CEO on down" was aware of this problem and discussed whether customer services would be cut off in order to force customers to pay. Ultimately, according to Plaintiffs, sales teams offered steep discounts on service contract renewals in order to secure deals, thereby generating lower-than-expected revenues. *Id.*

Fourth, Plaintiffs allege that "Aerohive's strategic partnership with Dell failed to develop as hoped." *Id.* ¶ 46. CW1 stated: "[The Dell partnership] was a move in the right direction, but we put too many eggs in that basket and it wasn't as fruitful as expected. It was 'Oh god, this is going to be fantastic,' because it would bring us into deals, but it turned out to be more of a pain." *Id.* CW2 said that the premature firing of Aerohive's E-Rate representatives meant a lack of personnel to support that aspect of Dell's business, and Aerohive lost ground it had gained in E-Rate through that channel. *Id.*

Plaintiffs allege that in order to remedy the sales organization turmoil and flat revenue, Defendants resorted to deep cost cutting measures, including further reductions in engineering, product management, and sales. *Id.* ¶ 47. CW2 described that the channel sales team was "stripped down," and that cuts to engineering and operations were so drastic that they were rendered "ineffectual." *Id.* CW2 also explained that instead of "selling, growing, and building, and improving," Defendants "started cutting ideas, started to cut back to meet revenue." *Id.*

### 6. Alleged Misrepresentations

Plaintiffs allege that between November 1, 2017 and January 16, 2018, Defendants made a number of false or misleading statements or omissions. Compl. ¶¶ 17, 51. Plaintiffs broadly categorize the false and misleading statements and omissions into three categories: (1) statements and omissions related to sales personnel issues; (2) statements and omissions related to sales

6

execution; and (3) statements and omissions related to projected revenues. Opp'n at 6–8. These false or misleading statements were allegedly made in Aerohive's quarterly report for 3Q17 on Form 10-Q ("3Q17 Form 10-Q") with the United States Securities and Exchange Commission ("SEC") and Aerohive's earnings call with investors for 3Q17 ("3Q17 Earnings Call"). *Id.* ¶¶ 51, 59. The Court has organized these statements by source below. Where necessary to the Court's discussion, the Court has provided the context for the statement at issue and indicated the challenged statement itself in bold font.

### *3Q17 Form 10-Q*

**Statement 1:** "We also expect to continue to invest in our organization and our channel and strategic partnerships to meet the needs of our customers and to pursue opportunities in new and existing markets. In particular, we are investing to increase our sales capacity as well as our channel program."

**Statement 2:** "We believe that the **significantly slower pace of order volume** in our education vertical in the third and fourth quarters of our fiscal year 2016, specifically due to **slower pace of funding approvals under the federal E-Rate program**, was one of the primary drivers of lower-than-expected order volume and revenue performance in our third quarter and our lowered revenue outlook for our fourth quarter."

**Statement 3:** "In May 2017, we announced that our Aerohive Connect and Select offerings are available across our entire portfolio of access points and switches. We believe that separating our product line into these two offerings delivers compellingly priced cloud-managed hardware for connectivity-oriented deployments and enables us to capture more subscription and software license revenue from those customers who require a more advanced feature set and support. This program may reduce our revenue, or the rate of our revenue growth, as purchasers take advantage of the lower entry pricing for our products. In addition, it may be difficult and take time for us to adjust expenses sufficiently to compensate for a shortfall in revenue, even when we may anticipate the shortfall."

**Statement 4:** "We also believe that we introduced our new HiveManager NG product to some of our larger and more complex customers before its feature set was able to fully address their requirements, which resulted in **elongated sales cycles** and reduced revenue opportunities, which specifically contributed to our lower revenue performance in the fourth quarter and our outlook for the first quarter of our fiscal year 2017."

### 3Q17 Earnings Call

**Statement 5 (by Defendant Flynn):** "In parallel, we continue to strengthen our go-to-market, both through our full OEM relationship with Dell EMC and through the initiative we launched at the start of this year to pivot to a more channel-centric go-to-market model to improve our sales efficiency and better address the mid-market. The foundation of this plan was the launch of our Connect-to-Select offering, and a launch of [a] number of channel recruitment and development end initiatives. Our sales leader Tom Wilburn's strength and passion is around larger enterprise direct touch business[es] so when we launched this initiative in Q1, he augmented his team with channel-centric sales leaders who built much of Ruckus' as well as new leadership in APAC. With this new program and team, we recruited 600 new resellers in the first half of the year and added 300 more in Q3. In Q3, we moved fully to a 2-tier model by transitioning our direct VAR business through SYNNEX and we signed WAV as a distributor to help us develop the MSP and HSP channels. Now with this team in place and a program on the right trajectory, Tom has decided to move on to pursue opportunities that better align with his preferred go-to-market model. Having successfully restructured my leadership team under a COO organization, paired with a unified products and marketing organization, I now have the capacity to take on global sales leadership to drive this critical initiative working directly with our 3 theater sales leaders.

. . .

I am encouraged by the significant progress of our product delivery and that this has given Dell EMC the confidence in us to expand into a full OEM relationship. Our results demonstrate that we are steadily improving our operating efficiency while positioning ourselves to resume growth."

**Statement 6 (by Defendant Ritchie):**[1] "We realized significant sales efficiencies with our non-GAAP sales and marketing cost coming in at 39% of revenue, driving this important metric to under 40% on a year-to-date basis.

. . .

During the quarter, we saw significant improvements in our sales efficiency as non-GAAP sales and marketing costs came in at $14.4 million or 39% of revenue in Q3, down $1.5 million from $15.9 million recognized in the second quarter. We're encouraged by several metrics that point to improved sales productivity. For the third quarter in a row, we have reported year-over-year declines in sales and marketing expenses. In addition[,] for the last 2 quarters and also on a year-to-date basis, our sales and marketing costs as a percentage of revenue were sub-40%."

**Statement 7 (by Defendant Ritchie):**[2] "We are currently expecting Q4 revenue in the range of $40 million to $42 million."

---

[1] In their motion, Defendants appear to count this statement as three separate statements. *See* Mot. at 17–18 (referring to statement 6 as "statements 6, 7, 8"). The Court refers to this statement in its entirety as "statement 6."

[2] Defendants refer to this statement as "statement 9" in their motion. *See* Mot. at 19.

Case No. 18-CV-00435-LHK
ORDER GRANTING MOTION TO DISMISS WITHOUT PREJUDICE

*Id.* ¶¶ 51–64.

Plaintiffs allege that the above statements or omissions were misleading for one of three reasons. First, Plaintiffs contend that statements or omissions regarding Aerohive's sales personnel were misleading because Aerohive had replaced knowledgeable, experienced sales personnel and implemented cost-cutting measures that left the sales organization understaffed and ill-equipped to service existing customers and develop new opportunities. *Id.* ¶ 53. Plaintiffs allege that Defendants' statements were inaccurate and incomplete because they created the impression that Defendants' sales strategy to increase sales capacity was successful. *Id.* ¶¶ 52, 53. Additionally, Plaintiffs allege that the decline in E-Rate business was attributable only to problems with the program itself, when Defendants had fired sales personnel specializing in the education sector and E-Rate program. *Id.* ¶¶ 54, 55.

Second, Plaintiffs contend that the statements and omissions related to sales execution were misleading because Defendants represented that the Aerohive Connect and Aerohive Select program offerings may reduce revenue or the rate of revenue growth and that it may be difficult to compensate for a shortfall in revenue when, according to Plaintiffs, "Defendants already knew and/or recklessly disregarded that [ ] the transition to Aerohive Connect and Aerohive Select was experiencing significant setbacks that would impact revenues in the fourth quarter." *Id.* ¶¶ 56–57. In short, Plaintiffs effectively allege that "while sales efficiency and productivity metrics were technically accurate, they were touted as evidence of Defendants' successful implementation of their sales strategy, while concealing the fact that Defendants had resorted to cost-cutting measures to compensate for lower than expected revenues." Opp'n at 8.

Third, Plaintiffs contend that the statements and omissions related to the projected revenues were misleading because Defendant Ritchie projected fourth quarter revenues in 2017 in the range of $40 million to $42 million but did not disclose adverse facts pertaining to Aerohive's business, operational and financial results. *Id.* ¶¶ 63–64. Then, on January 16, 2018, Aerohive issued a press release entitled "Aerohive Networks Announces Preliminary Fourth Quarter 2017 Results," which revealed that Aerohive "expects net revenue to be approximately $37 million,"

9

which is below the Company's previously stated guidance of $40 million to $42 million." *Id.* ¶ 71. The press release also stated: "Following the change in our sales leadership at the end of our third quarter, we uncovered underlying sales execution issues which became fully apparent in the last month of the fourth quarter." *Id.* Following this news, Aerohive's share price fell $1.63, or 28.6%, to close at $4.07 on January 17, 2018. *Id.* ¶ 72.

**B. Procedural History**

On January 19, 2018, a group of Aerohive shareholders filed suit against Aerohive in the instant case captioned *McGovney et al. v. Aerohive Networks, Inc., et al.,* N.D. Cal. Case No. 5:18-CV-00435-LHK. *See* ECF No. 1. A different group of Aerohive shareholders filed suit on January 25, 2018, in a case captioned *Beyerbach et al. v. Aerohive Networks, Inc., et al.*, N.D. Cal. Case No. 5:18-CV-00544-HSG. A third suit was filed on January 30, 2018, in a case captioned *Panjabi et al. v. Aerohive Networks, Inc., et al.*, N.D. Cal. Case No. 18-CV-00656-LHK. On February 15, 2018, the Court granted an administrative motion to relate the three cases. ECF No. 16. On August 9, 2018, the Court consolidated the three cases. ECF No 42. The Court also appointed Plaintiff Andrew Moreau as lead plaintiff in the instant suit. *Id.* In the same order, the Court also appointed lead plaintiff's counsel. *Id.*

On September 28, 2018, Plaintiffs filed a Consolidated Amended Class Action Complaint. *See* Compl. On October 26, 2018, Defendants filed a motion to dismiss the Consolidated Amended Class Action Complaint. *See* Mot. On December 5, 2018, Plaintiffs filed an opposition. ECF No. 52 ("Opp'n"). On December 28, 2018, Defendants filed a reply. ECF No. 53 ("Reply").

**C. Request for Judicial Notice**

In connection with their motion to dismiss, Defendants request judicial notice of five documents, which include (1) a transcript of Aerohive's earnings call for 4Q16, held on February 14, 2017 ("Exhibit 1"); (2) a transcript of Aerohive's earnings call for 2Q17, held on August 2, 2017 ("Exhibit 2"); (3) a copy of Aerohive's quarterly report for 3Q17 on Form 10-Q, filed on November 1, 2017 ("Exhibit 3"); (4) a transcript of Aerohive's earnings call for 3Q17, held on November 1, 2017 ("Exhibit 4"); and (5) a transcript of Aerohive's earnings call for 4Q17, held on

United States District Court
Northern District of California

February 8, 2018 ("Exhibit 5"). ECF No. 49 ("RJN"); *see also* ECF No. 48 ("Roberts Decl.").

"Although generally the scope of review on a motion to dismiss for failure to state a claim is limited to the Complaint, a court may consider evidence on which the complaint necessarily relies if: "(1) the complaint refers to the document; (2) the document is central to the plaintiffs' claim; and (3) no party questions the authenticity of the copy attached to the 12(b)(6) motion." *Daniels–Hall v. Nat'l Educ. Ass'n*, 629 F.3d 992, 998 (9th Cir. 2010) (internal quotation marks and citations omitted). The court may "treat such a document as 'part of the complaint, and thus may assume that its contents are true for purposes of a motion to dismiss under Rule 12(b)(6).'" *Marder v. Lopez*, 450 F.3d 445, 448 (9th Cir. 2006) (quoting *United States v. Ritchie*, 342 F.3d 903, 908 (9th Cir. 2003)).

Defendants contend that all the exhibits were referenced in Plaintiffs' complaint, and thus may be considered under the incorporation by reference doctrine. *See* RJN. Plaintiffs do not object to judicial notice being taken of these documents nor do Plaintiffs otherwise respond to Defendants' request for judicial notice. Here, the complaint refers to the contents of Defendants' quarterly earnings calls that occurred on February 14, 2017, August 2, 2017, November 1, 2017, and February 8, 2018. Compl. ¶¶ 5–6, 10, 34–36, 59–64, 73–76. The complaint also references Aerohive's quarterly report for 3Q17 on Form 10-Q, filed on November 1, 2017. *See id.* ¶¶ 51–58. Accordingly, judicial notice of Exhibits 1–5 is appropriate. The Court therefore GRANTS Defendants' request for judicial notice.

## II.     LEGAL STANDARD

### A.  Motion to Dismiss

Pursuant to Federal Rule of Civil Procedure 12(b)(6), a defendant may move to dismiss an action for failure to state a claim upon which relief may be granted. Because Plaintiffs have brought their claims as a federal securities fraud action, Plaintiffs are not subject to the notice pleading standards under Federal Rule of Civil Procedure 8(a)(2), which require litigants to provide "a short and plain statement of the claim showing that the pleader is entitled to relief." Instead, Plaintiffs must "meet the higher, [more] exacting pleading standards of Federal Rule of

Civil Procedure 9(b) and the Private Securities Litigation Reform Act (PSLRA)." *Or. Pub. Emp. Ret. Fund v. Apollo Group Inc.*, 774 F.3d 598, 603–04 (9th Cir. 2014).

Under Federal Rule of Civil Procedure 9(b), "[i]n alleging fraud or mistake, a party must state with particularity the circumstances constituting fraud or mistake." Plaintiffs must include "an account of the time, place, and specific content of the false representations" at issue. *Swartz v. KPMG LLP*, 476 F.3d 756, 764 (9th Cir. 2007) (internal quotation marks omitted). Rule 9(b)'s particularity requirement "applies to all elements of a securities fraud action." *Apollo Group*, 774 F.3d at 605. "PSLRA imposes additional specific pleading requirements, including requiring plaintiffs to state with particularity both the facts constituting the alleged violation and the facts evidencing scienter." *In re Rigel Pharmaceuticals, Inc. Sec. Litig.*, 697 F.3d 869, 877 (9th Cir. 2012). In order to properly allege falsity, "a securities fraud complaint must . . . specify each statement alleged to have been misleading, [and] the reason or reasons why the statement is misleading." *Id.* (internal quotation marks and alteration omitted). In addition, in order to "adequately plead scienter under the PSLRA, the complaint must state with particularity facts giving rise to a strong inference that the defendant acted with the required state of mind." *Id.* (internal quotation marks omitted).

For purposes of ruling on a Rule 12(b)(6) motion, the Court "accept[s] factual allegations in the complaint as true and construe[s] the pleadings in the light most favorable to the nonmoving party." *Manzarek v. St. Paul Fire & Marine Ins. Co.*, 519 F.3d 1025, 1031 (9th Cir. 2008). Nonetheless, the Court is not required to "'assume the truth of legal conclusions merely because they are cast in the form of factual allegations.'" *Fayer v. Vaughn*, 649 F.3d 1061, 1064 (9th Cir. 2011) (quoting *W. Mining Council v. Watt*, 643 F.2d 618, 624 (9th Cir. 1981)). Mere "conclusory allegations of law and unwarranted inferences are insufficient to defeat a motion to dismiss." *Adams v. Johnson*, 355 F.3d 1179, 1183 (9th Cir. 2004). Furthermore, "'a plaintiff may plead [him]self out of court'" if he "plead[s] facts which establish that he cannot prevail on his . . . claim." *Weisbuch v. Cty. of L.A.*, 119 F.3d 778, 783 n.1 (9th Cir. 1997) (quoting *Warzon v. Drew*, 60 F.3d 1234, 1239 (7th Cir. 1995)).

12

### B. Leave to Amend

Under Rule 15(a) of the Federal Rules of Civil Procedure, leave to amend "shall be freely granted when justice so requires," bearing in mind "the underlying purpose of Rule 15 to facilitate decision on the merits, rather than on the pleadings or technicalities." *Lopez v. Smith*, 203 F.3d 1122, 1127 (9th Cir. 2000) (en banc) (internal quotation marks and alterations omitted). Generally, leave to amend shall be denied only if allowing amendment would unduly prejudice the opposing party, cause undue delay, or be futile, or if the moving party has acted in bad faith. *Leadsinger, Inc. v. BMG Music Publ'g*, 512 F.3d 522, 532 (9th Cir. 2008).

## III. DISCUSSION

Plaintiffs allege two causes of action: (1) violation of § 10(b) of the Exchange Act and Rule 10b-5 against all Defendants, and (2) violation of § 20(a) of the Exchange Act against the Individual Defendants. *See* Compl. at 26–29. The Court addresses each cause of action in turn.

### A. Violation of § 10(b) of the Exchange Act and Rule 10b-5

"To plead a claim under section 10(b) and Rule 10b-5, Plaintiff must allege: (1) a material misrepresentation or omission; (2) scienter; (3) a connection between the misrepresentation or omission and the purchase or sale of a security; (4) reliance; (5) economic loss; and (6) loss causation." *Apollo Group*, 774 F.3d at 603. Defendants argue that Plaintiffs' complaint should be dismissed because (1) the confidential witnesses lack personal knowledge and reliability; (2) the complaint fails to allege a false or misleading statement; and (3) the complaint fails to allege scienter. First, the Court discusses Defendants' challenges to the confidential witnesses and finds that the confidential witnesses' allegations are insufficient. Second, the Court discusses Defendants' alleged misrepresentations and omissions and finds that Plaintiffs have failed to adequately allege actionable misrepresentations or omissions. Although the Court finds below that Plaintiffs' confidential witnesses lack personal knowledge and reliability and that Plaintiffs fail to adequately allege actionable misrepresentations or omissions, in anticipation of an amended complaint, the Court also briefly discusses issues regarding scienter.

### 1. Confidential Witnesses

"[A] complaint relying on statements from confidential witnesses must pass two hurdles to satisfy the PSLRA pleading requirements." *Zucco Partners, LLC v. Digimarc Corp.*, 552 F.3d 981, 995 (9th Cir. 2009), *as amended* (Feb. 10, 2009). "First, the confidential witnesses whose statements are introduced to establish scienter must be described with sufficient particularity to establish their reliability and personal knowledge." *Id.* "Second, those statements which are reported by confidential witnesses with sufficient reliability and personal knowledge must themselves be indicative of scienter." *Id.* As to the first prong, for a confidential witness allegation to be credited at the pleading stage, the confidential witness must be described "with sufficient particularity to support the probability that a person in the position occupied by the source would possess the information alleged." *Id.* (quoting *In re Daou Sys., Inc.*, 411 F.3d 1006, 1015 (9th Cir. 2005). To determine whether a confidential witness has the requisite knowledge, courts look to the "level of detail provided by the confidential sources, the corroborative nature of the other facts alleged (including from other sources), the coherence and plausibility of the allegations, the number of sources, the reliability of the sources, and similar indicia." *Id.* (quoting *Daou*, 411 F.3d at 1015).

Defendants challenge each of the four CWs on the grounds that the complaint fails to allege that the CWs had personal knowledge of Aerohive's 4Q17 external revenue guidance or company-wide performance in 4Q17; that the complaint cannot allege such information because none of the CWs were employed by Aerohive at the time the 4Q17 revenue guidance issued; and that the complaint fails to allege what the CWs did or how they know what they know. Mot. at 8–9. Defendants argue that because the complaint relies so heavily on the CWs, the unreliability of the CWs is fatal to the complaint. *Id.* at 9. The Court agrees that the complaint fails to allege that the CWs had personal knowledge.

In particular, although the complaint lists the CWs' job titles, the Court agrees with Defendants that the complaint is lacking important details about the CWs' employment information, including "his or her job description and responsibilities," or duties. *Zucco*, 552 F.3d

at 996. For instance, the complaint states only of CW1 that he or she was a "former inside sales representative from October 2016 to July 2017." Compl. ¶ 41. CW2 is only described as a "program director who reported directly to Defendant Flynn and General Manager Alan Cuellar Amrod from June 2015 to September 2017." *Id.* ¶ 42. The complaint explains of CW3, only that he or she was an "Aerohive territory manager from August 2015 to September 2017." *Id.* ¶ 43. Finally, CW4 is described only as a "sales operations renewals coordinator from September 2016 to June 2017." *Id.* ¶ 45. At a bare minimum, the Ninth Circuit requires that the complaint describe the confidential witnesses with a "large degree of specificity," including not just the witnesses' job description, but also his or her "responsibilities." *See Daou*, 411 F.3d at 1016. Here, a description of the CWs' "responsibilities" is missing for each CW. This lack of specificity renders them unreliable under *Daou. See, e.g.*, *Applestein v. Medivation, Inc.*, 561 F. App'x 598, 600 (9th Cir. 2014) (affirming district court's finding that the complaint failed to allege with requisite particularity the responsibilities of the CWs and facts supporting an inference that the CWs had personal knowledge of relevant information).

Moreover, without describing the particular responsibilities of each of the CWs, the complaint also fails to adequately allege that the CWs were in a position to have the knowledge they profess. *See Zucco*, 552 F.3d at 995 (stating that the CWs must be described "with sufficient particularity to support the probability that a person in the position occupied by the source would possess the information alleged."). In particular, the complaint does not articulate why CW1 would have knowledge that the partnership with Dell was not fruitful, *see* Compl. ¶ 46, nor does the complaint explain as to CW3 what a territory manager does or why such a manager would be in the position to have knowledge that Aerohive "only had two reps on inside sales making their number[s] and the engineers were sitting around twiddling their thumbs," Compl. ¶ 44. CW3's statement also provides no information about the number of sales representatives in each territory to provide context and specificity to CW3's role and statement. Similarly, there are no facts explaining CW4's "sales operations renewals coordinator" role and whether CW4 was in a position to be personally knowledgeable to be able to assert that everyone "from the CEO on

15

down" was aware of problems with the unbuilding of product and support. *See id.* ¶ 45. Such lack of allegations concerning personal knowledge renders the CWs' statements unreliable. S*ee, e.g.*, *Applestein*, 861 F. Supp. 2d 1037 ("Even if Plaintiffs had provided more complete descriptions of the confidential witnesses, the statements are still unreliable. First, Plaintiffs fail to adequately allege that the confidential witnesses were in a position to have the knowledge they profess. Plaintiffs do not state that any of the confidential witnesses were connected to Organica's work for Medivation; for example, the TAC does not explain what a Senior Technology Engineer does and why someone in that position would have knowledge about the Dimebon pills produced for the Phase 2 study."); *Weiss v. Amkor Tech., Inc.*, 527 F. Supp. 2d 938, 955 (D. Ariz. 2007) ("The Court notes that the SAC does generally describe the CWs job titles; however, the SAC fails to allege facts showing how the CWs possess the information attributed to them, that the CWs were involved in Amkor's forecasting process or that the CWs were in a position to possess knowledge about the forecasting process.").

Finally, although CW2 was alleged to report directly to Defendant Flynn and General Manager Amrod, CW2's statements make no mention of Flynn or Amrod. *Id.* ¶ 42. Instead, CW2's statements are about Ron Gill, Aerohive's newly hired Vice President of Americas Sales, and how Gill "was too quick to cut E-Rate experienced sales personnel." However, the complaint does not allege that CW2 was in a position to be personally knowledgeable about Gill's actions. Moreover, this statement is an opinion by CW2 which makes it unhelpful to the inquiry as to what Aerohive knew. *See, e.g., In re Downey Sec. Litig.*, No. CV 08-3261-JFW (RZx), 2009 WL 2767670, at *11 10 (C.D. Cal. Aug. 21, 2009) ("[T]he second-guessing of management decisions by confidential witnesses does not provide a basis for securities fraud.").

In sum, the Court finds that, as currently alleged, the CWs lack personal knowledge and reliability because the complaint lacks important details about the CWs employment information, including "his or her job description and responsibilities," as per *Zucco* and *Daou*.

## 2. False or Misleading Statement

Plaintiffs allege that between November 1, 2017 and January 16, 2018, Defendants made a

number of false or misleading statements or omissions in Aerohive's 3Q17 Form 10-Q and 3Q17 Earnings Call. Compl. ¶¶ 17, 51, 59. Defendants argue that Defendants' statements are nonactionable because, among other things, they are true and not misleading and not accompanied by sufficient allegations. Defendants also argue that statement 7 is a forward-looking statement protected by the PSLRA's "Safe Harbor" Provision. The Court address Defendants' challenges to each of the statements in turn and finds that none of the alleged misrepresentations or omissions are actionable.

### a. Failure to Allege Falsity

To assert a claim under the PSLRA, the plaintiff must plead with particularity, inter alia, the element of falsity. *Zucco*, 552 F.3d at 990–91. "The PSLRA has exacting requirements for pleading 'falsity.'" *Metzler Inv. GMBG v. Corinthian Colleges, Inc.*, 540 F.3d 1049, 1070 (9th Cir. 2008). To satisfy these "exacting requirements," a plaintiff must plead "specific facts indicating why" the statements at issue were false. *Id.*; *Ronconi v. Larkin*, 253 F.3d 423, 434 (9th Cir. 2001) ("Plaintiffs' complaint was required to allege specific facts that show" how statements were false). Moreover, to be actionable, a statement must be false "at [the] time by the people who made them." *Ronconi*, 253 F.3d at 430. "The fact that [a] prediction proves to be wrong in hindsight does not render the statement untrue when made." *In re VeriFone Sec. Litig.*, 11 F.3d 865, 871 (9th Cir. 1993).

Plaintiffs largely challenge Defendants' statements for being false or misleading because, according to Plaintiffs, Defendants knew but omitted material information concerning sales personnel issues and sales strategy failures. *see* Opp'n at 14–15. Thus, Plaintiffs largely do not contest that Defendants' statements are technically true, but instead Plaintiffs argue that the statements are incomplete.

However, as the United States Supreme Court has held, "§ 10(b) and Rule 10b-5(b) do not create an affirmative duty to disclose any and all material information." *Matrixx Initiatives, Inc. v. Siracusano*, 563 U.S. 27, 44–45 (2011) (citing 17 C.F.R. § 240.10b-5(b)). Indeed, "[s]ilence, absent a duty to disclose, is not misleading under Rule 10b-5." *Basic Inc. v. Levinson*, 485 U.S.

17

224, 239 n. 17 (1988). Rather, "[t]o be actionable under the securities laws, an omission must be misleading." *Brody v. Transitional Hosps. Corp.*, 280 F.3d 997, 1006 (9th Cir. 2002). That is to say the omission "must affirmatively create an impression of a state of affairs that differs in a material way from the one that actually exists." *Id.* "[T]o fulfill the materiality requirement 'there must be a substantial likelihood that the disclosure of the omitted fact would have been viewed by the reasonable investor as having significantly altered the 'total mix' of information made available.'" *Basic*, 485 U.S. at 231–32 (quoting *TSC Indus., Inc. v. Northway, Inc.*, 426 U.S. 438, 449 (1976)).

Below, the Court focuses specifically on pleading deficiencies with regards to challenged statements 1-6.

### i. Statements 1 and 2

Statement 1 is a statement in the 3Q17 Form 10-Q regarding Aerohive's "expect[ation]" that it would "continue to invest" in the organization and that Aerohive is "investing to increase [its] sales capacity as well as [its] channel program." Compl. ¶ 52. Statement 2 is a statement in the 3Q17 Form 10-Q regarding Aerohive's "significantly slower pace of order volume" attributable to "slower pace of funding approvals under the federal E-Rate Program." *Id.* ¶ 54. Plaintiffs contend that these statements omit information because "Defendants replaced knowledgeable, experienced sales personnel and implemented cost-cutting measures that left the sales organization understaffed and ill-equipped to service existing customers and develop new opportunities." *Id.* ¶ 53. As for the E-Rate Program statement, Plaintiffs assert that Defendant should have also told investors that Defendants had fired sales personal specializing in the E-Rate Program. *Id.* ¶ 55.

Plaintiffs' claims regarding the falsity of these statements are not legally sufficient for several reasons. First, although Plaintiffs complain that Aerohive did not provide more complete statements, it is well-settled that the securities laws prohibit "*only* misleading and untrue statements, not statements that are incomplete." *Police Retirement Sys. of St. Louis v. Intuitive Surgical* ("*Intuitive Surgical*"), 759 F.3d 1051, 1061 (9th Cir. 2014). In *Intuitive Surgical*,

18

plaintiffs alleged that a series of statements were false or misleading because the defendant did not "detail[ ] that system placement was declining because of market saturation and the economic downturn, that new Systems were being purchased at higher utilization rates, and that [product] growth was declining faster than anticipated." *Id.* The Ninth Circuit held that such allegations were not false or misleading because "Rule 10b–5 prohibits 'only misleading and untrue statements, not statements that are incomplete.'" *Id.* (*quoting Brody*, 280 F.3d at 1006 (emphasis in original)).

Here, similar to *Intuitive Surgical*, Plaintiffs allege that statements 1 and 2 were false or misleading because they provided an incomplete picture of Aerohive's sales personnel issues. Yet to "survive a motion to dismiss under the heightened pleading standards of the [PSLRA], the plaintiffs' complaint must specify the reason or reasons why the statements made by [the defendant] were misleading or untrue, not simply why the statements were incomplete." *Brody*, 280 F.3d at 1006. Thus, even accepting Plaintiffs' allegation that the statements at issue were incomplete, Plaintiffs must still specify why the statements were misleading or untrue. Here, Plaintiffs' claims regarding statements 1 and 2 are insufficient because they fail to specify why the statements were misleading or untrue.

Moreover, Aerohive did disclose sales personnel issues. Indeed, Aerohive disclosed sales organization turnover in that same document—the 3Q17 Form—of which this Court has taken judicial notice. For instance, Aerohive wrote:

> We have experienced in the past higher than normal turn-over, especially amongst our sales and engineering personnel, and continue to replace personnel where we think needed to improve our operations and product development capabilities and processes. We also continue to replace personnel as part of our ongoing performance and expense management initiatives. Turn-over is highly disruptive to our operations and has had and could continue to have an adverse effect on our revenue

ECF No. 48, Ex. 3 ("3Q17 Form 10-Q") at 45. Therefore, Aerohive discloses exactly what Plaintiffs claim Aerohive omitted. *See, e.g., Paskowitz v. Pac. Capital Bancorp*, No. CV 09-6449 ODW (JCx), 2009 WL 4911850, at *5 (C.D. Cal. Nov. 6, 2009) (finding statements not misleading where information "actually disclosed").

19

Third, although many of Plaintiffs' allegations hinge on the allegation that Aerohive was "understaffed," Plaintiffs only vaguely discuss the fact that some staff were fired, some left, and some new employees were brought in to replace those who had left. *See, e.g.*, Compl. ¶¶ 41, 44, 53. However, Plaintiffs do not provide allegations that quantify the actual staffing problems, which makes it difficult to understand the severity of the problem or whether that actually had an impact on revenue. Similarly, Plaintiffs do not articulate specific information about the sales personnel that were involved with the E-Rate program. Without this information, it is difficult to assess the falsity of Defendants' statements. *See, e.g.*, *In re Silicon Graphics Inc. Sec. Litig.*, 183 F.3d 970, 985 (9th Cir. 1999) (affirming dismissal where allegations lacking "specifics" invited the court to "speculate" as to the "severity of the problems"), *superseded by statute on other grounds*; *Ronconi*, 253 F.3d at 434 ("Plaintiffs' complaint was required to allege specific facts to show how these 'problems' and 'difficulties' translated into decreasing revenues. It fails to do so."); *see also, e.g.*, *In re Copper Mountain Sec. Litig.*, 311 F. Supp. 2d 857, 867–68 (N.D. Cal. 2004) ("[W]ithout sufficient detail regarding the amount of reductions in customer orders, it is not possible to know the scope of the impact of such reductions on CM's business and thus whether the projected revenues and earnings would be impossible to meet. And without knowing the precise timing of such reductions, it is impossible to discern whether defendants were aware of the alleged problems at the times they made their revenue and earnings projections."); *In re Vantive Corp. Sec. Litig.*, 283 F.3d 1079, 1086–87 (9th Cir. 2002) ("[T]he complaint leaves unclear what it would mean for Vantive to "adequately train" an employee, what "sufficient numbers" of hires would be, or what it means for "a substantial percentage of people to quit."), *abrogation on other grounds recognized by Gebhart v. S.E.C.*, 595 F.3d 1034 (9th Cir. 2010).

Similarly, Plaintiffs' allegations regarding losing E-Rate business are also vague and conclusory because Plaintiffs do not specifically explain the losses to the E-Rate business. *See, e.g.*, *In re Vantive Corp.*, 283 F.3d at 1087 ("Even when the complaint eventually indicates that 'Vantive's sales cycles were lengthening substantially,' the complaint gives no indication of what it means for a sales cycle to lengthen 'substantially,' or what the actual length of the cycle was at

20

the time of the statement."). Finally, to the extent that Plaintiffs rely on the accounts of CWs to support Plaintiffs' allegations regarding falsity, as discussed above, the Court has found the accounts of the CWs insufficient.

For the reasons stated above, the Court finds that, with respect to statements 1 and 2, Plaintiffs fail to plead falsity as required by the PSLRA. Therefore, the Court GRANTS Defendants' motion to dismiss as to these statements. Because granting Plaintiffs an additional opportunity to amend the complaint would not be futile, cause undue delay, or unduly prejudice Defendants, and because Plaintiffs have not acted in bad faith, the Court grants leave to amend. *See Leadsinger, Inc.*, 512 F.3d at 532.

### ii. Statements 3 and 4

Statement 3 is a statement in the 3Q17 Form 10-Q regarding the Aerohive Connect and Aerohive Select program offerings and the fact that the "program may reduce [Aerohive's revenue], or the rate of [Aerohive's] revenue growth, as purchasers take advantage of the lower entry pricing for [Aerohive's] products. In addition, it may be difficult and take time for [Aerohive] to adjust expenses sufficiently to compensate for a shortfall in revenue, even when we may anticipate the shortfall." Compl. ¶ 56. Plaintiffs contend that this statement was false or misleading because Defendants already knew that "the transition to Aerohive Connect and Aerohive Select was experiencing significant setbacks that would impact revenues in the fourth quarter." *Id.* ¶ 57.

Statement 4 is a statement in the 3Q17 Form 10-Q that noted that the introduction of Aerohive's HiveManager NG resulted in "elongated sales cycles." *Id.* ¶ 58. Plaintiffs argue that this statement was false or misleading because Defendants did not disclose that they "lacked adequate systems and internal controls to accurately project sales and revenues." *Id.*

Plaintiffs' claims regarding the falsity of statements 3 and 4 are not legally sufficient. First, Plaintiffs' allegations about the falsity of these statements relies on information from CW4 and CW2, whom the Court found to be lacking personal knowledge and reliability. Second, like with statements 1 and 2, Plaintiffs fail to specify why statements 3 and 4 were "misleading or untrue"

as opposed to "incomplete," *Brody*, 280 F.3d at 1006, especially when challenged statement 3 cautioned investors about potential problems with the Aerohive Connect and Aerohive Select program itself, and when Aerohive disclosed in 3Q17 Form 10-Q that "[i]t is difficult for us to forecast our future operating results" or engage in "accurate financial planning." 3Q17 Form 10-Q at 33; *see Intuitive Surgical*, 759 F.3d at 1061 ("[T]o be actionable under the securities laws, an omission must be misleading . . . it must affirmatively create an impression of a state of affairs that differs in a material way from the one that actually exists." (citation omitted)). Third, the factual allegations regarding any failures with the Aerohive Connect and Aerohive Select program do not meet particularity requirements because the complaint does not provide details about the severity of the problems with the Aerohive Connect and Aerohive Select program, including the revenue impact of customers who were not converting to service subscriptions, the timing of such actions, as well as what "substantial discounts" means. *See, e.g.*, *In re Silicon Graphics*, 183 F.3d at 985 (affirming dismissal where allegations lacking "specifics" invited the court to "speculate" as to the "severity of the problems"); *Ronconi*, 253 F.3d at 434 ("Plaintiffs' complaint was required to allege specific facts to show how these 'problems' and 'difficulties' translated into decreasing revenues. It fails to do so.").

Similarly, Plaintiffs' allegations regarding statement 4 are vague because Plaintiffs just state in a conclusory manner that the sales projections were constantly overinflated but did not explain precisely what that meant. *See, e.g.*, *In re Vantive Corp.*, 283 F.3d at 1087 ("Even when the complaint eventually indicates that 'Vantive's sales cycles were lengthening substantially,' the complaint gives no indication of what it means for a sales cycle to lengthen 'substantially,' or what the actual length of the cycle was at the time of the statement.").

For the reasons stated above, the Court finds that, with respect to statements 3 and 4, Plaintiffs fail to plead falsity as required by the PSLRA. Therefore, the Court GRANTS Defendants' motion to dismiss as to these statements. The Court finds that granting Plaintiffs an additional opportunity to amend the complaint would not be futile, cause undue delay, or unduly prejudice Defendants, and that Plaintiffs have not acted in bad faith. *See Leadsinger, Inc.*, 512

F.3d at 532. Therefore, the Court grants leave to amend.

### iii. Statement 5

Statement 5 is a statement in the 3Q17 Earnings Call made by Defendant Flynn regarding the fact that Aerohive "continue[s] to strengthen our go-to-market, both through our full OEM relationship with Dell EMC and through the initiative we launched at the start of this year to pivot to a more channel-centric go-to-market model to improve our sales efficiency and better address the mid-market." *Id.* ¶ 59. The statement also included information that sales leader Wilburn departed Aerohive, and that "[h]aving successfully restructured my leadership team under a COO organization, paired with a unified products and marketing organization, I now have the capacity to take on global sales leadership to drive this critical initiative working directly with our 3 theater sales leaders." *Id.* Finally, Flynn also said: "Our results demonstrate that we are steadily improving our operating efficiency while positioning ourselves to resume growth." *Id.* Plaintiffs argue this statement fails to disclose that: (1) the Aerohive Connect and Aerohive Select program and the partnership with Dell were not delivering expected returns; (2) the "*de facto*" abandonment of the education sector and the E-Rate program "was negatively impacting revenues"; (3) "Defendants implemented severe cost cutting measures to create the appearance of operating efficiency and disguise shortfalls in revenue;" (4) Defendants replaced knowledgeable, experienced sales personnel and left the sales organization understaffed; and (5) Wilburn departed in part, due to dysfunction in the sales organization. *Id.* ¶ 60.

However, Plaintiffs' claims regarding the falsity of statement 5 are not legally sufficient for many of the same reasons that plague statements 1–4. First, Plaintiffs have failed to plead sufficient facts in support of their allegations about the sales personnel issues as well as issues pertaining to the E-Rate program and the Aerohive Connect and Aerohive Select program. *See* discussion *supra*, at III.A.2.a.i & ii. Second, Plaintiffs' argument that Wilburn's departure was due to dysfunction of the sales organization is not supported by any further facts, including an allegation about the source of the information. Indeed, Plaintiffs do not state that information was gathered from a CW. Third, the portion of the statement about restructuring of the leadership team

23

in February 2017 under a COO organization is "quite literally true." *See, e.g.*, *Colyer v. Acelrx Pharmaceuticals, Inc.*, No. 14-CV-04416-LHK, 2015 WL 7566809, at *6 (N.D. Cal. Nov. 25, 2015). Therefore, by definition, it is not misleading. *See Brody*, 280 F.3d at 1006. Thus, the Court finds that, with respect to statement 5, Plaintiffs fail to plead falsity as required by the PSLRA. Therefore, the Court GRANTS Defendants' motion to dismiss this statement. Because granting Plaintiffs an additional opportunity to amend the complaint would not be futile, cause undue delay, or unduly prejudice Defendants, and because Plaintiffs have not acted in bad faith, the Court grants leave to amend. *See Leadsinger, Inc.*, 512 F.3d at 532.

### iv. Statement 6

Statement 6 is a statement in the 3Q17 Earnings Call made by Defendant Ritchie that made references to "sales efficiency" and "sales productivity." *Id.* ¶ 61. In particular, the statement reflected that Aerohive had seen significant improvements in efficiency "as non-GAAP sales and marketing costs came in at $14.4 million or 39% of revenue in Q3, down $1.5 million from $15.9 million recognized in the second quarter." *Id.* Plaintiffs allege that the statement is false or misleading because "Aerohive's sales force was neither productive nor efficient, and Defendants merely had implemented severe cost cutting measures to create the appearance of operating efficiency and to disguise shortfalls in revenue." *Id.* ¶ 62.

However, Plaintiffs' claims regarding the falsity of statement 6 are not legally sufficient because, as even Plaintiffs admit in their opposition, the "sales efficiency and productivity metrics were technically accurate." Opp'n at 8. Although statement 6 is literally true, Plaintiffs still fault this statement for being misleading. *Id.* at 16. In particular, Plaintiffs want further information about how Defendants had "cost-cut their way to success." *Id.* However, the Court finds that Plaintiffs' allegations regarding Defendants' purported sales execution failures lack particularity to support the assertion that Defendants' statements were misleading. *See, e.g.*, *In re Silicon Graphics*, 183 F.3d at 985 (affirming dismissal where allegations lacking "specifics" invited the court to "speculate" as to the "severity of the problems"). Without further information about the severity of the problems, it is difficult to assess whether Defendants' technically true statement

was still misleading. Accordingly, the Court GRANTS Defendants' motion to dismiss statement 6. The Court grants leave to amend because the Court finds that Plaintiffs have not acted in bad faith and that granting Plaintiffs an additional opportunity to amend the complaint would not be futile, cause undue delay, or unduly prejudice Defendants. *See Leadsinger, Inc.*, 512 F.3d at 532.

### b. Forward-Looking Statements Safe Harbor

Finally, Statement 7 is a statement in the 3Q17 Earnings Call made by Defendant Ritchie on November 1, 2017 that "[w]e are currently expecting Q4 revenue in the range of $40 million to $42 million." Compl. ¶ 63. Plaintiffs claim this statement was false or misleading because it was not coupled with additional information about Aerohive's performance. *Id.* ¶ 64. Plaintiffs also challenge this November 1, 2017 statement as being overstated because, as made clear in January 16, 2018, the revenue for Q417 turned out to be $37 million. *Id.* ¶¶ 64, 71. Defendants argue this statement is protected by the PSLRA's "Safe Harbor" Provision. Mot. at 19–20.

Under the PSLRA's "Safe Harbor" Provision, "forward-looking statements" are not actionable as a matter of law if they are identified as such and accompanied by "meaningful cautionary statements identifying important facts that could cause actual results to differ materially from those in the forward looking statement." *See* 15 U.S.C. § 78u–5(c)(1)(A)(i). A forward-looking statement is "any statement regarding (1) financial projections, (2) plans and objectives of management for future operations, (3) future economic performance, or (4) the assumptions 'underlying or related to' any of these issues." *No. 84 Employer–Teamster Joint Council Pension Trust Fund v. Am. W. Holding Corp.*, 320 F.3d 920, 936 (9th Cir. 2003) (citing 15 U.S.C. § 78u5 (i)). When a statement includes both forward-looking and non-forward-looking statements, the challenged statements still fall within the safe harbor as forward-looking if, when "examined as a whole, the challenged statements relate[] to future expectations and performance." *Intuitive Surgical*, 759 F.3d at 1059 (*citing In re Cutera Sec. Litig.*, 610 F.3d 1103, 1111 (9th Cir. 2010)).

"[I]f a forward-looking statement is identified as such and accompanied by meaningful cautionary statements, then the state of mind of the individual making the statement is irrelevant, and the statement is not actionable regardless of the plaintiff's showing of scienter." *In re Cutera*,

610 F.3d at 1112. Alternatively, if a forward-looking statement is not identified as a forward-looking statement or is unaccompanied by meaningful cautionary statements, then the statement is actionable only if the plaintiff proves that the forward-looking statement "was made with actual knowledge . . . that the statement was false or misleading." 15 U.S.C. § 78u–5(c)(1)(B).

Here, the Court agrees with Defendants that statement 7's revenue forecast is, by definition, forward looking under the PSLRA because it is a "statement containing a projection of revenues." *See* 15 U.S.C. § 78u–5(i)(1)(A). Plaintiffs' insistence that Defendants' revenue projection be evaluated as a mixed statement, Opp'n at 17–18, is incorrect. Importantly, *In re Quality Sys., Inc. Sec. Litig.*, 865 F.3d 1130, 1146–47 (9th Cir. 2017), is distinguishable because in that case, the statements at issue consisted not just of predictions, but were "support[ed]," "at the same time," with statements such as that "greenfield opportunities are plentiful" and that the pipeline is "growing" and that "there's nothing out of character in the pipeline that we're reporting today versus what we have seen there in the past couple of years." The connections between these statements and the prediction was explicit. Here, by contrast, the statement Plaintiffs challenge is only a revenue prediction. *See* Compl. ¶ 63. Plaintiffs do not explain how that statement is explicitly mixed with other statements regarding Wilburn's departure or sales personnel issues, among other things. *See id.* ¶ 64.

Moreover, statement 7 was accompanied by "meaningful cautionary statements identifying important facts that could cause actual results to differ materially from those in the forward looking statement." *See* 15 U.S.C. § 78u–5(c)(1)(A)(i). For instance, at the beginning of the call, Aerohive warned investors that the call would contain "forward-looking statements" that involve a "number of risks and uncertainties," and that investors should reference the "Risk Factors and Management's Discussion and Analysis of Financial Condition and Results of Operations in our recent annual report on Form 10-K and quarterly report on Form 10-Q." ECF No. 48, Ex. 4 ("3Q17 Earnings Call") at 2. In the 3Q17 Form 10-Q, Defendants had warned that "the timing and size of sales," were "highly variable"; that Aerohive had "slowing rate of [ ] revenue growth" that "may continue, and may even become negative"; that Aerohive had experienced a "higher than

normal turn-over, especially amongst our sales and engineering personnel"; that "[t]urn-over is highly disruptive to our operations and has had and could continue to have an adverse effect on [Aerohive's] revenue"; and that "the lower-level of E-Rate funded transactions and lengthier sales cycle associated with our HiveManager NG [(Aerohive's next generation of cloud networking platform)] offering continued to affect our revenue opportunities and operating results in 2017." 3Q17 Form 10-Q at 22, 33, 35, 46. Plaintiff argues that Defendants' cautionary statements are "boilerplate," but similar language has already been held sufficient by the Ninth Circuit. Indeed, in *In re Cutera*, the cautionary language was that "these prepared remarks contain forward-looking statements concerning future financial performance and guidance," that "management may make additional forward-looking statements in response to[ ] questions," and that factors like the defendant's "ability to continue increasing sales performance worldwide" could cause variance in the results. 610 F.3d at 1112. The Ninth Circuit held that "[defendant] affirmatively warned that its ability to compete and perform in the industry depended on the ability of its sales force to sell products to new customers and upgraded products to current customers, and that failure to attract and retain sales and marketing personnel would materially harm its ability to compete effectively and grow its business." *Id.* Here, Defendants' warnings contained language similar to that in *In re Cutera*, but also made even more specific warnings about the turnover of sales personnel and adverse effects on revenue.

Finally, the Court rejects Plaintiffs' argument to the extent it relies on statements from CWs because, as discussed above, the CWs lack personal knowledge and their statements are unreliable. *See* Opp'n at 19.

In sum, the Court finds that Plaintiffs have not adequately alleged that statement 7 was false or misleading. The Court grants leave to amend because the Court finds that Plaintiffs have not acted in bad faith and that granting Plaintiffs an additional opportunity to amend the complaint would not be futile, cause undue delay, or unduly prejudice Defendants. *See Leadsinger, Inc.*, 512 F.3d at 532.

### 3. Scienter

Although the Court grants Defendants' motion to dismiss because none of the allegedly false or misleading statements are actionable, in anticipation of an amended complaint, the Court briefly addresses Defendants' argument about scienter.

In order to survive a motion to dismiss, Plaintiffs' complaint must also create a strong inference of scienter. *See* 15 U.S.C. § 78u–4(b)(2) ("[The complaint must] state with particularity facts giving rise to a strong inference that the defendant acted with the required state of mind."). With respect to the strong inference requirement, the Ninth Circuit has stated that "[a] strong inference of scienter must be more than merely plausible or reasonable—it must be cogent and at least as compelling as any opposing inference of nonfraudulent intent." *Reese v. Malone*, 747 F.3d 557, 569 (9th Cir. 2014), *overruled on other grounds by City of Dearborn Heights Act 345 Police & Fire Ret. Sys. v. Align Tech., Inc.*, 856 F. 3d 605 (9th Cir. 2017). As to the meaning of "scienter," the Ninth Circuit has held that a plaintiff's complaint must show that "the defendants made false or misleading statements either intentionally or with deliberate recklessness." *Zucco*, 552 F.3d at 990–91 (internal quotation marks omitted). "[F]acts showing mere recklessness or a motive to commit fraud and [the] opportunity to do so" are insufficient. *Id.* "To meet this pleading requirement, the complaint must contain allegations of specific contemporaneous statements or conditions that demonstrate the intentional or the deliberately reckless false or misleading nature of the statements when made." *Ronconi*, 253 F.3d at 432 (internal quotation marks and citation omitted). When an omission is at issue, "the plaintiff must plead a highly unreasonable omission, involving not merely simple, or even inexcusable negligence, but an extreme departure from the standards of ordinary care, and which presents a danger of misleading buyers or sellers that is either known to the defendant or is so obvious that the actor must have been aware of it." *Zucco*, 552 F.3d at 991 (internal quotation marks omitted).

In the Ninth Circuit, courts must determine first "whether any of the plaintiff's allegations, standing alone, [are] sufficient to create a strong inference of scienter." *In re NVIDIA Corp. Sec. Litig.*, 768 F.3d 1046, 1056 (9th Cir. 2014). If none is sufficient alone, the court must "then

Case No. 18-CV-00435-LHK
ORDER GRANTING MOTION TO DISMISS WITHOUT PREJUDICE

consider the allegations holistically to determine whether they create a strong inference of scienter taken together." *Id.* Under this holistic determination, scienter is adequately pled if "all of the facts alleged, taken collectively, give rise to a strong inference of scienter." *Intuitive Surgical*, 759 F.3d at 1061–62.

Here, Plaintiffs argue that they have adequately pled scienter through (1) various CW statements when viewed holistically; (2) that scienter can be inferred based on Defendants' positions within the company; and (3) that Wilburn's resignation supports an inference of scienter. Opp'n at 21–23. Defendants argue that Plaintiffs have failed to adequately allege scienter because (1) the absence of state of mind allegations undermines an inference of scienter; (2) the existence of "problems" does not support a strong inference of scienter; (3) Wilburn's departure does not support a strong inference of scienter; (4) voluntary disclosures undermine inference of scienter; and (5) the absence of motive allegations undermines inference of scienter. Mot. at 20–25.

The Court need not consider all of the parties' arguments because the Court found all of the statements non-actionable above; however, the Court provides a few comments. First, as explained above, the CW statements as alleged currently lack reliability because Plaintiffs have not provided enough information about the CWs' responsibilities. *See* II.A.1. Therefore, to the extent Plaintiffs allegations of scienter are based on the CWs statements, more information as to the CWs must be pled. Second, as already discussed, Plaintiffs argument that Wilburn's departure was due to dysfunction in the sales organization is not supported by any further facts, including an allegation about the source of that information. *See* II.A.2.a.iii. Finally, the Court agrees with Defendants that Plaintiffs' allegations fall flat, particularly because of the deficiencies with the CWs, when it comes to demonstrating what Flynn and Ritchie knew. *See, e.g.*, *In re Apple Computer, Inc.*, 127 F. App'x 296, 302 (9th Cir. 2005) ("Although plaintiffs attach the witness summaries of several confidential witnesses that demonstrate the engineers at Apple knew there were production problems with the Cube, again these witness statements do not establish exactly what Jobs knew, nor when he knew it, to allege that Jobs knew his predictions were false when he made them."). Accordingly, any amended complaint shall cure the scienter deficiencies that the

Court has identified as well as any deficiencies properly identified by the Defendants in their motion.

### B.  Violation of § 20(a) of the Exchange Act

Congress has established liability in § 20(a) for "[e]very person who, directly or indirectly, controls any person liable" for violations of the securities laws.  15 U.S.C. § 78t(a). To prove a prima facie case under Section 20(a), a plaintiff must prove: (1) "a primary violation of federal securities law;" and (2) "that the defendant exercised actual power or control over the primary violator." *See Howard v. Everex Sys., Inc.*, 228 F.3d 1057, 1065 (9th Cir. 2000). Because Plaintiffs have failed to plead a primary securities law violation, Plaintiffs have also failed to plead a violation of Section 20(a). *See In re Cutera*, 610 F.3d at 1113 n. 6. Accordingly, Defendants' motion to dismiss Plaintiffs' claim under Sections 20(a) is also GRANTED. Because granting Plaintiffs an additional opportunity to amend the complaint would not be futile, cause undue delay, or unduly prejudice Defendants, and Plaintiffs have not acted in bad faith, the Court grants leave to amend. *See Leadsinger, Inc.*, 512 F.3d at 532.

## IV.    CONCLUSION

For the foregoing reasons, Defendants' motion to dismiss Plaintiffs' complaint in its entirety is GRANTED without prejudice. Should Plaintiffs choose to file an amended complaint, they must do so within 30 days of this Order. Failure to do so, or failure to cure the deficiencies addressed in this Order, will result in dismissal of Plaintiffs' claims with prejudice. Plaintiffs may not add new claims or parties without leave of the Court.

**IT IS SO ORDERED.**

Dated: February 5, 2019

*Lucy H. Koh*
_____
LUCY J. KOH
United States District Judge

Case No. 18-CV-00435-LHK
ORDER GRANTING MOTION TO DISMISS WITHOUT PREJUDICE