Jennifer Pafiti (SBN 282790)
**POMERANTZ LLP**
468 North Camden Drive
Beverly Hills, CA 90210
Telephone:     (818) 532-6499
E-mail: jpafiti@pomlaw.com

*Counsel for Plaintiff*

[*Additional counsel on signature page*]

**UNITED STATES DISTRICT COURT**
**NORTHERN DISTRICT OF CALIFORNIA**

| | |
|---|---|
| JACOB MCGOVNEY, Individually and on Behalf of All Others Similarly Situated,<br><br>Plaintiff,<br><br>vs.<br><br>AEROHIVE NETWORKS, INC., DAVID K. FLYNN, and JOHN RITCHIE,<br><br>Defendants | Case No. 18-CV-00435-LHK<br><br>**CONSOLIDATED SECOND AMENDED CLASS ACTION COMPLAINT FOR VIOLATION OF THE FEDERAL SECURITIES LAWS**<br><br>JURY TRIAL DEMANDED |

Lead Plaintiff Andrew Moreau ("Plaintiff"), individually and on behalf of all other persons similarly situated, by his undersigned attorneys, for his second amended complaint against Defendants (defined below), alleges the following based upon personal knowledge as to himself and his own acts, and information and belief as to all other matters, based upon, *inter alia*, the investigation conducted by and through his attorneys, which included, among other things, a review of the Defendants' public documents, conference calls and announcements made by Defendants, United States Securities and Exchange Commission ("SEC") filings, wire and press releases published by and regarding Aerohive Networks, Inc. ("Aerohive" or the "Company"), analysts' reports and advisories about the Company,

1

and information readily obtainable on the Internet. Plaintiff believes that substantial evidentiary support will exist for the allegations set forth herein after a reasonable opportunity for discovery.

## NATURE OF THE ACTION

1. This is a federal securities class action on behalf of a class consisting of all persons other than Defendants who purchased or otherwise acquired Aerohive common shares between November 1, 2017 and January 16, 2018, both dates inclusive (the "Class Period"). Plaintiff seeks to recover compensable damages caused by Defendants' violations of the federal securities laws and to pursue remedies under Sections 10(b) and 20(a) of the Securities Exchange Act of 1934 (the "Exchange Act") and Rule 10b- 5 promulgated thereunder.

2. Founded in 2006, Aerohive has designed and developed a cloud networking platform and portfolio of products that enable customers to manage their network systems and to collect and analyze data from users. Aerohive services the healthcare, education, manufacturing, distribution, and retail industries throughout the United States, Europe, the Middle East, and Asia. The Company is headquartered in Milpitas, California, and its stock trades on the New York Stock Exchange ("NYSE") under the ticker symbol "HIVE."

3. Despite its claims that the Company "lead[s] in innovation" and is "often imitated by the competition," Aerohive has struggled to achieve profitability. During 2016, the Company reported that it had encountered some difficulties in the education sector, which historically, generated nearly 40 percent of the Company's revenues. In particular, uncertainties surrounding the Schools and Libraries Program overseen by the Federal Communications Commission, also known as the "E-Rate" program, which provides discounts to educational institutions to purchase technology and internet access, were a growing concern for the Company. In addition, the Company launched the next generation of its cloud networking platform, HiveManager NG, which, due to delays in product updates, was creating what the

2

Company called "elongated sales cycles" while customers waited for features and capabilities to be added.

4.     By year end 2016, Defendants faced increasing pressure to prove that Aerohive was a real player in the industry. Consequently, in or around January 2017, Defendants announced major changes to Aerohive's sales organization and strategy, which Defendants assured investors would improve the pace and execution of the Company's sales, thereby driving revenues and profitability. These changes included, among other things, (1) installing new sales leadership; (2) "unbundling" Aerohive's product and service offerings; and (3) growing the Company's business with Dell, one of its key strategic partners.

5.     Throughout 2017, Defendants repeatedly assured investors that the Company was on track and that these changes were working.  For instance, during an investor conference call in August 2017, Defendant Flynn touted that the "unbundled" products, Aerohive Connect and Aerohive Select, "provided disruptive entry pricing and a seamless software upgrade," which "enabl[ed] us to recruit over 600 new resellers in the first half of the year."  Defendant Flynn dismissed the existence of any problems in the sales organization, emphasizing that the changes "will drive increased revenue and sales efficiency."  Defendant Flynn also highlighted that "Dell continues to be material" and "we continue to make progress … We have expansion with them."

6.     During the November 1, 2017 investor conference call to discuss the Company's third quarter 2017 results, Defendant Flynn announced the departure of Vice President of Sales Thomas Wilburn and confidently declared that "[h]aving successfully restructured my leadership team under a COO organization paired with a unified products and marketing organization, I now have the capacity to take on global sales leadership to drive this crucial initiative …"  Similarly, Defendant Ritchie assured investors that the Company had overcome any challenges and was "in a much better position to

3

more accurately forecast our revenue."  Consequently, Defendants promised that "We are currently expecting Q4 revenue in the range of $40 to $42 million"

7.     In actuality, and unbeknownst to investors, Defendants already knew – and indeed, had known and/or recklessly disregarded for months – that Aerohive's guidance was unreliable and overstated, and the Company could never deliver that fourth quarter result. As an initial matter, Aerohive's sales organization was in turmoil. The changes in sales leadership were disastrous: unexpected lay-offs of experienced, well-liked personnel, who were replaced with management's former colleagues from an Aerohive competitor, decimated morale and triggered a massive employee exodus by the Summer of 2017.  By the Fall of 2017, the majority of Aerohive's sales force had been with the Company less than a year and was ill-equipped to close sales efficiently and to service existing customers.

8.     In addition, Aerohive failed to implement adequate sales systems to ensure accountability and accuracy of forecasts. Thus, sales frequently failed to close on time, and contrary to Defendants' statements, there was no indication that purported "elongated sales cycles" were shortening during the second half of 2017.  One former Aerohive employee stated that sales quotas were so unrealistic and sales projections so inflated that only two of his colleagues were on target to reach their objectives by year-end 2017.

9.     Moreover, the attempt to shift away from the E-Rate program had been so poorly executed that even existing E-Rate business suffered, and not just because there were administrative problems with the program as Defendants contended. Because E-Rate-experienced representatives were abruptly fired, no one was trained to step in and continue developing those accounts.  In fact, at least one former employee noted that education customers stopped identifying Aerohive as a preferred vendor, and gains in the education sector made through the Company's strategic partner, Dell, had been

almost entirely wiped out.  The *de facto* abandonment of a line of business comprising nearly 40 percent of the Company's revenues made it virtually impossible to achieve fourth quarter targets.

10.     The transition to Aerohive Connect and Aerohive Select was also not "seamless." Rather, many existing customers, who previously received service and support for free, refused to renew their service contracts without receiving steep discounts.

11.     Finally, the Company's business with Dell remained flat and could not compensate for failures to execute in other areas.

12.     Defendants ultimately resorted to cost-cutting measures in an attempt to disguise these shortfalls in revenue and deliver more promising results.    But the cost-cutting proved counterproductive, instead leaving the sales organization understaffed, under-resourced, and unprepared to drive growth.

13.     Nevertheless, on January 16, 2018, after market close, Aerohive announced that it "expects net revenue for the fourth quarter to be approximately $37 million, which is **below the Company's previously stated guidance of $40 million to $42 million.**"  (Emphasis added.)  Aerohive attributed the reduced guidance to "underlying sales execution issues," which Defendants claimed had only been discovered in December 2017.

14.     On this news, Aerohive's share price fell $1.63, or 28.6%, to close at $4.07 on January 17, 2018, damaging investors.

15.     On February 8, 2018, during the fourth quarter 2017 earnings conference call, Defendants attempted to explain the purportedly-undetectable "sales execution issues," stating that, *inter alia*:

> I think the primary issue was we were operating with sales forecasts that,
> obviously, substantiated the guidance we had given and we have seen
> normal linearity. And they had a projected close for what was going to
> happen in December and then just fully closed substantially less than
> what was the projection. So I think the execution issues were not

5

adequately assessing the realistic close date and the probability of close inside the quarterly window, which led to bad forecasting. And so, as I said, we have closed a number of those deals since then in the first weeks of 2018, which was – that's encouraging, indicating that in fact much of this was timing. But that kind of forecast and accuracy is a pretty serious execution problem that we have to fix.

16.    However, the underlying issues in the sales organization, including but not limited to rapid employee departures, inadequate sales forecasting systems, abandonment of E-Rate, and problems with product transitions, made it readily apparent months earlier that Aerohive's guidance was unrealistic.  In the words of one former employee, "[Defendants] should have known; it was written all over the walls."

17.    Consequently, throughout the Class Period, Defendants made materially false and misleading statements regarding the Company's business, operations, and expected financial results. Specifically, Defendants made false and/or misleading statements and/or failed to disclose that: (i) Aerohive had uncovered sales execution issues at the Company by mid-year 2017 and before the end of the third quarter of 2017; (ii) consequently, Aerohive's revenue guidance for the fourth quarter of 2017 was overstated; and (iii) as a result, Aerohive's public statements were materially false and misleading at all relevant times.

18.    As a result of Defendants' wrongful acts and omissions, and the precipitous decline in the market value of the Company's common shares, Plaintiff and other Class members have suffered significant losses and damages.

## JURISDICTION AND VENUE

19.    The claims asserted herein arise under and pursuant to §§10(b) and 20(a) of the Exchange Act (15 U.S.C. §§78j(b) and §78t(a)) and Rule 10b-5 promulgated thereunder by the SEC (17 C.F.R. §240.10b-5).

20.     This Court has jurisdiction over the subject matter of this action under 28 U.S.C. §1331 and §27 of the Exchange Act.

21.     Venue is proper in this Judicial District pursuant to §27 of the Exchange Act (15 U.S.C. §78aa) and 28 U.S.C. §1391(b).  The Company's principal executive offices are located within this Judicial District.

22.     In connection with the acts, conduct and other wrongs alleged in this Complaint, Defendants, directly or indirectly, used the means and instrumentalities of interstate commerce, including but not limited to, the United States mail, interstate telephone communications and the facilities of the national securities exchange.

## PARTIES

23.     Plaintiff, as previously set forth, purchased Aerohive common shares at artificially inflated prices during the Class Period and was damaged upon the revelation of the alleged corrective disclosure.

24.     Defendant Aerohive is incorporated in California, and the Company's principal executive offices are located at 1011 McCarthy Boulevard, Milpitas, California 95035.  Aerohive's common stock trades on the NYSE under the ticker symbol "HIVE."

25.     Defendant David K. Flynn ("Flynn") has served as the Company's Chief Executive Officer ("CEO") since July 2007, as its President since November 2007 and as its Chairman since July 2013.

26.     Defendant John Ritchie ("Ritchie") has served as the Company's Chief Financial Officer ("CFO") and Senior Vice President since September 2015, and as its Chief Operating Officer ("COO") since February 2017.

27.     The Defendants referenced above in ¶¶ 25-26 are sometimes referred to herein as the "Individual Defendants."

28.     The Individual Defendants, because of their positions with the Company, possessed the power and authority to control the contents of Aerohive's reports to the SEC, press releases and presentations to securities analysts, money and portfolio managers and institutional investors, i.e., the market. The Individual Defendants were provided with copies of the Company's reports and press releases alleged herein to be misleading prior to, or shortly after, their issuance and had the ability and opportunity to prevent their issuance or cause them to be corrected. Because of their positions and access to material non-public information available to them, the Individual Defendants knew that the adverse facts specified herein had not been disclosed to, and were being concealed from, the public, and that the positive representations which were being made were then materially false and/or misleading. The Individual Defendants are liable for the false statements pleaded herein.

## SUBSTANTIVE ALLEGATIONS

### A.     Background

29.     Founded in 2006, Aerohive designs and develops cloud networking and enterprise Wi-Fi solutions that enable customers to manage their network systems and to collect and analyze data.  The Company's products include hardware, such as routers and switches, network management and data collection applications, and maintenance and support services.  Aerohive claims that it has sold to over 30,000 end-user customers (*i.e.*, organizations holding licenses to products and/or software subscriptions or services) in the Americas, Europe, the Middle East, Africa, and Asia Pacific in the education, retail, healthcare, and hospitality industries, among others.

30.     Aerohive reaches most of its end-user customer base through "channel partners," who are authorized to resell, distribute, and service Aerohive's technology platform.  These channel partners are supported by Aerohive's sales organization, which is comprised of regional sales offices and inside sales teams. Aerohive's sales representatives also are responsible for identifying and selling directly to

new accounts, especially state and local governments in the education sector.  In addition, Aerohive boasts that a "strategic alliance" with Dell materially contributes to the Company's revenues.

31.     Through 2016, Aerohive appeared to be headed in a positive direction.  Although it faced intense competition from industry giants, such as Cisco, its main platform, HiveManager, and related wireless technology, were considered cutting-edge and were well-received by end-users.  The Company also capitalized on a government-funded program known as E-Rate, which provides subsidies to schools, libraries, and educational institutions to purchase technology, in order to increase public sector sales and expand its customer base.  By the end of 2016, approximately 40 percent of Aerohive's revenues came from the education sector; roughly half of those revenues were attributable to the E-Rate program.

32.     Despite its potentially disruptive technology and promising year-over-year increases in revenue from 2013 through 2016, Aerohive had never achieved profitability. By the end of 2016, analysts repeatedly emphasized that the Company needed to reach this important benchmark in order to maintain the value of its common stock.

### B.    Aerohive Overhauls Its Sales Organization To Achieve Profitability

33.     Aerohive had to overcome several obstacles to meet expectations in 2017.  Defendants acknowledged that the Company had become overly dependent on E-Rate to close education sales, and the Company needed to diversify its customer base.  At the same time, Aerohive changed its product offerings, launching a new version of its networking platform called HiveManager NG, as well as a lower-priced, entry-level option called Aerohive Connect.  Defendants acknowledged that changes in the product line were creating "elongated sales cycles" as delays in updates and capabilities caused customers to wait longer for new features to roll out.

34.     However, during an investor conference call in February 2017, Defendants assured investors that the Company was "taking tangible actions to improve [its] growth trajectory."  First,

Defendants announced new sales leadership, which would "strengthen[ ] [Aerohive's] organization to drive improved execution," especially as it related to shortening sales cycles.  Specifically, Aerohive announced that it hired Ron Gill as Vice President of Americas Sales, who previously worked for Ruckus, one of Aerohive's competitors.  Gill reported to Thomas J. Wilburn, who served as Senior Vice President, Worldwide Field Operations since April 2015 and who possessed extensive experience in technology and networking sales and marketing. Aerohive also added Alan Amrod, another industry veteran, in order to make the organization "faster and more nimble."  Under this new structure, Defendant Flynn stated that he would "continue to directly manage sales, marketing, and products."

35.     Second, the launch of Aerohive Connect was lauded as a key component to expanding and diversifying the Company's customer base away from the E-Rate program.  Aerohive Connect was intended as a "catalyst" that would drive sales by offering a low cost introduction, with additional features and upgrades that could be purchased as part of Aerohive Select, a subscription service that would generate deferred revenues on a going-forward basis.

36.     When asked whether these shifts in sales and marketing would affect the sales force, Defendant Flynn stated: "I think you're specifically saying, will be need to hire more salespeople to deal with the elongated sales cycle, and the answer is no."

37.     During a separate investor conference call, Defendant Ritchie similarly stated: "We left sales [expenses] mostly untouched because we do think, fundamentally, technology companies don't cost-cut their way to success.  So we didn't want to do anything that would prohibit growth in the future."

38.     Throughout 2017, Defendants continued to emphasize that their re-alignment of the sales organization was a success.  On May 3, 2017, Defendant Flynn reported: "The organizational changes we made have dramatically improved our pace and quality of execution on NG.  This has gone a long

10

way towards accelerating our transition to NG and improving our sales cycles.  This improved product execution is also leading to increased energy and results from our sales force …"

39.     Defendant Flynn concluded: "In summary, we believe that the major challenges that affected our results began in the second half of 2016, are now behind us.  In Q1, we saw that our most recent changes have led to improved execution and operational efficiency.  We believe we are now back on a more positive trajectory and are poised to resume year-over-year growth in the second half of 2017."

**C.    Multiple Confidential Witnesses Confirm That Aerohive Concealed Fatal Flaws In Its Sales Strategy Throughout 2017**

40.     Contrary to Defendants' statements, and unbeknownst to investors, Defendants' plan to achieve profitability by overhauling the sales organization showed signs of failing almost immediately. According to several former Aerohive sales employees, the purported "sales execution issues" that Defendant Flynn cited in February 2018 as the reason for missing revenue projections in the last quarter of 2017 were readily apparent by at least mid-year 2017, and consequently, Defendants knew and/or recklessly disregarded the fact that their revenue guidance was overstated.

41.     First, rather than stemming the flow of talent, the installation of new sales leadership – and replacement of well-liked sales personnel – actually had the opposite effect, and departures accelerated beginning in January 2017.  The abrupt resignation of Senior Director of Inside Sales Timothy Balistreri and loss of CMO/CSO David Greene, both respected leaders within the sales force, in conjunction with layoffs of existing Aerohive sales representatives in favor of VP Ron Gill's hiring of former colleagues from Ruckus, an Aerohive competitor, ultimately hurt morale.

42.     CW1 was a former Sales Operations Renewals Coordinator at Aerohive from September 2016 to June 2017.  CW1 initially reported to the Director of Worldwide Sales Operations and Business, and ultimately reported to the Director of Sales, Eddie Ramirez.  As a member of the

11

Company's Sales Operations Division, CW1 was responsible for reorganizing Aerohive's renewals business, introducing standardized discounts for relationship partners, and developing and growing relationships with resellers.   In particular, CW1 was responsible for supporting the Company's relationship with Synnex, a channel partner, and provided guidance to the renewals desk on partner renewals and quotes, and coordinated training for renewing contracts.   In the course of CW1's duties, CW1 worked directly with Aerohive's sales team, regional sales managers and upper management to build and implement a more robust system for renewing the Company's sales contracts.

43.     According to CW1, on or about January 2017, Aerohive terminated half the members of its sales organization or 30 sales employees from a staff of, at least, 60 people.   CW1 also recounted that Aerohive's decision to increase revenues by offering a lower-priced product, Aerohive Connect, and then upsell a service subscription package, Aerohive Select, was plagued with problems from the outset because new equipment included free support automatically, and the free support never expired. This practice had been going on for nearly a decade, and CW1 states that Aerohive discovered this practice in November or December 2016.

44.     CW1 further stated that most customers were provided with free support for four or more years instead of the expected six to nine months, and this free support service cost the Company hundreds of thousands of dollars a year.   CW1 knows these facts because CW1 was responsible for formulating solutions to rectify this problem.   According to CW1, Defendant Flynn knew that the Company provided unlimited free support to customers because he worked very closely with the Vice President of Sales Operations and Head of Customer Support, and these managers knew about the negative impact that unlimited free support had on the Company's bottom line.   Ultimately, sales teams were allowed to offer steep discounts on service contract renewals in order to secure deals, thereby generating lower-than-expected revenues.

12

45.     CW2 was an inside sales territory manager on the commercial sales team at Aerohive from January 2016 to June 2017.  CW2 was responsible for building relationships with the Company's channel partners in Texas, Oklahoma, Louisiana and Arkansas.  CW2 managed the Company's existing sales accounts in these states, and secured new customer relationships by contacting potential customers via the telephone and then following up with in person meetings.  CW2 sold the Company's wireless solutions to customers in the manufacturing, industrial, healthcare, assisted living, and financial services industries.  CW2 confirmed CW1's account regarding a mass exodus of employees in the beginning of 2017.  CW2 stated that after Ron Gill was hired as Vice President of Sales for the Americas in the beginning of 2017, half the inside territory managers, or 6 out of a total of 12, left the Company.

46.     CW3 served as an Opportunity Development Representative ("ODR") in Aerohive's inside sales department from October 2016 to July 2017.  From July 2017 to September 2017, CW3 was rehired by the Company as a Sales Operation Business Analyst.  As an ODR, CW3 qualified business leads and found meetings for the Company's inside and outside sales representatives.  CW3 collaborated with the inside and outside sales representatives to identify target accounts, filter inbound leads, and cold called or emailed potential clients from established target lists.  CW3 also utilized customized campaigns to build sales relationships, recruited customers from Aerohive's booths at various conferences and trained resellers regarding how to pitch the Company's solutions to potential customers.

47.     CW3 stated that in the summer of 2017, the Company abruptly laid off an overwhelming majority of ODRs, including CW3, and there were only 2 ODRs out of a team of 9 that remained at the Company.  The layoffs were precipitated by the Company's decision to shift away from its E-Rate business.

13

48.     Similarly, CW4, Aerohive's K-12 programs director who reported directly to Defendant Flynn and the Senior Vice President and General Manager of Products and Marketing, Alan Cuellar Amrod, from June 2015 to September 2017, confirmed that Aerohive and the Individual Defendants dramatically cut E-Rate-experienced sales personnel, who were responsible for generating nearly 40 percent of the Company's revenue.   As Aerohive's K-12 program director, CW4 is a self-described expert for the Company's E-Rate program in terms of sales strategy as well as compliance with federal and local rules.   CW4 was responsible for growing Aerohive's education-segmented sales, and focused on building relationships with educational institutions that purchased networking infrastructure equipment from the Company.   In June 2015, CW4 developed Aerohive's E-Rate 2.0 sales plan, which sought to take advantage of the public funding available to help schools modernize their Wi-Fi networks.

49.     Initially, CW4 was tasked with growing Aerohive's E-Rate business to $100 million over two years, and CW4 believes that the Company was on the path to achieving that goal until it abruptly shifted its focus away from public sector sales to commercial contracts.   CW4 stated that many sales teams' members lacked education-sales experience, and following the layoffs in early 2017, Aerohive did not have the resources to train employees to grow the E-Rate business.   As a result, CW4 asserts that the E-Rate business declined from $32.4 million in 2017 to $23.35 million in 2018.   As the Company's expert for the E-Rate program, CW4 directly attributes the sudden fall in the Company's E-Rate business to a lack of expertise caused by the dramatic cuts in the sales department in early 2017.

50.     CW4 also asserted that the premature firing of Aerohive's E-Rate representatives meant that no one was around to support Dell's business, and the Company lost ground it had gained in E-Rate through that channel.   According to CW4, Aerohive helped Dell grow its E-Rate business by 68 percent in 2016, but by the end of 2017, Dell had lost 72% of that business due to lack of adequate support from Aerohive.

51.     CW5, was an inside sales territory manager on the commercial sales team at Aerohive from August 2015 to September 2017.  CW5 had nine people on the inside sales team and interfaced with two outside sales representatives.   As a regional inside sales territory manager, CW5 was responsible for managing the Company's sales in Texas, Louisiana and Arkansas in collaboration with CW2's separate team.  CW5 grew channel relationships, managed direct client engagement, closed deals, and directly engaged with the Company's clients in an effort to pitch wireless solutions and provide architectural guidance.  CW5 also managed the inside sales team's productivity and finances, represented the Company at tradeshows and presented to the Company's c-level executives at boardroom events.   Like many other CWs, CW5 confirmed that Aerohive experienced an unprecedented level of attrition in the middle of 2017.  According to CW5, six of the nine members of CW5's inside sales team left the Company in the middle of 2017, and by the end of Fall 2017, the majority of the Company's 30 to 35 regional sales managers had been with the Company less than a year, and these new managers did not understand Aerohive's products well enough to sell them deftly.

52.     CW5 recalled that Aerohive released a less-than-exciting iteration of its wireless networking switch in 2016, which was followed by an equally deficient update in 2017, and the lackluster reviews of this product also compromised the Company's ability to meet its sales goals as the product was increasingly returned by customers.  Second, Aerohive's failure to implement a system that ensured accuracy and predictability in forecasting sales revenues compounded the employee turnover and weak product problems.

53.     CW5 further explained that because sales quotas had become unrealistic and there was little accountability, representatives frequently inflated their projections, and deals almost never closed when promised.   CW5 stated that Craig Lockwood, Aerohive's Director of Commercial Sales, forecasted sales figures based on deals that closed in the last two weeks of the quarter.  According to CW5, Lockwood had a substance abuse disorder, and he would remain away from the office for most of

15

the quarter, and returned to the office in the final two weeks of each quarter.  When Lockwood returned to the office, sales employees would show him deals that were lined up in the final weeks of the quarter, and Lockwood would forecast sales figures based on that information and report back to Gill, who shared these figures with the executive leadership.  CW5 stated that sales quotas were so unrealistic and sales projections so inflated that only two of his colleagues were on target to reach their objectives by year-end 2017.

54.    CW5 described Aerohive as a small Company where the Individual Defendants worked from a second floor office that was only one hundred feet from the sales staff.  CW5 explained that both the commercial and the public sector sales teams had two 42-inch televisions mounted prominently in each of the two sales sections, and these televisions displayed a leaderboard for each team.  The leaderboard showed sales projections, internal rankings, deals closed to date, and expected closings. The Individual Defendants had access to the leaderboard.  According to CW5, the Individual Defendants visited the teams each week and commented on the sales teams' progress and internal rankings.

55.    These CW accounts confirm that although Defendants Flynn and Ritchie recognized that they could not "cost-cut their way to success" and promised that they "didn't want to do anything that would prohibit growth in the future," they nevertheless approved dramatic cuts in the Company's sales force well before the beginning of the Class Period and knew facts to show that problems associated with the Company's corporate strategy, sales projections, and product development were already having a seriously negative impact on the Company's business and financial outlook.

56.    Moreover, during investor conference calls throughout 2017, Defendants proudly reported declines in expenses without disclosing that these cuts were taking a toll on the organization that would inhibit revenue growth and prevent the Company from achieving its targets.

57.     However, the "sales execution" issues identified by the Individual Defendants at the tail end of the Class Period surfaced well before the last month of the fourth quarter of 2017, and undoubtedly were known to Defendants by the time that Vice President of Sales Thomas Wilburn left the Company.  As CW3 stated: "[Defendants] should have known; it was written all over the walls."

58.     As set forth herein, Defendants knew and/or recklessly disregarded all indications that the Company was unlikely to achieve its revenue targets and that its revenue projections were therefore overstated.

## MATERIALLY FALSE AND MISLEADING STATEMENTS ISSUED DURING THE CLASS PERIOD

59.     The Class Period begins on November 1, 2017, when Aerohive filed a quarterly report for the period ended September 30, 2017 on a Form 10-Q with the SEC ("3Q 2017 10-Q"), which was signed by Defendants Flynn and Ritchie, and which stated the Company's reported financial results and financial position.  The 3Q 2017 10-Q contained signed certifications by Defendants Flynn and Ritchie, stating that the financial information contained in the Form 10-Q was accurate and that they disclosed any material changes to the Company's internal control over financial reporting.

60.     In the 3Q 2017 10-Q, Defendants disclosed: "We also expect to continue to invest in our organization and our channel and strategic partnerships to meet the needs of our customers and to pursue opportunities in new and existing markets. ***In particular, we are investing to increase our sales capacity as well as our channel program.***"

61.     The statement identified in paragraph 60 was materially false and misleading when made because it omitted to disclose that (a) Aerohive dramatically reduced its entire sales staff by 50% months before the Class Period began, (b) Aerohive's decision to shift away from education-sales and lay off experienced education-sales related personnel caused the E-Rate business to decline by over $9

17

million, and (c) Aerohive's channel program was negatively impacted by a weak product launch and the Company's failure to accurately forecast sales revenues.

62.     With respect to sales in the education sector, Defendants stated that "significantly slower pace of order volume" was attributable to "slower pace of funding approvals under the federal E-Rate program."

63.     The statement identified in paragraph 62 was materially false and misleading when made because (a) Aerohive laid off sales personnel specializing in the education sector and E-Rate program, who were responsible for generating nearly 40 percent of the Company's revenues, (b) the remaining personnel lacked education-sales experience to grow the E-Rate business, and, as a result (c) the Company's E-Rate business declined from $32.4 million to $23.5 million in 2018.

64.     With respect to the transition to Aerohive Connect and Aerohive Select, Defendants stated:

> In May 2017, we announced that our Aerohive Connect and Select offerings are available across our entire portfolio of access points and switches. We believe that separating our product line into these two offerings delivers compellingly priced cloud-managed hardware for connectivity-oriented deployments and enables us to capture more subscription and software license revenue from those customers who require a more advanced feature set and support. This program ___may___ reduce our revenue, or the rate of our revenue growth, as purchasers take advantage of the lower entry pricing for our products. In addition, it ___may___ be difficult and take time for us to adjust expenses sufficiently to compensate for a shortfall in revenue, even when we may anticipate the shortfall.

65.     The statements identified in paragraph 64 were materially false and misleading when made because (a) Aerohive provided free support to customers for four or more years instead of the expected six to nine months, and this free support caused the Company to absorb hundreds of thousands of dollars a year in losses, and (b) Aerohive sought to rectify the problem by offering steep discounts on service contract renewals, which ultimately generated lower-than-expected revenues.

66. In addition, the 3Q 2017 10-Q noted that the introduction of Aerohive's HiveManager NG resulted in "elongated sales cycles," which affected revenue opportunities and operating results.

67. The statement identified in paragraph 66 was materially false and misleading when made because the Company's revenue opportunities and operating results were negatively impacted by (a) lackluster reviews of a wireless networking switch that was increasingly returned by customers, and (b) sale representatives routinely inflated their sales projections in the last two weeks of the quarter, and these projections were ratified by a habitually absent Director of Commercial Sales, who suffered from a substance abuse disorder.

68. The 3Q 2017 10-Q also contained the following materially misleading statements regarding the Company's future ability to attract and retain talent, and the prospective effect of unidentified turn-over on the Company's operations:

> Our future success also depends on our ability to continue to attract, integrate and retain highly skilled personnel, especially skilled executives and sales and engineering employees. ***We have experienced in the past higher than normal turn-over, especially amongst our sales and engineering personnel, and continue to replace personnel where we think needed to improve our operations and product development capabilities and processes.*** We also continue to replace personnel as part of our ongoing performance and expense management initiatives. ***Turn-over is highly disruptive to our operations and has had and could continue to have an adverse effect on our revenue.***
>
> ****
>
> ***Any failure to successfully attract, integrate or retain qualified personnel to fulfill our current or future needs may negatively impact our growth.*** Also, to the extent we hire personnel from our competitors, we may be subject to allegations that we have improperly solicited these employees, that they have divulged to us proprietary or other confidential information of their former employers, or that their former employers own their inventions or other work product. This may expose us to significant liability and litigation risk

69. The statements identified in paragraph 68 were materially false and misleading when made because they omitted to disclose that (a) Aerohive's then-existing dramatic cuts to sales personnel

already had a negative impact on the Company's financial outlook months before the beginning of the Class Period, and (b) Aerohive had already failed at the time to retain "qualified personnel to fulfill [its] current or future needs." To the extent that the Company sought to dribble out negative information with the half-truth that "[t]urn-over . . . has had or could continue to have an adverse effect on our revenue," this half-truth was materially misleading because (a) Aerohive failed to disclose the full scale of the problems associated with its dramatic layoffs and its failed business strategy, and (b) Aerohive made materially inconsistent statements when the Company told investors that it would not "cost-cut [its] way to success."

70. Post-market on November 1, 2017, Defendants held a conference call with investors and analysts to discuss its financial results for the period ended September 30, 2017 and expectations for the fourth quarter of 2017 (the "Q3 2017 Call"). During the Q3 2017 call, Defendant Flynn touted Aerohive's sales team and operating efficiency, and discussed Aerohive's sales efficiency, stating in pertinent part:

> In parallel, we continued strengthen our go-to-market, both through our full OEM relationship with Dell EMC and through the initiative we launched at the start of this year to pivot to a more channel centric go-to-market model to improve our sales efficiency and better address the mid-market. The foundation of this plan was the launch of our Connect to Select offering and the launch of a number of channel recruitment and development initiatives.

> Our sales leader, Tom Wilburn's strength and passion is around larger enterprise direct touch business. So when we launched this initiative in Q1, he augmented his team with channel centric sales leaders who built much of Ruckus' channel as well as new leadership in APAC. With this new program and team, we recruited 600 new resellers in the first half of the year and added 300 more in Q3 … Now with this team in place and the program on the right trajectory, Tom has decided to move on to pursue opportunities that better align with his prefer to go-to-market model.

> ***Having successfully restructured my leadership team under a COO organization paired with a unified products and marketing organization, I now have the capacity to take on global sales leadership***

*to drive this critical initiative working directly with our three feeder sales leaders.*

\* \* \*

I am encouraged by the significant progress of our product delivery and this has given Dell EMC the confidence in us to expand into a full OEM relationship. ***Our results demonstrate that we are steadily improving our operating efficiency while positioning ourselves to resume growth.***

(Emphases added.)

71.    The statements identified in paragraph 70 were false and misleading and/or omitted material information, because as set forth herein, *inter alia*, (a) the launch of Aerohive Connect and Aerohive Select and Aerohive's strategic partnership with Dell were not delivering expected returns, (b) the *de facto* abandonment of the education sector and the E-Rate program, which historically comprised nearly 40 percent of the Company's revenues, was negatively impacting revenues, (c) Defendants implemented severe cost cutting measures to create the appearance of operating efficiency and to disguise shortfalls in revenue, and (d) Defendants replaced knowledgeable, experienced sales personnel with former Ruckus employees, leaving the sales organization understaffed and ill-equipped to service existing customers and develop new opportunities.  In addition, Defendants knew but failed to disclose that Tom Wilburn's departure was due, in part, to dysfunction in the sales organization, including but not limited to, failures to retain experienced sales personnel, boost revenues, and successfully execute the Company's sales strategy.

72.    Nevertheless, reinforcing Defendant Flynn's statements, Defendant Ritchie touted Aerohive's "sales efficiency" and "sales productivity," stating in pertinent part:

***We realized significant sales efficiency with our non-GAAP sales and marketing costs*** coming in at 39% of revenue driving this important metric to under 40% on a year-to-date basis.

\* \* \*

During the quarter, we saw significant improvements in our sales efficiency as non-GAAP sales and marketing costs came in at $14.4

21

million or 39% of revenue in Q3, down $1.5 million from $15.9 million recognized in the second quarter. ***We are encouraged by several metrics that point to improved sales productivity.*** For the third quarter in a row, we have reported year-over-year decline in sales and marketing expenses. In addition, for the last two quarters and also on a year-to-date basis, our sales and marketing costs as a percentage of revenue were sub-40%.

(Emphases added.)

73.     These statements were false and misleading and/or omitted material information, because as set forth herein, Aerohive's sales force was neither productive nor efficient, and Defendants merely had implemented severe cost cutting measures to create the appearance of operating efficiency and to disguise shortfalls in revenue.

74.     Defendant Ritchie further stated: "We are currently expecting Q4 revenue in the range of $40 million to $42 million."

75.     The statement identified in paragraph 75 was materially false and misleading and/or omitted material information, because it failed to disclose the following adverse facts pertaining to the Company's business, operational and financial results, which were known to Defendants or recklessly disregarded by them. Specifically, Defendants made false and/or misleading statements and/or failed to disclose that: as set forth herein, *inter alia*, (a) the launch Aerohive Connect and Aerohive Select and Aerohive's strategic partnership with Dell were not delivering expected returns, (b) the *de facto* abandonment of the education sector and the E-Rate program, which historically comprised nearly 40 percent of the Company's revenues, was negatively impacting revenues, (c) Defendants implemented severe cost cutting measures to create the appearance of operating efficiency and to disguise shortfalls in revenue, (d) Defendants replaced knowledgeable, experienced sales personnel with former Ruckus employees, leaving the sales organization understaffed and ill-equipped to service existing customers and develop new opportunities, (e) Aerohive was aware of "sales execution issues" at the Company by at least mid-year 2017 and before the end of the third quarter of 2017, and (f) consequently, Aerohive's

revenue guidance for the fourth quarter of 2017 was overstated.  As a result, Aerohive's public statements were materially false and misleading at all relevant times.

## ADDITIONAL SCIENTER ALLEGATIONS

76.    In addition to the allegations set forth herein, each of the following demonstrates Defendants' scienter:

77.    The Individual Defendants, as directors and/or officers of Aerohive during the Class Period, are liable as direct participants in all of the wrongs complained of herein. Through their positions of control and authority, these Defendants were in a position to, and did, control all of the Company's false and misleading statements and omissions, including the contents of SEC filings and press releases, as set forth herein.

78.    As alleged herein, Defendants acted with scienter in that they knew, or at least recklessly disregarded that the public documents and statements issued or disseminated by Defendants in the name of the Company were materially false and misleading; they knew that such statements or documents would be issued or disseminated to the investing public; and they knowingly and substantially participated or acquiesced in the issuance or dissemination of such statements or documents as primary violations of federal securities laws.  The state of mind of Aerohive's senior management, including but not limited to the Individual Defendants, is imputed to Aerohive.

79.    With respect to Defendant Flynn, in addition to his experience, high level position, and access to information, Defendant Flynn stated during investor conference calls that he was directly responsible for the Company's sales organization, and multiple confidential witnesses confirm that he participated in sales meetings and received regular updates from sales management. Consequently, Defendant Flynn knew and/or recklessly disregarded that, *inter alia*, the strategy to overhaul Aerohive's sales organization and launch new product offerings was failing; knowledgeable and experienced employees were leaving at unprecedented levels; E-Rate business was threatened due to poor service

and abandonment of the channel; and revenues generated through the Company's relationship with Dell remained flat.  Consequently, Defendant Flynn knew and/or recklessly disregarded that the Company's revenue guidance for the fourth quarter of 2017 were overstated and unattainable.

80.    CW5 described Aerohive as a small Company where the Individual Defendants worked form the second floor office that was only a hundred feet away from the sales staff.  CW5 stated that both the commercial and the public sector sales teams had two 42-inch televisions mounted prominently in each of the sales sections, and these televisions showed a leaderboard for each team that displayed sales projections, internal rankings, deals closed to date, and expected closings.  CW5 confirmed that the Individual Defendants visited the teams each week and commented on the sales teams' progress and internal rankings.  In other words, the Individual Defendants monitored the Company's sales performance on an ongoing basis in real time.

81.    Wilburn's abrupt departure at the end of the third quarter of 2017 is further evidence of Defendants' scienter.  As head of the sales organization through October 2017, Wilburn was responsible for executing Aerohive's sales strategy and therefore by mid-2017, knew and/or recklessly disregarded that the Company was not on track to meet its guidance for the fourth quarter of 2017 for the reasons explained herein.  At a minimum, any purported "sales execution issues" were and/or should have been known to Defendants when Wilburn resigned from the Company.

82.    Furthermore, because the E-Rate program historically comprised nearly 40 percent of the Company's revenues, and because the Company's ability to meet revenue guidance was materially impacted by business in the education sector, education-sales and the E-Rate program constitute as a "core operation" of the Company, and the Defendants cannot credibly claim that they were unaware that, *inter alia*, (1) knowledgeable and experienced E-Rate sales representatives were fired or left the Company; (2) many education clients stopped identifying the Company as a preferred provider, and (3) revenues generated from the education sector were declining because the Company failed to devote the

24

necessary resources to develop and maintain that business.   As a result, Defendants knew and/or recklessly disregarded that the Company would not meet its revenue guidance.

## THE TRUTH BEGINS TO EMERGE

83.     On January 16, 2018, post-market, Aerohive issued a press release entitled "Aerohive Networks Announces Preliminary Fourth Quarter 2017 Financial Results," revealing that it "expects net revenue for the fourth quarter to be approximately $37 million, which is ***below the Company's previously stated guidance of $40 million to $42 million.***"  (Emphasis added.)  Aerohive attributed the reduced guidance to "underlying sales execution issues" uncovered at the end of the third quarter, stating in pertinent part:

> MILPITAS, Calif.--(BUSINESS WIRE)--Aerohive Networks™ (NYSE: HIVE) today announced preliminary results for the fourth quarter ended December 31, 2017.
>
> * * *
>
> - Aerohive® expects net revenue for the fourth quarter to be approximately $37 million, which is below the Company's previously stated guidance of $40 million to $42 million.
>
> * * *
>
> "We delivered non-GAAP operating profitability in our fourth quarter but were disappointed that our revenue was below our prior guidance," stated David Flynn, President and Chief Executive Officer. "***Following the change in our sales leadership at the end of our third quarter, we uncovered underlying sales execution issues*** which became fully apparent in the last month of the fourth quarter. We have taken actions to replace underperforming sales team members, and we believe that the new people we have been putting in place, combined with other actions, will enable us to capitalize on our improved product offering and exciting roadmap in 2018."

(Emphasis added.)

84.     On this news, Aerohive's share price fell $1.63, or 28.6%, to close at $4.07 on January 17, 2018, damaging investors.

85.    On February 8, 2018, during an investor conference call, Defendant Flynn attempted to explain the alleged "sales execution issues" that resulted in the Company's missed earnings.  According to Defendant Flynn:

> "[Aerohive] had experienced typical order linearity in October and November, but as December progressed, orders came in well below forecast and frankly, this was due to poor execution within our sales organization, including in part overoptimistic assessments of closed dates for deals in the pipeline.

86. Defendant Ritchie elaborated:

> I think some of our sales execution issues that we took action around where there were some people that weren't enabling and developing those VARs as effectively as we would have liked them to have been to drive growth. I think we've engaged a lot of VARs and they certainly are contributing, but we would have expected them to contribute. Part of that is people have to – people there may be more used to more direct touch selling. We need to change their motion and their behavior to be more channel-centric or, in some of these cases, we needed to bring in people that know how to really develop the VARs more effectively. So that's an ongoing effort.

87.    One analyst asked: "I want to understand the sales execution issues a little bit before. Because what's not really reconciling is the comment that linearity in the first two months of the quarter was kind of as expected and then the issues uncovered in the last month of the quarter. So can you provide a little bit more detail as to kind of what was being over-modeled or what the underlying issue was? And then exactly how you've addressed that on a go-forward basis?

88.    Defendant Ritchie further responded:

> Yeah. I think the primary issue was we were operating with sales forecasts that, obviously, substantiated the guidance we had given and we have seen normal linearity. And they had a projected close for what was going to happen in December and then just fully closed substantially less than what was the projection. So I think the execution issues were not adequately assessing the realistic close date and the probability of close inside the quarterly window, which led to bad forecasting. And so, as I said, we have closed a number of those deals since then in the first weeks of 2018, which was – that's encouraging, indicating that in fact much of

26

this was timing. But that kind of forecast and accuracy is a pretty serious execution problem that we have to fix.

89.     Although Defendants acknowledged the seriousness of the purported "execution issues" during the call, these issues were known and/or recklessly disregarded by Defendants by mid-year 2017 and before the announcement of Aerohive's third quarter 2017 financial results and projections for the fourth quarter of 2017.

90.     As a result of Defendants' wrongful acts and omissions, and the precipitous decline in the market value of the Company's common shares, Plaintiff and other Class members have suffered significant losses and damages.

## PLAINTIFF'S CLASS ACTION ALLEGATIONS

91.     Plaintiff brings this action as a class action pursuant to Federal Rule of Civil Procedure 23(a) and (b)(3) on behalf of a Class, consisting of all those who purchased or otherwise acquired Aerohive common shares traded on the NYSE during the Class Period (the "Class"); and were damaged upon the revelation of the alleged corrective disclosures. Excluded from the Class are Defendants herein, the officers and directors of the Company, at all relevant times, members of their immediate families and their legal representatives, heirs, successors or assigns and any entity in which Defendants have or had a controlling interest.

92.     The members of the Class are so numerous that joinder of all members is impracticable. Throughout the Class Period, Aerohive common shares were actively traded on the NYSE. While the exact number of Class members is unknown to Plaintiff at this time and can be ascertained only through appropriate discovery, Plaintiff believes that there are hundreds or thousands of members in the proposed Class. Record owners and other members of the Class may be identified from records maintained by Aerohive or its transfer agent and may be notified of the pendency of this action by mail, using the form of notice similar to that customarily used in securities class actions.

93.     Plaintiff's claims are typical of the claims of the members of the Class as all members of the Class are similarly affected by Defendants' wrongful conduct in violation of federal law that is complained of herein.

94.     Plaintiff will fairly and adequately protect the interests of the members of the Class and has retained counsel competent and experienced in class and securities litigation. Plaintiff has no interests antagonistic to or in conflict with those of the Class.

95.     Common questions of law and fact exist as to all members of the Class and predominate over any questions solely affecting individual members of the Class. Among the questions of law and fact common to the Class are:

- whether the federal securities laws were violated by Defendants' acts as alleged herein;

- whether statements made by Defendants to the investing public during the Class Period misrepresented material facts about the financial condition, business, operations, and management of Aerohive;

- whether Defendants caused Aerohive to issue false and misleading financial statements during the Class Period;

- whether Defendants acted knowingly or recklessly in issuing false and misleading financial statements;

- whether the prices of Aerohive securities during the Class Period were artificially inflated because of Defendants' conduct complained of herein; and

- whether the members of the Class have sustained damages and, if so, what is the proper measure of damages.

96.     A class action is superior to all other available methods for the fair and efficient adjudication of this controversy since joinder of all members is impracticable. Furthermore, as the damages suffered by individual Class members may be relatively small, the expense and burden of individual litigation make it impossible for members of the Class to individually redress the wrongs done to them. There will be no difficulty in the management of this action as a class action.

28

97.     Plaintiff will rely, in part, upon the presumption of reliance established by the fraud-on-the-market doctrine in that:

- Defendants made public misrepresentations or failed to disclose material facts during the Class Period;

- the omissions and misrepresentations were material;

- Aerohive common shares are traded in efficient markets;

- the Company's shares were liquid and traded with moderate to heavy volume during the Class Period;

- the Company traded on the NYSE, and was covered by multiple analysts;

- the misrepresentations and omissions alleged would tend to induce a reasonable investor to misjudge the value of the Company's common shares; and

- Plaintiff and members of the Class purchased and/or sold Aerohive common shares between the time the Defendants failed to disclose or misrepresented material facts and the time the true facts were disclosed, without knowledge of the omitted or misrepresented facts.

98.     Based upon the foregoing, Plaintiff and the members of the Class are entitled to a presumption of reliance upon the integrity of the market.

99.     Alternatively, Plaintiff and the members of the Class are entitled to the presumption of reliance established by the Supreme Court in *Affiliated Ute Citizens of the State of Utah v. United States*, 406 U.S. 128, 92 S. Ct. 2430 (1972), as Defendants omitted material information in their Class Period statements in violation of a duty to disclose such information, as detailed above.

## INAPPLICABILITY OF THE STATUTORY SAFE HARBOR AND BESPEAKS CAUTION DOCTRINE

100.     The statutory safe harbor or bespeaks caution doctrine applicable to forward looking statements under certain circumstances do not apply to any of the false and misleading statements pleaded in this Complaint. None of the statements complained of herein was a forward-looking statement. Rather, they were historical statements or statements of purportedly current facts and

conditions at the time the statements were made, including statements about the condition of the sales organization, the purported successful implementation of the Company's sales strategy, and the likelihood that the Company would meet its guidance in the fourth quarter of 2017.

101.    To the extent that any of the false and misleading statements alleged herein can be construed as forward-looking, those statements were not accompanied by meaningful cautionary language identifying important facts that could cause actual results to differ materially from those in the statements. As set forth above in detail, then-existing facts contradicted Defendants' statements regarding the condition of the sales organization, the purported successful implementation of the Company's sales strategy, among others. Given the then-existing facts contradicting Defendants' statements, any generalized risk disclosures made by Aerohive were not sufficient to insulate Defendants from liability for their materially false and misleading statements.

102.    To the extent that the statutory safe harbor does apply to any forward-looking statements pleaded herein, Defendants are liable for those false forward-looking statements because at the time each of those statements was made, the particular speaker knew that the particular forward-looking statement was false, and the false forward-looking statement was authorized and approved by an executive officer of Aerohive who knew that the statement was false when made.

## COUNT I

### Violation of Section 10(b) of The Exchange Act and Rule 10b-5
### Against All Defendants

103.    Plaintiff repeats and realleges each and every allegation contained above as if fully set forth herein.

104.    This Count is asserted against Aerohive and the Individual Defendants and is based upon Section 10(b) of the Exchange Act, 15 U.S.C. § 78j(b), and Rule 10b-5 promulgated thereunder by the SEC.

105.    During the Class Period, Aerohive and the Individual Defendants, individually and in concert, directly or indirectly, disseminated or approved the false statements specified above, which they knew or deliberately disregarded were misleading in that they contained misrepresentations and failed to disclose material facts necessary in order to make the statements made, in light of the circumstances under which they were made, not misleading.

106.    Aerohive and the Individual Defendants violated §10(b) of the 1934 Act and Rule 10b-5 in that they:

- employed devices, schemes and artifices to defraud;
- made untrue statements of material facts or omitted to state material facts necessary in order to make the statements made, in light of the circumstances under which they were made, not misleading; or
- engaged in acts, practices and a course of business that operated as a fraud or deceit upon plaintiff and others similarly situated in connection with their purchases of Aerohive common shares during the Class Period.

107.    Aerohive and the Individual Defendants acted with scienter in that they knew that the public documents and statements issued or disseminated in the name of Aerohive were materially false and misleading; knew that such statements or documents would be issued or disseminated to the investing public; and knowingly and substantially participated, or acquiesced in the issuance or dissemination of such statements or documents as primary violations of the securities laws. These Defendants by virtue of their receipt of information reflecting the true facts of Aerohive, their control over, and/or receipt and/or modification of Aerohive allegedly materially misleading statements, and/or their associations with the Company which made them privy to confidential proprietary information concerning Aerohive, participated in the fraudulent scheme alleged herein.

108.    Individual Defendants, who are the senior officers and/or directors of the Company, had actual knowledge of the material omissions and/or the falsity of the material statements set forth above, and intended to deceive Plaintiff and the other members of the Class, or, in the alternative, acted with reckless disregard for the truth when they failed to ascertain and disclose the true facts in the statements

made by them or other Aerohive personnel to members of the investing public, including Plaintiff and the Class.

109.    As a result of the foregoing, the market price of Aerohive common shares was artificially inflated during the Class Period.  In ignorance of the falsity of Aerohive's and the Individual Defendants' statements, Plaintiff and the other members of the Class relied on the statements described above and/or the integrity of the market price of Aerohive common shares during the Class Period in purchasing Aerohive common shares at prices that were artificially inflated as a result of Aerohive's and the Individual Defendants' false and misleading statements.

110.    Had Plaintiff and the other members of the Class been aware that the market price of Aerohive common shares had been artificially and falsely inflated by Aerohive's and the Individual Defendants' misleading statements and by the material adverse information which Aerohive's and the Individual Defendants did not disclose, they would not have purchased Aerohive's common shares at the artificially inflated prices that they did, or at all.

111.    As a result of the wrongful conduct alleged herein, Plaintiff and other members of the Class have suffered damages in an amount to be established at trial.

112.    By reason of the foregoing, Aerohive and the Individual Defendants have violated Section 10(b) of the 1934 Act and Rule 10b-5 promulgated thereunder and are liable to the plaintiff and the other members of the Class for substantial damages which they suffered in connection with their purchase of Aerohive common shares during the Class Period.

## COUNT II

### Violation of Section 20(a) of The Exchange Act Against The Individual Defendants

113.    Plaintiff repeats and realleges each and every allegation contained in the foregoing paragraphs as if fully set forth herein.

114.    During the Class Period, the Individual Defendants participated in the operation and management of Aerohive, and conducted and participated, directly and indirectly, in the conduct of Aerohive's business affairs. Because of their senior positions, they knew the adverse non-public information regarding the Company's inadequate internal safeguards in data security protocols.

115.    As officers and/or directors of a publicly owned company, the Individual Defendants had a duty to disseminate accurate and truthful information with respect to Aerohive's financial condition and results of operations, and to correct promptly any public statements issued by Aerohive which had become materially false or misleading.

116.    Because of their positions of control and authority as senior officers, the Individual Defendants were able to, and did, control the contents of the various reports, press releases and public filings which Aerohive disseminated in the marketplace during the Class Period. Throughout the Class Period, the Individual Defendants exercised their power and authority to cause Aerohive to engage in the wrongful acts complained of herein. The Individual Defendants therefore, were "controlling persons" of Aerohive within the meaning of Section 20(a) of the Exchange Act. In this capacity, they participated in the unlawful conduct alleged which artificially inflated the market price of Aerohive common shares.

117.    By reason of the above conduct, the Individual Defendants are liable pursuant to Section 20(a) of the Exchange Act for the violations committed by Aerohive.

## **PRAYER FOR RELIEF**

WHEREFORE, Plaintiff demands judgment against Defendants as follows:

A.      Determining that the instant action may be maintained as a class action under Rule 23 of the Federal Rules of Civil Procedure, and certifying Plaintiff as the Class representative;

B.      Requiring Defendants to pay damages sustained by Plaintiff and the Class by reason of the acts and transactions alleged herein;

C.      Awarding Plaintiff and the other members of the Class prejudgment and post- judgment interest, as well as their reasonable attorneys' fees, expert fees and other costs; and

D.      Awarding such other and further relief as this Court may deem just and proper.

**<u>DEMAND FOR TRIAL BY JURY</u>**

Plaintiff hereby demands a trial by jury.

Dated: March 7, 2019

Respectfully submitted,

**POMERANTZ LLP**

By: */s/ Omar Jafri*

Patrick V. Dahlstrom
Omar Jafri
Ten South La Salle Street, Suite 3505
Chicago, Illinois 60603
Telephone:  (312) 377-1181
Facsimile:   (312) 377-1184
E-mail: pdahlstrom@pomlaw.com
           ojafri@pomlaw.com

Jennifer Pafiti (SBN 282790)
468 North Camden Drive
Beverly Hills, CA 90210
Telephone:     (818) 532-6499
E-mail: jpafiti@pomlaw.com

Jeremy A. Lieberman
Michele S. Carino
600 Third Avenue, 20th Floor
New York, New York 10016
Telephone:     (212) 661-1100
Facsimile:     (212) 661-8665
E-mail: jalieberman@pomlaw.com
E-mail: mcarino@pomlaw.com

**BRONSTEIN, GEWIRTZ
& GROSSMAN, LLC**
Peretz Bronstein
60 East 42nd Street, Suite 4600
New York, NY 10165
(212) 697-6484

34

peretz@bgandg.com

***Attorneys for Plaintiff***