1   KEITH E. EGGLETON, State Bar No. 159842
    Email: keggleton@wsgr.com
2   RODNEY G. STRICKLAND, State Bar No. 161934
    Email: rstrickland@wsgr.com
3   WILSON SONSINI GOODRICH & ROSATI
    Professional Corporation
4   650 Page Mill Road
    Palo Alto, CA 94304-1050
5   Telephone: (650) 493-9300
    Facsimile: (650) 565-5100
6
    JOHN C. ROBERTS JR., admitted *pro hac vice*
7   Email: jroberts@wsgr.com
    WILSON SONSINI GOODRICH & ROSATI
8   Professional Corporation
    701 5th Avenue, Suite 5100
9   Seattle, WA 98104
    Telephone: (206) 883-2500
10  Facsimile: (206) 883-2699

11  Attorneys for Defendants Aerohive Networks, Inc.,
    David K. Flynn, and John Ritchie
12

13              UNITED STATES DISTRICT COURT

14             NORTHERN DISTRICT OF CALIFORNIA

15                    SAN JOSE DIVISION

16  JACOB MCGOVNEY, Individually and on          )   CASE NO.:  5:18-cv-00435-LHK
    behalf of all others similarly situated,     )
17                                               )   CLASS ACTION
                                                 )
18                   Plaintiff,                  )   DEFENDANTS' NOTICE OF
                                                 )   MOTION, MOTION TO DISMISS
19          v.                                   )   CONSOLIDATED SECOND
                                                 )   AMENDED CLASS ACTION
20  AEROHIVE NETWORKS, INC., DAVID K.            )   COMPLAINT, AND
    FLYNN, and JOHN RITCHIE,                     )   MEMORANDUM OF POINTS AND
21                                               )   AUTHORITIES
                     Defendants.                 )
22                                               )
                                                 )   Hearing Date: August 1, 2019
23                                               )   Hearing Time: 1:30 p.m.
                                                 )   Dept.: Courtroom 8, 4th Floor
24                                               )   Judge: Hon. Lucy H. Koh
                                                 )
25  _____)

26

27

28

# TABLE OF CONTENTS

**Page**

NOTICE OF MOTION AND MOTION .................................................................................. 1

MEMORANDUM OF POINTS AND AUTHORITIES ......................................................... 1

STATEMENT OF ISSUES ..................................................................................................... 1

INTRODUCTION .................................................................................................................... 2

STATEMENT OF ALLEGED FACTS .................................................................................. 3

LEGAL STANDARD .............................................................................................................. 6

ARGUMENT ........................................................................................................................... 7

I.   THE SAC SHOULD BE DISMISSED BECAUSE THE CONFIDENTIAL
     WITNESSES LACK PERSONAL KNOWLEDGE AND RELIABILITY ................. 7

II.  THE SAC FAILS TO ALLEGE WITH PARTICULARITY A FALSE OR
     MISLEADING STATEMENT .................................................................................... 10

     A.   Statement 1: Investing in the Company .............................................................. 10

          1.   Additional Allegations Regarding Salesforce Turnover .......................... 10

          2.   Newly Alleged $9 Million Reduction in Annual E-Rate Revenue .......... 12

          3.   Vague New Allegations About a Weak Product Launch .......................... 14

     B.   Statement 2: E-Rate ............................................................................................ 14

     C.   Statement 3: Connect to Select ........................................................................... 15

     D.   Statement 4: HiveManager NG .......................................................................... 17

     E.   Statement 5: Restructuring Under a COO Organization ..................................... 17

     F.   Statement 6: Sales Efficiency, Sales Productivity and Operational
          Efficiency ............................................................................................................ 18

     G.   Statement 7: 4Q17 Revenue Guidance ............................................................... 19

     H.   Statement 8: Disclosure of Salesforce Turnover ................................................ 19

III. THE SAC FAILS TO ALLEGE WITH PARTICULARITY A STRONG
     INFERENCE OF SCIENTER ..................................................................................... 20

     A.   CW Allegations Do Not Establish a Strong Inference of Scienter ...................... 21

     B.   Existence of "Problems" Does Not Support a Strong Inference of Scienter ........ 22

     C.   Mr. Wilburn's Departure Does Not Support a Strong Inference of Scienter ....... 23

D.   Voluntary Disclosures Undermine Inference of Scienter.......................................23

E.   Absence of Motive Allegations Undermines Inference of Scienter.....................24

F.   Considered Holistically, the More Plausible Inference Is Nonculpable .............24

IV.   THE SAC FAILS TO STATE A CLAIM UNDER SECTION 20(a)..............................25

V.   THE SAC SHOULD BE DISMISSED WITH PREJUDICE ...........................................25

CONCLUSION ..............................................................................................................................25

# TABLE OF AUTHORITIES

**Page(s)**

## CASES

*Alaska Elec. Pension Fund v. Adecco S.A.*,
    434 F. Supp. 2d 815 (S.D. Cal. 2006) ................................................................8, 9

*Alaska Elec. Pension Fund v. Adecco S.A.*,
    256 F. App'x 74 (9th Cir. 2007)...........................................................................9

*Applestein v. Medivation*,
    561 F. App'x 598 (9th Cir. 2014)........................................................................9

*Brodsky v. Yahoo! Inc.*,
    592 F. Supp. 2d 1192 (N.D. Cal. 2008) ............................................................15

*Brodsky v. Yahoo! Inc.*,
    630 F. Supp. 2d 1104 (N.D. Cal. 2009) ............................................................21

*Brody v. Transitional Hosps. Corp.*,
    280 F.3d 997 (9th Cir. 2002)...........................................................6, 15, 16, 20

*City of Dearborn Heights Act 345 Police & Fire Ret. Sys. v. Align Tech., Inc.*,
    2013 WL 6441843 (N.D. Cal. Dec. 9, 2013) ....................................................23

*City of Dearborn Heights Act 345 Police & Fire Ret. Sys. v. Align Tech., Inc.*,
    856 F.3d 605 (9th Cir. 2017)................................................................13, 18, 23

*City of Dearborn Heights Act 345 Police & Fire Ret. Sys. v. Waters Corp.*,
    632 F.3d 751 (1st Cir. 2011) ............................................................................22

*City of Roseville Emps. Ret. Sys. v. Sterling Fin. Corp.*,
    963 F. Supp. 2d 1092 (E.D. Wash. 2013) ..........................................9, 13, 23, 24

*City of Roseville Emps. Ret. Sys. v. Sterling Fin. Corp.*,
    691 F. App'x 393 (9th Cir. 2017).......................................................................9

*City of Royal Oak Ret. Sys. v. Juniper Network, Inc.*,
    880 F. Supp. 2d 1045 (N.D. Cal. 2012) ..........................................12, 15, 16, 18

*City of Royal Oak Ret. Sys. v. Juniper Networks, Inc.*,
    2013 WL 2156358 (N.D. Cal. May 17, 2013) ...................................................21

*Colyer v. AcelRx Pharms., Inc.*,
    2015 WL 7566809 (N.D. Cal. Nov. 25, 2015)...................................................22

*Curry v. Yelp Inc.*,
    875 F.3d 1219 (9th Cir. 2017)...............................................................10, 19, 25

*Ernst & Ernst v. Hochfelder*,
    425 U.S. 185 (1976) ......................................................................................6, 7

*Greenberg v. Cooper Cos.*,
    2013 WL 2403648 (N.D. Cal. May 31, 2013) ............................................................10, 19

*In re Apple Comput., Inc.*,
    127 F. App'x 296 (9th Cir. 2005).............................................................................21

*In re Computerized Thermal Imaging, Inc., Sec. Litig.*,
    2003 U.S. Dist. LEXIS 26500 (D. Or. Apr. 17, 2003) ............................................19

*In re Computerized Thermal Imaging, Inc., Sec. Litig.*,
    104 F. App'x 655 (9th Cir. 2004)............................................................................19

*In re Convergent Techs. Sec. Litig.*,
    948 F.2d 507 (9th Cir. 1991)..................................................................................20

*In re Copper Mountain Sec. Litig.*,
    311 F. Supp. 2d 857 (N.D. Cal. 2004) .......................................................12, 15, 16

*In re Downey Sec. Litig.*,
    2009 WL 2767670 (C.D. Cal. Aug. 21, 2009) .........................................................9, 23

*In re Fusion-io, Inc., Sec. Litig.*,
    2015 WL 6618969 (N.D. Cal. Feb. 12, 2015)..........................................................16

*In re NVIDIA Corp. Sec. Litig.*,
    768 F.3d 1046 (9th Cir. 2014).................................................................................22

*In re Rackable Sys. Sec. Litig.*,
    2010 WL 3447857 (N.D. Cal. Aug. 27, 2010) .........................................................9

*In re Rigel Pharms., Inc., Sec. Litig.*,
    697 F.3d 869 (9th Cir. 2012)..........................................................................23, 24

*In re Siebel Sys., Inc., Sec. Litig.*,
    2005 WL 3555718 (N.D. Cal. Dec. 28, 2005) ........................................................17

*In re Silicon Graphics, Inc. Sec. Litig.*,
    183 F.3d 970 (9th Cir. 1999)........................................................................7, 12, 21

*In re Silicon Storage Tech.*,
    2006 WL 648683 (N.D. Cal. Mar. 10, 2006) ..........................................................22

*In re SolarCity Corp. Sec. Litig.*,
    274 F. Supp. 3d 972 (N.D. Cal. 2017) .......................................................................6, 14

*In re Tibco Software Sec. Litig.*,
    2006 WL 1469654 (N.D. Cal. May 25, 2006) .........................................................9

*In re Vantive Sec. Litig.*,
    283 F.3d 1079 (9th Cir. 2002).................................................................................14

*In re Wet Seal, Inc. Sec. Litig.*,
    518 F. Supp. 2d 1148 (C.D. Cal. 2007)....................................................................24

*In re Worlds of Wonder Secs. Litig.*,
    35 F.3d 1407 (9th Cir. 1994)..........................................................................23, 24

*In re Zumiez, Inc. Sec. Litig.*,
    2009 WL 901934 (W.D. Wash. Mar. 30, 2009)....................................................13, 18, 22

*Lipton v. Pathogenesis Corp.*,
    284 F.3d 1027 (9th Cir. 2002) ....................................................................................25

*Matrixx Initiatives, Inc. v. Siracusano*,
    563 U.S. 27 (2011) ........................................................................................................6

*Metzler Inv. GMBG v. Corinthian Colleges, Inc.*,
    540 F.3d 1049 (9th Cir. 2008) ................................................................................6, 20

*Or. Pub. Emps. Ret. Fund v. Apollo Grp. Inc.*,
    774 F.3d 598 (9th Cir. 2014) .................................................................6, 11, 12, 14

*Paskowitz v. Pac. Capital Bancorp*,
    2009 WL 4911850 (C.D. Cal. Nov. 6, 2009) ......................................................12, 14

*Police Ret. Sys. v. Intuitive Surgical, Inc.*,
    759 F.3d 1051 (9th Cir. 2014) ..............................................................................15, 22

*Ronconi v. Larkin*,
    253 F.3d 423 (9th Cir. 2001) ...............................................................13, 14, 22, 23

*Tellabs, Inc. v. Makor Issues & Rights, Ltd.*,
    551 U.S. 308 (2007) ................................................................................................7, 24

*Weiss v. Amkor Tech., Inc.*,
    527 F. Supp. 2d 938 (D. Ariz. 2007) ...........................................................................9

*Wolirab v. Siebel Sys.*,
    261 F. App'x 60 (9th Cir. 2007)................................................................................17

*Zucco Partners, LLC v. Digimarc Corp.*,
    552 F.3d 981 (9th Cir. 2009) .............................................................................7, 12, 15

**STATUTES**

Private Securities Litigation Reform Act of 1995, Pub. L. 104-67, 109 Stat. 737 ...............1, 3, 6, 7

Securities Exchange Act of 1934, Section 10(b), 15 U.S.C. § 78j(b) ................................1, 2, 6, 25

Securities Exchange Act of 1934, Section 20(a), 15 U.S.C. § 78t(a),................................1, 2, 6. 25

**RULES**

Federal Rule of Civil Procedure 9(b) ...................................................................................1, 3, 6

Federal Rule of Civil Procedure 12(b)(6) ...................................................................................1

**MISCELLANEOUS**

OXFORD DICTIONARY OF BUSINESS & MANAGEMENT 480
    (Jonathan Law, ed., 6th ed. 2016) ...........................................................................18

**NOTICE OF MOTION AND MOTION**

PLEASE TAKE NOTICE that on August 1, 2019 at 1:30 p.m., or as soon thereafter as the matter may be heard, before the Honorable Lucy H. Koh of the United States District Court for the Northern District of California, located at 280 South 1st Street, San Jose, CA 95113, defendants Aerohive Networks, Inc. ("Aerohive" or the "Company"), David K. Flynn and John Ritchie ("Individual Defendants," together with Aerohive, "Defendants") will and hereby do move to dismiss the Consolidated Second Amended Class Action Complaint for Violations of the Federal Securities Laws, ECF No. 60 ("SAC" or "¶") on the grounds that it fails to state a claim.  This Motion is brought under Federal Rules of Civil Procedure 12(b)(6) and 9(b) and the Private Securities Litigation Reform Act of 1995, Pub. L. 104-67, 109 Stat. 737 ("PSLRA"), and is based on the Memorandum of Points and Authorities, the Declaration of John C. Roberts Jr. in Support of Motion to Dismiss Second Amended Class Action Complaint ("Roberts Declaration") and attached exhibits, and all other matters properly before the Court.[1]

**MEMORANDUM OF POINTS AND AUTHORITIES**

**STATEMENT OF ISSUES**

1.      Whether the SAC fails to state a claim under Section 10(b) of the Securities Exchange Act of 1934 ("Exchange Act"), 15 U.S.C. § 78j(b), where it fails to (a) establish the personal knowledge and reliability of alleged confidential witnesses; (b) plead with particularity a false or misleading statement; and (c) plead with particularity a strong inference of scienter.

2.      Whether the SAC fails to state a claim under Section 20(a) of the Exchange Act, 15 U.S.C. § 78t(a), for failure to allege a predicate violation.

---

[1] All references to "Ex." are exhibits to the Roberts Declaration, which are identical to the exhibits attached to his previous declaration.  *See* ECF No. 48.  This Court previously found, and Plaintiff did not dispute, that these exhibits were incorporated by reference into the Consolidated Amended Class Action Complaint for Violation of the Federal Securities Laws, ECF No. 44 (the "FAC").  *See* ECF No. 49; Order at 10–11.  They are incorporated in the same way into the SAC. *See* Ex. 1 (incorporated at ¶¶ 34–36); Ex. 2 (incorporated at ¶¶ 5, 10); Ex. 3 (incorporated by ¶¶ 52–58); Ex. 4 (incorporated at ¶¶ 6, 59–69); Ex. 5 (incorporated at ¶¶ 70–75).  Therefore they can be considered again.

1

**INTRODUCTION**

2     On February 5, 2019, this Court issued an Order Granting Motion to Dismiss Without

3     Prejudice ("Order"), ECF No. 58, which held that Plaintiff's FAC, ECF No. 44, failed to state a

4     claim for violations of Sections 10(b) and 20(a) of the Exchange Act.  The Court held that

5     Plaintiff failed to allege the existence of a false or misleading statement for numerous reasons—

6     among others, the central statement regarding 4Q17 guidance was protected by the statutory Safe

7     Harbor, the confidential witnesses ("CWs") on which the FAC was based "lack[ed] personal

8     knowledge and reliability," the challenged statements were "literally true," Plaintiff "d[id] not

9     provide details" about the "severity" of the alleged problems, Plaintiff failed to allege with

10    particularity that Aerohive's problems necessarily precluded achieving its 4Q17 guidance,

11    Aerohive "disclose[d] exactly what Plaintiff claim[s] [it] omitted," and Plaintiff showed no duty

12    to disclose additional information to investors.  Order at 13, 17–27.  Though it did not reach

13    Plaintiffs' scienter allegations, the Court described several deficiencies in them—including that

14    none of the CWs said anything about Mr. Flynn or Mr. Ritchie or their states of mind at the time

15    the challenged statements were made.  *Id*. at 28–30.  And while the Court gave the Plaintiff an

16    opportunity to correct the deficiencies, it warned that failure to do so would result in dismissal

17    with prejudice.  *Id*. at 30.

18    Plaintiff's SAC does not cure the numerous deficiencies identified in the Order.  While a

19    few allegations are added and a few subtracted, the bulk of the SAC is recycled from the

20    dismissed complaint and the basic substance remains unchanged.  Plaintiffs added only one new

21    CW—CW2, who says nothing of consequence and, like the other CWs, left Aerohive months

22    before the start of the purported class period.  Plaintiffs added only one new alleged false

23    statement; it is yet another cautionary statement, and the claim of falsity is the weakest one yet.

24    Plaintiffs added only one new scienter allegation, that Mr. Flynn or Mr. Ritchie may have seen

25    "two 42-inch televisions," but Plaintiff does not allege what was shown on these TVs or that Mr.

26    Flynn or Mr. Ritchie saw something on them that cast doubt on their public statements.

27    At bottom, Plaintiff again challenges a series of statements that the Court already has

28    found not be misleading, and ignores that Aerohive disclosed to investors virtually every

problem alleged in the Complaint. As before, none of Plaintiff's CWs were at Aerohive during the purported class period; none speak to any interactions with Mr. Flynn or Mr. Ritchie, and none say that any of the challenged statements were false when made. In other words, Plaintiff has failed to cure the deficiencies identified in the Order, and therefore the SAC fails to satisfy the heightened requirements of Rule 9(b) and the PSLRA. For the reasons set forth in the Order and below, the SAC should be dismissed with prejudice.

## STATEMENT OF ALLEGED FACTS

The basic facts alleged in the SAC are virtually identical to those in the dismissed FAC.

**Aerohive's Business**. Aerohive is a computer-networking equipment company headquartered in Milpitas. ¶ 2. Founded in 2006, Aerohive has designed and developed a cloud-networking platform and portfolio of products that enable customers to manage their network systems and to collect and analyze data from users. ¶ 2. Aerohive services the healthcare, education, manufacturing, distribution, and retail industries throughout the United States, Europe, the Middle East, and Asia. ¶¶ 2, 29.

**Challenges Facing Aerohive at the Close of 2016**. Aerohive has historically had strong revenue, with "promising" year-over-year increases from 2013 through 2016, but has never achieved profitability in any quarter. ¶¶ 3, 32. By the end of 2016, Aerohive faced "increasing pressure" to show profitability. ¶¶ 4, 32. But it faced "several obstacles." ¶ 33. It had launched its next generation cloud-networking platform, HiveManager NG, before all features were ready, and uncertainty surrounding the federal E-Rate program, which provides discounts to schools for technology and internet access, was a "growing concern." ¶¶ 3, 33.

**The Shift Away from E-Rate**. Around the beginning of 2017, Aerohive determined that it was "overly dependent" on the E-Rate program and announced that it would "shift away" and attempt to diversify its revenue base. ¶¶ 9, 31, 33, 35. Aerohive also announced a new "Connect to Select" offering, consisting of a lower-priced, entry-level product called "Aerohive Connect," with additional features and upgrades that could be purchased as part of "Aerohive Select," a subscription service. ¶¶ 33, 35, 45. Aerohive believed that Connect to Select gave it a better way to address the mid-market and pivot to a more "channel centric" approach. ¶ 70.

**4Q16 Earnings Call.**  On a February 14, 2017 earnings call, Mr. Flynn, Aerohive's Chairman, Chief Executive Officer, and President, informed investors that 4Q16 revenues had come in slightly below guidance in a "challenging revenue environment." Ex. 1 (4Q16 Call) at 3, 5. Mr. Flynn explained that E-Rate continued to be a "headwind," Ex. 1 at 4, and that Aerohive was having "transition challenges" with HiveManager NG, *id.*, creating "elongated sales cycles," ¶¶ 3, 33, 36, that required "more time and attention from our sales teams to close current deals as well as develop new sales opportunities." Ex. 1 at 4. When asked if the elongated sales cycles would cause Aerohive to "step up hiring," Mr. Ritchie, the Chief Financial Officer, responded that it would not: "[W]e will hold spending at or below the level [required] to get to profitability."  ¶ 36; Ex. 1 at 14. Mr. Flynn announced that Mr. Ritchie would take on "the expanded role of Chief Operating Officer in addition to his duties as Chief Financial Officer," in which role Mr. Ritchie would "focus on operational execution" while Mr. Flynn "continue[d] to directly manage sales, marketing and products." Ex. 1 at 7.

**2Q17 Earnings Call**.  On the August 2, 2017 earnings call, ¶¶ 5, 10, Mr. Flynn noted that Connect to Select was "taking more time and effort than expected" to "translate" into "revenue growth." Ex. 2 (2Q17 Call) at 4. He admitted that Connect to Select "ha[d] been a short-term distraction, particularly within our sales organization." *Id.*. Mr. Flynn also noted that E-Rate was a "troubled program," *id.* at 8, and Mr. Ritchie told investors that Aerohive anticipated a "bad E-Rate year." *Id.* at 10.

**3Q17 Quarterly Report.**  On November 1, 2017, the first day of the purported class period, Aerohive filed its 3Q17 quarterly report on Form 10-Q.  ¶¶ 59 – 60; Ex. 3 (3Q17 10-Q). The 3Q17 10-Q contained extensive disclosures of problems and risks facing Aerohive.  For example, Aerohive cautioned that it "expect[ed]" to "continue to invest" in its organization, that it was "investing to increase [its] sales capacity as well as [its] channel program," that it might "incur expenses in the near term" doing so, and that this might cause continued unprofitability. ¶ 60; Ex. 3 at 21–22 [**Statement 1**].  Aerohive also cautioned that E-Rate caused a "significantly slower pace of order volume" due to a "slower pace of funding approvals," ¶ 62; Ex. 3 at 22 [**Statement 2**], that Connect to Select "may reduce [] revenue," ¶ 64; Ex. 3 at 33 [**Statement 3**],

and that "elongated sales cycles" continued due to HiveManager NG, ¶ 66; Ex. 3 at 22

[**Statement 4**].  Aerohive also disclosed:

> We have experienced in the past higher than normal turn-over, especially amongst our sales and engineering personnel, and continue to replace personnel where we think needed to improve our operations and product development capabilities and processes.  . . . .  Turn-over is highly disruptive to our operations and has had and could continue to have an adverse effect on our revenue.

¶ 68; Ex. 3 at 46 [**Statement 8**, the only challenged statement not alleged in the FAC].

**3Q17 Earnings Call.**  On a November 1, 2017 earnings call, Mr. Flynn noted that 3Q17 "non-GAAP gross margin performance and EPS" came in "at the high end of our guidance ranges," but revenue came in "slightly below guidance," a result he attributed to "challenges with forecasting."  Ex. 4 Ex. 4 (3Q17 Call) at 2–3.  Mr. Flynn also announced the departure of Thomas Wilburn, Senior Vice President of Worldwide Sales.  ¶ 70.  Mr. Flynn said that restructuring leadership "under a COO organization"—the change that assigned Mr. Ritchie the additional role of COO—freed Mr. Flynn "to take on global sales leadership" after Mr. Wilburn's departure.  ¶ 70 [**Statement 5**].  Mr. Flynn noted that Aerohive's results "demonstrate[d] that [it] [was] steadily improving [its] operating efficiency while positioning [itself] to resume growth."  ¶ 70 [**Statement 6**].  Specifically, Aerohive "realized significant sales efficiency with our non-GAAP sales and marketing costs coming in at 39% of revenue driving this important metric to under 40% on a year-to-date basis."  ¶ 72 [**Statement 6**].  Mr. Ritchie observed "several metrics that point to improved sales productivity," noting "year-over-year decline in sales and marketing expenses" for the "third quarter in a row."  ¶ 72 [**Statement 6**].[2]  Aerohive forecasted 4Q17 revenue "of $40 million to $42 million."  ¶ 74 [**Statement 7**].  Acknowledging a "challeng[ing] year," Mr. Flynn stated his belief that Aerohive was positioned for growth "even if that growth takes longer to deliver than expected."  Ex. 4 at 4–5.

**January 16, 2018 Press Release**.  On January 16, 2018, post-market, Aerohive

---

[2] On the last round of briefing, Defendants referred to current Statement 6 as three different statements—Statements 6, 7 and 8.  Following the convention set out the Court's Order, Defendants now refer to these as a single statement, Statement 6.  Order at 8 & n.1.

1    announced preliminary 4Q17 results: it expected net revenue for the fourth quarter to be

2    approximately $37 million, $3 million short of the guidance given on November 1, 2017.  ¶ 83.

3    Aerohive explained that, "[f]ollowing the change in [its] sales leadership," it "uncovered

4    underlying sales execution issues which became fully apparent in the last month of the fourth

5    quarter [December 2017]."  *Id*.  Aerohive stated that it had "taken actions to replace

6    underperforming sales team members."  *Id*.  On January 17, 2018, Aerohive's stock price fell

7    $1.63 to close at $4.07.  ¶ 84.  This lawsuit was filed eight days later.  *See* ECF No. 1.

8         **4Q17 Earnings Call**.  On February 8, 2018, Mr. Flynn again explained to investors that

9    "sales execution issues," ¶ 85, identified "[f]ollowing the . . . change in sales leadership," only

10   became "fully apparent" in December.  Ex. 5 (4Q17 Call) at 3.  Aerohive saw "typical order

11   linearity in October and November, but as December progressed orders came in well below

12   forecast."  *Id*.  This was "due to poor execution within our sales organization, including, in part,

13   overoptimistic assessments of close dates for deals in the pipeline."  *Id*.  Mr. Ritchie added that

14   some sales personnel still needed to become "more channel-centric."  Ex. 5 at 11.

15                                    **LEGAL STANDARD**

16        Claims brought under Sections 10(b) and 20(a) must "'meet the higher, [more] exacting

17   pleading standards of Federal Rule of Civil Procedure 9(b) and [the PSLRA].'"  Order at 11–12

18   (quoting *Or. Pub. Emps. Ret. Fund v. Apollo Grp. Inc.*, 774 F.3d 598, 603–04 (9th Cir. 2014)).

19        **Falsity**.  A plaintiff must plead with particularity the existence of a statement that was

20   false or misleading when made. *See In re SolarCity Corp. Sec. Litig.*, 274 F. Supp. 3d 972, 997–

21   98 (N.D. Cal. 2017).  The PSLRA has "exacting requirements for pleading 'falsity.'" Order at 17

22   (quoting *Metzler Inv. GMBG v. Corinthian Colleges, Inc.*, 540 F.3d 1049, 1070 (9th Cir. 2008)).

23   When falsity is based on an alleged omission, merely alleging that material facts were omitted is

24   not sufficient.  Order at 17 (discussing *Matrixx Initiatives, Inc. v. Siracusano*, 563 U.S. 27, 44

25   (2011)).  The plaintiff must specify "why the statements . . . were misleading or untrue, not

26   simply why [they] were incomplete." *Brody v. Transitional Hosps. Corp.*, 280 F.3d 997, 1006

27   (9th Cir. 2002).

28        **Scienter**.  "Scienter," the "mental state embracing intent to deceive, manipulate or

1    defraud," *Ernst & Ernst v. Hochfelder*, 425 U.S. 185, 193 n.12 (1976), encompasses both

2    "conscious misconduct" and "deliberately reckless" conduct, the latter being "a highly

3    unreasonable omission, involving not merely simple, or even inexcusable negligence, but an

4    extreme departure from the standards of ordinary care," *In re Silicon Graphics, Inc. Sec. Litig.*,

5    183 F.3d 970, 974, 992 n.5 (9th Cir. 1999).  In assessing whether a complaint pleads a "strong"

6    inference of scienter, the PSLRA requires courts to perform a holistic, comparative analysis,

7    weighing not only "inferences urged by the plaintiff" but also any "plausible nonculpable

8    explanations." *Tellabs, Inc. v. Makor Issues & Rights, Ltd.*, 551 U.S. 308, 314–15, 324 (2007).

9    The culpable inference must be both "cogent" and "at least as compelling" as any inference of

10   innocent or even grossly negligent conduct.  *Id.* at 314.  Mere  recklessness is not enough.  Order

11   at 28 (quoting *Zucco Partners, LLC v. Digimarc Corp.*, 552 F.3d 981, 990–91 (9th Cir. 2009)).

12       **Confidential Witnesses**.  Where a plaintiff cites confidential witnesses, the CWs "must

13   be described with sufficient particularity to establish their reliability and personal knowledge."

14   Order at 14 (quoting *Zucco*, 552 F.3d at 995).  Courts consider the "'level of detail provided by

15   the [CW], the corroborative nature of the other facts alleged (including from other sources), the

16   coherence and plausibility of the allegations, the number of sources, the reliability of the sources,

17   and similar indicia.'"  *Id.* (citation omitted).

18
19                                   **ARGUMENT**

20   I.    **THE SAC SHOULD BE DISMISSED BECAUSE THE CONFIDENTIAL
            WITNESSES LACK PERSONAL KNOWLEDGE AND RELIABILITY**

21       To allege both falsity and scienter, the SAC, like Plaintiff's previous pleading, depends

22   almost entirely on vague and anecdotal allegations made by alleged "confidential witnesses"—

23   four from the previous pleading and a new one (CW2), who says next to nothing.[3]  ¶ 45.  The

24   Court found that Plaintiff's previous pleading "fail[ed] to allege that the CWs had personal

25   knowledge" because Plaintiff failed both to "describ[e] the particular responsibilities of each of

26

27       [3] Plaintiff has renumbered his CWs.  So the Court can cross-reference the SAC with the
     Order:  SAC CW1 is FAC CW4.  SAC CW2 is new.  SAC CW3 is FAC CW1, SAC CW4 is
28   FAC CW2, and SAC CW5 is FAC CW3.

the CWs," and to "adequately allege that the CWs were in a position to have the knowledge they profess." Order at 14–15. The SAC does not cure these fatal deficiencies in the CW allegations. Plaintiff arguably might have now pled the "bare minimum" of job titles and responsibilities, Order at 15, but Plaintiff has in no way rectified that second, more significant deficiency. Like its dismissed predecessor, the SAC simply does not allege that the CWs had personal knowledge of what matters most in this case—Company-wide financials, the forecasting process, 4Q17 guidance and events, and the state of mind of Mr. Flynn and Mr. Ritchie at the time the challenged statements were issued.

The one new CW, CW2, worked accounts in only four states and left five months before the start of the purported class period. ¶ 45. CW2 says only two things: he/she "confirms" CW1's statement about employee departures at the beginning of 2017, and claims that six inside sales territory managers left Aerohive at the beginning of 2017. *Id.* Even if true, these statements about employee departures 11 months before the class period do nothing to suggest that the statements made in November 2017 were false. Nor do they help Plaintiff's scienter allegations, because they say nothing about what Mr. Flynn or Mr. Ritchie knew on November 1. Indeed, CW2 couldn't provide such information, since he/she left Aerohive in June 2017.

The SAC's additional details about CW job responsibilities are largely "filler." ¶¶ 42, 45, 46, 48, 51. If anything, the newly added details about the CWs confirm that the CWs were not well-situated to opine about Aerohive's strategic decisions or financial guidance. CW1 (former CW4) worked for Aerohive for only ten months, and his primary responsibility was "supporting" Aerohive's relationship with Synnex, a company never mentioned again in the SAC. ¶ 42. CW3 (former CW1) worked for Aerohive for less than a year as a low-level employee who "cold called," followed "leads" and worked the "booths at various conferences." ¶ 46. CW4 (former CW2), allegedly Aerohive's K-12 programs director and a "self-described [E-Rate] expert," is not alleged to have any personal knowledge outside the E-Rate program. ¶ 48. The experience of CW5 (former CW3) was also limited to a handful of states. ¶ 51.

None of the CWs are alleged to have access to Company-wide financial information, and thus their statements cannot support inferences at that level. *See Alaska Elec. Pension Fund v.*

1    *Adecco S.A.*, 434 F. Supp. 2d 815, 825 (S.D. Cal. 2006) (rejecting plaintiff's attempted

2    extrapolation of nationwide financial data from a low-level CW at a local branch office), *aff'd*,

3    256 F. App'x 74 (9th Cir. 2007).  Moreover, none of the CWs are alleged to have participated in

4    creating Aerohive's external revenue guidance, or even to have seen it; they are certainly not in a

5    position to remark on its feasibility.  *See Applestein v. Medivation*, 561 F. App'x 598, 601 (9th

6    Cir. 2014) (no "allegation that any CW relayed [allegedly omitted] information to any

7    defendant"); *Weiss v. Amkor Tech., Inc.*, 527 F. Supp. 2d 938, 955 (D. Ariz. 2007) (no allegation

8    "CWs were involved in . . . forecasting process or . . . in a position to possess knowledge about

9    the forecasting process"); *In re Tibco Software Sec. Litig.*, 2006 WL 1469654, at *22 (N.D. Cal.

10   May 25, 2006) (CWs failed to allege involvement in "forecasting process").   Thus the CWs do

11   not have the "personal knowledge" and "reliability" that courts require.   Order at 14–16.

12        Moreover, each CW—even the new one—left Aerohive months before the purported

13   class period, months prior to the start of 4Q17, and months prior to the issuance of 4Q17

14   guidance and the challenged statements.  ¶¶ 41, 43, 45, 59, 63.  These CWs "have no basis to

15   opine about [the company's] practices after they left the company," *In re Downey Sec. Litig.*,

16   2009 WL 2767670, at *10 (C.D. Cal. Aug. 21, 2009), and "[a]ny inference that pre-Class Period

17   practices continued during the Class Period amounts to unsubstantiated speculation," *City of

18   Roseville Emps. Ret. Sys. v. Sterling Fin. Corp.*, 963 F. Supp. 2d 1092, 1135–36 (E.D. Wash.

19   2013) (citation omitted), *aff'd*, 691 F. App'x 393 (9th Cir. 2017).  Finally, none of the CWs is

20   alleged "to have provided any defendant with information, or to have heard or read any statement

21   by any defendant, that contradicted or even cast doubt on a public statement," *In re Rackable

22   Sys. Sec. Litig.*, 2010 WL 3447857, *9 (N.D. Cal. Aug. 27, 2010), and "there is no allegation by

23   any CW directly asserting that the statements at issue were false."  *Amkor Tech.*, 527 F. Supp. 2d

24   at 955.  This fails to allege the required "personal knowledge."  Order at 14–16.  The only

25   reasonable conclusion to be drawn from the SAC is that the CWs were not positioned to opine on

26   Company-wide financials, the forecasting process, 4Q17 guidance or events, or Mr. Flynn or Mr.

27   Ritchie's state of mind.

28

## II.     THE COMPLAINT FAILS TO ALLEGE WITH PARTICULARITY A FALSE OR MISLEADING STATEMENT

In its Order, the Court found that the FAC failed to allege with particularity the existence of any false or misleading statement.   Order at 17.   Neither does the SAC.   It challenges the same statements, with one exception (new Statement 5), and makes only cosmetic changes to the allegations.   Nothing in the SAC requires a different result from what the Court decided the last time around.   *See Curry v. Yelp Inc.*, 875 F.3d 1219, 1228 (9th Cir. 2017) (failure to cure identified deficiencies is grounds for denying leave to amend); *Greenberg v. Cooper Cos.*, 2013 WL 2403648, at *12 (N.D. Cal. May 31, 2013) (noting that the SAC "d[id] not correct the pleading issues . . . that the Court identified in its previous Order of dismissal").

### A.     Statement 1: Investing in the Company

Statement 1 is, as before, a quote from Aerohive's November 1, 2017 Form 10-Q *cautioning* investors that Aerohive "expected" to "continue to invest" in its organization, that "[it was] investing to increase [its] sales capacity as well as [its] channel program," that it might "incur expenses in the near term," and that those expenses might cause it to be unprofitable."  ¶ 60; Ex. 3 (3Q17 10-Q) at 21–22.   This Court previously held that Statement 1 was not false or misleading because (i) Plaintiff failed to allege with particularity salesforce understaffing as opposed to salesforce turnover, (ii) Aerohive disclosed salesforce turnover and sales personnel issues, and (iii) Plaintiff alleged, at best, that Statement 1 was incomplete, not false or misleading.   Order at 18–21.   The SAC does not fill these holes.   The SAC adds only three new allegations: that Statement 1 was false or misleading for failing to also disclose that Aerohive terminated half of its salesforce at the beginning of 2017, that E-Rate revenue declined by $9 million, and that Aerohive was suffering from a "weak product launch."   None of these new allegations withstands scrutiny.

#### 1.     Additional Allegations Regarding Salesforce Turnover

Just like the previous pleading, the SAC assumes that cuts to E-Rate sales personnel led to the missed guidance in 4Q17.   No CW says this, however.   The SAC adds a few new anecdotes about salesforce reduction—that Aerohive "terminated half the members of its sales

1   organization" on or about "January 2017," 11 months prior to the purported class period, ¶ 43,

2   that "in the beginning of 2017, half the inside territory managers, or 6 out of a total of 12, left the

3   Company," ¶ 45, and that by the end of the fall of 2017, "the majority of the Company's 30 to 35

4   regional sales managers had been with the Company less than a year," ¶ 51.  Even assuming

5   these allegations were reliable and based on personal knowledge, Plaintiff is making the same

6   error that he did the last time around—analyzing departures in isolation and ignoring the SAC's

7   own allegations of "hiring[s]" and "replacements," as the SAC itself alleges that when Aerohive

8   initiated its strategic changes, some sales personnel decided to leave, some were asked to leave,

9   *and new employees were brought in to replace them.*  *See* ¶ 7 (existing personnel "replaced" with

10  "management's former colleagues"); ¶ 41 (alleging "replacement of well-liked personnel"); *id.*

11  (Mr. Gill's "hiring of former colleagues"); ¶ 51 (complaining about "new" managers); ¶ 52

12  (alleging "turnover"); ¶ 70 (new "channel centric sales leaders" brought in from Ruckus in

13  1Q17); ¶ 75 (existing personnel "replaced" with "former Ruckus employees").  In context,

14  anecdotal allegations of departures long before the Class Period ignore that the larger picture

15  shows salesforce *turnover*, not salesforce understaffing.  Order at 20.

16         Moreover, Plaintiff cannot plead around the fact that Aerohive disclosed salesforce

17  turnover and sales personnel issues in the same document from which Statement 1 was plucked.

18  Order at 19.  Aerohive specifically told investors of "higher than normal turn-over, especially

19  amongst our sales and engineering personnel," that was "highly disruptive" and "has had and

20  could continue to have an adverse effect on [] revenue."  Ex. 3 (3Q17 10-Q) at 45–46; *see also*

21  *id.* at 33, 35, 37.  Aerohive noted that "newly hired personnel [] also require several quarters to

22  gain experience and develop their territories before achieving capacities we have assumed in our

23  sales forecasts."  *Id.* at 37, 45–46.  Aerohive also disclosed, on previous calls, that the salesforce

24  was dealing with "short-term distraction[s]," Ex. 2 (2Q17 Call) at 4, which were taking the

25  salesforce's "time and attention" away from closing deals and developing opportunities, Ex. 1

26  (4Q16 Call) at 4.  As in so many other instances, Aerohive's disclosure of the allegedly omitted

27  facts dooms Plaintiff's omissions claims.  *See* Order at 19 ("Aerohive disclosed exactly what

28  Plaintiffs claim Aerohive omitted."); *Apollo Grp.*, 774 F.3d at 607 (omissions theory failed

where defendants "clearly disclosed" information); *Paskowitz v. Pac. Capital Bancorp*, 2009 WL 4911850, at *5–6 (C.D. Cal. Nov. 6, 2009) (statement not misleading where allegedly omitted facts "actually disclosed").

There are still more deficiencies that have not been cured.  While the SAC focuses on departures at the beginning of FY17, it does not does not state anything about the salesforce during the purported class period or anytime in 4Q17.  *See Silicon Graphics*, 183 F.3d at 984–85 (affirming dismissal where vague allegations invited court to "speculate" as to the "severity of problems").  Critically, the SAC does not "quantify" the impact of the alleged problems, Order at 20, and it does not explain—and no CW says—that the alleged salesforce reductions "necessarily precluded" Aerohive from achieving its 4Q17 projections.  *City of Royal Oak Ret. Sys. v. Juniper Network, Inc.*, 880 F. Supp. 2d 1045, 1064 (N.D. Cal. 2012); *see also In re Copper Mountain Sec. Litig.*, 311 F. Supp. 2d 857, 867–68 (N.D. Cal. 2004) ("[W]ithout sufficient detail regarding the amount of reductions in customer orders, it is not possible to know the scope of the impact of such reductions on [the company]'s business and thus whether the projected revenues and earnings would be impossible to meet.").  Finally, the SAC does not explain how Statement 1 is misleading, as opposed to merely incomplete.  Order at 19–20 (not enough to allege that defendant company provided an "incomplete picture").

### 2.    Newly Alleged $9 Million Reduction in Annual E-Rate Revenue

The SAC newly alleges that Aerohive's decision to shift away from E-Rate and lay off E-Rate personnel "caused the E-Rate business to decline by over $9 million." ¶ 61.  But CW4 (former CW2) alleges in the SAC that E-Rate revenues declined year-over-year from $32.4 million in 2017 to $23.5 million in 2018. ¶ 49.  Even assuming that CW4 had access to accurate 2018 E-Rate revenue figures long after leaving Aerohive in September 2017, *see Zucco*, 552 F.3d at 996–98 (CW testimony should not be based on "secondhand information"), the allegation is clearly that there was a decline in E-Rate revenue in 2018.  *Id.*  This does nothing for Plaintiff, because the SAC concerns 2017 guidance, and post-class-period declines in E-Rate revenue do not establish that Aerohive should have disclosed additional information about E-Rate *on November 1, 2017*.  Indeed, Aerohive could not have possibly known, or disclosed, on that date

what E-Rate revenues were going to look like 14 months later.  *See* Order at 17 (to be actionable, statements must be false "at [the] time [made] by the people who made them") (quoting *Ronconi v. Larkin*, 253 F.3d 423, 430 (9th Cir. 2001)); *Sterling*, 963 F. Supp. 2d at 1144 (what Company learned after the close of the class period "has no bearing" on what Defendants knew "at the time the [alleged] misrepresentations were made").  CW4 also fails to state how actual 4Q17 and FY17 E-Rate results differed from the E-Rate projections embodied in the 4Q17 and FY17 guidance, another fatal omission.  *See City of Dearborn Heights Act 345 Police & Fire Ret. Sys. v. Align Tech., Inc.*, 856 F.3d 605, 618 (9th Cir. 2017) (failure to allege "actual assumptions . . . relied upon" made it impossible to determine whether "events and circumstances" alleged in complaint were ignored); *In re Zumiez, Inc. Sec. Litig.*, 2009 WL 901934, at *11 (W.D. Wash. Mar. 30, 2009) ("nothing in the Complaint suggests that Defendants did not take such problems into account when generating the Company's projections").

In any event, Plaintiff's omissions theory is undone by the fact that Aerohive repeatedly disclosed problems with the E-Rate program and openly discussed them with investors and analysts.  Aerohive announced its strategic decision to shift away from E-Rate as far back as 3Q16, a year before the Class Period.  *See, e.g.*, ¶ 33 (Company "had become overly dependent on E-Rate" and "needed to diversify"); ¶ 35 (new programs "lauded" as means of getting "away from the E-Rate program"); Ex. 1 (4Q16 Call) at 5 ("As mentioned last quarter, we have accelerated our plans to lessen this dependency."); Ex. 2 (2Q17 Call) at 8 ("We are clearly focused on . . . reducing the dependence on the E-Rate.").  Aerohive disclosed that problems with E-Rate were negatively affecting its financials.  *See, e.g.*, Ex. 1 (4Q16 Call) at 5 ("[O]ur results continued to highlight our overdependence on the troubled E-Rate program"; E-Rate remains a "headwind"); Ex. 2 (2Q17 Call) at 4 ("expected Q3 weakness in education"); Ex. 3 (3Q17 10-Q) at 22 ("significantly slower pace of order volume in our education vertical" was a "primary driver[] of lower-than-expected order volume and revenue performance").  Indeed, Aerohive disclosed, on the same day that the challenged statements were made, that it predicted "*another bad E-Rate year*" and that education made up only 35% of revenue, down from the usual "low to mid-40s."  Ex. 4 (3Q17 Call) at 8 (emphasis added).  Again, Aerohive disclosed

precisely what Plaintiff claims was omitted, and did so on the very same day.  *See* Order at 19
(no falsity where there was disclosure of allegedly omitted material);  *Apollo Grp.*, 774 F.3d at
607; *Pac. Capital Bancorp.*, 2009 WL 4911850, *5–6.

### 3.    Vague New Allegations About a Weak Product Launch

The SAC devotes a handful of sentences to the notion that Aerohive failed to disclose
that a "weak product launch" in 2016 "negatively impacted" the Company's channel program a
year later.  ¶¶ 52, 61.  But CW5's allegations regarding a "less-than-exciting iteration" of a
"wireless networking switch," "an equally deficient update," and "lackluster reviews," ¶ 52, are
hopelessly vague and non-particularized.  *See Ronconi*, 253 F.3d at 430–31 (rejecting allegations
that required court to speculate as to severity); *In re Vantive Sec. Litig.*, 283 F.3d 1079, 1086,
1088 (9th Cir. 2002) ("lengthening" sales cycles and "slow sales" not pled with particularity);
*SolarCity*, 274 F. Supp. 3d at 998–99 (finding complaint lacking in details about "low quality"
contracts).  And Plaintiff does not explain why the omission of this additional information
rendered the challenged statement misleading, as opposed to merely incomplete.  Order at 18–19
(at worst the challenged statements gave "incomplete picture").

More importantly, to the extent that these allegations relate to problems with the launch
of HiveManager NG in 2016, Aerohive disclosed them.  Ex. 3 (3Q17 Call) at 22 (disclosing that
Aerohive had "introduced [its] new HiveManager NG product to some of our larger and more
complex customers before its feature set was able to fully address their requirements," which
"resulted in elongated sales cycles and reduced revenue opportunities," "contributed to our lower
revenue performance in [4Q16]," and "continued to affect our revenue opportunities and
operating results in 2017, including in [3Q17]").

### B.    Statement 2: E-Rate

Statement 2 is, as last time, a quote from the November 1, 2017 Form 10-Q in which
Aerohive *cautioned* investors regarding a "slower pace of funding approvals under the federal E-
Rate program" and "significantly slower pace of order volume in [its] education vertical." ¶ 62;
Ex. 3 (3Q17 10-Q) at 22.  This Court held that Plaintiff had failed to allege that Statement 2 was
false or misleading because (i) the Complaint alleged at best that the statement was merely

1   incomplete, (ii) Aerohive disclosed salesforce turnover and sales personnel issues, and (iii)

2   Plaintiff failed to quantify staffing problems or explain E-Rate losses.  Order at 18–21.  Since

3   then, the only new allegation in the SAC is that Aerohive should have disclosed that E-Rate

4   business declined by $9 million in 2018.  This allegation is debunked above.  *See supra* 12–13.

5          The problems do not stop there.  Again, Plaintiff cannot plead around Aerohive's

6   extensive disclosures regarding problems with E-Rate.  *See supra* 13.  The SAC does not specify

7   the impact (if any) that the alleged problems with E-Rate had on Aerohive's 4Q17 guidance.  *See*

8   Order at 20: *Juniper*, 880 F. Supp. 2d at 1064; *Copper Mountain*, 311 F. Supp. 2d at 867–68.

9   Nor does the SAC explain how Statement 2 is made false or misleading by the omission of this

10  information, as opposed to merely incomplete.  *See* Order at 18–19; *Police Ret. Sys. v. Intuitive*

11  *Surgical, Inc.*, 759 F.3d 1051, 1061 (9th Cir. 2014); *Brody*, 280 F.3d at 1006.

12          **C.**      **Statement 3: Connect to Select**

13          Statement 3 is also the same as it was last time—*i.e.*, a quote from the November 1, 2017

14  Form 10-Q *cautioning* investors that the introduction of the Connect to Select program "may

15  reduce [Aerohive's] revenue, or the rate of [its] revenue growth," because customers might "take

16  advantage of the lower entry pricing" and choose the cheaper Connect option over the more

17  expensive Select.  ¶ 64.  Plaintiff claims that Statement 3 is false and misleading because it did

18  not disclose that Connect to Select was already generating "lower-than-expected revenues."

19  ¶ 65.  This Court previously held this to be insufficient to plead falsity.  Order at 21–22.

20          The only new allegation bearing on Statement 3 is CW1's claim that the practice of

21  providing "free support service" cost Aerohive "hundreds of thousands of dollars a year."  ¶ 44.

22  Plaintiff does not explain how CW1 arrived at this vague figure, *see Zucco*, 552 F.3d at 996–98

23  (must be more than "secondhand information"), nor how this figure could be material when

24  Aerohive's revenue for FY17 was $152.9 million.  Ex. 5 (4Q17 Call) at 5.  And CW1 still has no

25  "objective indicators" to substantiate this claim.  *Brodsky v. Yahoo! Inc.*, 592 F. Supp. 2d 1192,

26  1200–01 (N.D. Cal. 2008).  This is particularly important where, as here, Aerohive disclosed

27  subscription and support revenue as a category.  *See* Ex. 3 (3Q17 10-Q) at 23 (including separate

28  line in financial statements for subscription and support revenue); Ex. 5 (4Q17 Call) at 5 ("record

$11 million of revenue"). CW1's failure to reconcile these readily available statistics is telling.

More fundamentally, Plaintiff is measuring the wrong thing. The SAC itself alleges that the "practice" of providing free support services had been going for "nearly a decade" until it was discovered in late 2016. ¶ 43. Facing this problem, Aerohive made the "decision" to "offer[] a lower-priced product" and try to "upsell a service subscription." ¶ 43. This was Connect to Select, introduced across Aerohive's entire portfolio in May 2017. ¶ 64. The SAC's claim that providing free support services cost "hundreds of thousands of dollars per year" confuses the problem with the proposed solution; it quantifies the problem rather than the degree to which the solution fell short.

There are additional problems. Again, Plaintiff cannot plead around the fact that Aerohive repeatedly disclosed issues with Connect to Select, including its current impact on financials. *See* Order at 22 (Aerohive "cautioned investors about potential problems with [Connect to Select]"); Ex. 2 (2Q17 Call) at 4 (Connect to Select "taking more time and effort than expected to recruit and fully activate this volume with new partners"); Ex. 3 (3Q17 10-Q) at 35 (3Q17 revenue "impacted by the challenges in forecasting the mix of Connect and Select sales, and estimating the percentage of customers who will choose [] subscription offerings versus our perpetual license offerings"); *id.* at 36 (disclosing that "[Connect to Select] may reduce our revenue, or the rate of our revenue growth, as purchasers take advantage of the lower entry pricing"); *id.* at 38 ("If our customers, both new and existing, choose the simplified and lower-priced Connect product offering, as an alternative to our Select offering, we could see a shift in the mix of these product offerings, thus reducing overall revenue.").

Finally, as with Plaintiff's previous pleading, the SAC does not specify any reason why omitting this information renders Aerohive's statement "misleading or untrue" as opposed to "incomplete." Order at 21–22 (quoting *Brody*, 280 F.3d at 1006); *see also In re Fusion-io, Inc., Sec. Litig.*, 2015 WL 6618969, at *17–18 (N.D. Cal. Feb. 12, 2015). And it does not explain the impact (if any) that the alleged loss of subscription revenue had on Aerohive's 4Q17 revenue guidance. *See Juniper*, 880 F. Supp. 2d at 1064; *Copper Mountain*, 311 F. Supp. 2d at 867–68.

### D. Statement 4: HiveManager NG

Statement 4 is, as it was last time, a quote from the November 1, 2017 Form 10-Q *warning* investors that the introduction of HiveManager NG had caused "elongated sales cycles" that "continued to affect [Aerohive's] opportunities and operating results in 2017, including in [3Q17]," the quarter that had just ended. ¶ 66; Ex. 3 (3Q17 10-Q) at 22. Plaintiff previously alleged that Statement 4 was false and misleading because Aerohive had trouble forecasting its results. *See* FAC, ECF No. 44, ¶ 58. The Court rejected this allegation because, at best, the Statement was merely incomplete as opposed to misleading, and because Plaintiff's allegations were vague with regard to the projections. Order at 21–22.

The new allegations by CW5 are little more than gossip and mudslinging, uncorroborated by any other CW. CW5 once again alleges that Aerohive's sales projections were unreliable because sales representatives "inflated" them, but now adds that the representatives got away with it because the Director of Commercial Sales allegedly had a substance-abuse problem and made decisions based entirely on the "final two weeks of each quarter." ¶ 53. This gossip does not state a federal securities claim. *See In re Siebel Sys., Inc., Sec. Litig.*, 2005 WL 3555718, at *8–9 (N.D. Cal. Dec. 28, 2005) (CW must do more than "merely regurgitat[e] gossip and innuendo"), *aff'd, Wolirab v. Siebel Sys.*, 261 F. App'x 60 (9th Cir. 2007). Even if one assumes (charitably) that CW5's gossip is true, Plaintiff has not alleged that any of these "inflated" projections were included in 4Q17 guidance, which was issued months after CW5 left Aerohive. ¶ 51. Nor can Plaintiff surmount the fact that Aerohive disclosed difficulty in forecasting accurately. Order at 22. It specifically cautioned investors, on the same day that Statement 4 was made, that it was "difficult" for it to "forecast [] future operating results" or engage in "accurate financial planning," Ex. 3 (3Q17 Call) at 33, and that the failure to achieve 3Q17 guidance was "primarily due to challenges with forecasting." Ex. 4 at 2–3.

### E. Statement 5: Restructuring Under a COO Organization

After announcing on November 1, 2017 that Mr. Wilburn was leaving Aerohive to pursue other opportunities, Mr. Flynn stated that the "successful[] restructur[ing]" of his leadership team "under a COO organization" announced in February 2017 gave him "the capacity to take on

global sales leadership." ¶¶ 70–71 [**Statement 5**].  The Court previously analyzed this statement

and held that it was literally true; it also rejected vague allegations that Mr. Wilburn's departure

was due to dysfunction in the sales organization.  Order at 23–24.  CW4 alleges in the SAC that

Aerohive helped Dell grow its E-Rate business by 68 percent in 2016, but by the end of 2017,

Dell had lost 72% of that business due to lack of adequate support from Aerohive.  ¶ 50.  But this

is just another way of saying that E-Rate revenues with Dell "remained flat," ¶¶ 11, 50, 79, and

Plaintiff alleged that last time around, FAC, ECF No. 44, ¶¶ 11, 68.  This does not help establish

that Dell was "not delivering expected returns," ¶ 71, because Plaintiff does not allege what

Aerohive expected from Dell.  *See* Order at 15 (Plaintiff failed "to articulate why CW1 would

have knowledge that the partnership with Dell was not fruitful"); *Juniper Networks*, 880 F. Supp.

2d at 1064 ("Plaintiffs fail to allege facts that provide an analytical link between the particular

facts supplied by the [CWs] and the ultimate conclusion that [the company] could not meet its

overall revenue and growth goals.").  Nor does Plaintiff allege that Aerohive executives did not

consider these trends when they created the 4Q17 guidance.  *See Align Tech., Inc.*, 856 F.3d at

618; *Zumiez*, 2009 WL 901934, at *11.

      **F.**      **Statement 6: Sales Efficiency, Sales Productivity and Operational Efficiency**

      Statement 6 need not be discussed at length because nothing has changed.  On the

November 1, 2017 conference call, Aerohive ran through a series of financial items such as

revenue, operating expenses, and gross margins.  Ex. 4 (3Q17 Call) at 5–6.  As previously

explained, ECF No. 47 at 17–19, the references to "sales efficiency," "sales productivity" and

"operational efficiency" pertained to a specific metric: "sales and marketing costs as a

percentage of revenue."  *Id.*  Aerohive's use of the term is consistent with dictionary definition

and its plain meaning—if anything, "efficiency" and "productivity" connote frugality, not free

spending.  *See* OXFORD DICTIONARY OF BUSINESS AND MANAGEMENT 211, 480 (Jonathan Law,

ed., 6th ed. 2016) (defining efficiency as "the maximum output of acceptable quality with the

*minimum of time, effort, and other inputs*," "*with less input*" and "*at the lowest possible cost*";

defining productivity as "the output of an organization or economy per unit of input") (emphasis

added).  Plaintiff conceded that these figures were accurate.  Order at 24; Pl.'s Opp. to MTD

FAC, ECF No. 52 at 8.  The SAC does not change any of its allegations with respect to Statement 6, and therefore it should be dismissed again.  *See, e.g., Yelp*, 875 F.3d at 1228.

### G.     Statement 7: 4Q17 Revenue Guidance

This Court previously found that Aerohive's actual provision of 4Q17 revenue guidance made on the November 1, 2017 earnings call was protected by the statutory Safe Harbor.  Order at 25–27.  The SAC makes no attempt to amend its pleadings with respect to this statement.  Nor could it.  The application of the Safe Harbor is based on the forward-looking statement, the accompanying cautionary language, and the governing law—none of which can be changed by amendment. *See In re Computerized Thermal Imaging, Inc., Sec. Litig.*, 2003 U.S. Dist. LEXIS 26500, at *35 (D. Or. Apr. 17, 2003) (re-pleading is "futile" when Safe Harbor applies), *aff'd*, 104 F. App'x 655 (9th Cir. 2004).   The statement should be dismissed again for the same reason.

### H.     Statement 8: Disclosure of Salesforce Turnover

Statement 8, the only new statement challenged in the SAC, is Aerohive's November 1, 2017 disclosure on salesforce turnover:

> We have experienced in the past higher than normal turn-over, especially amongst our sales and engineering personnel, and continue to replace personnel where we think needed to improve our operations and product development capabilities and processes.  We also continue to replace personnel as part of our ongoing performance and expense management initiatives.  Turn-over is highly disruptive to our operations and has had and could continue to have an adverse effect on our revenue.

¶ 68.[4]  These disclosures were part of the Court's reason for dismissing Plaintiff's previous pleading.  Order at 19.  While he assiduously edited this disclosure out of his previous pleading, Plaintiff now challenges it as false or misleading, hoping to somehow defuse its force.  ¶ 69. This newly challenged statement does not save the SAC.

First, Plaintiff repeats the old saw that Aerohive's disclosure masked a "then-existing" problem, which had "already had" a negative impact, as a mere contingency.  ¶ 69.  This ignores

---

[4] The SAC, like Plaintiff's previous pleading, is remarkable in that most of the challenged statements are in fact cautionary or negative disclosures by Aerohive.  ¶¶ 60, 62, 64, 66, 68.  The fact that these disclosures were negative in nature makes it extremely difficult for Plaintiff to show that the alleged omissions rendered the statements false or misleading, as opposed to merely incomplete.  Order at 21–22.  It is also inconsistent with the theme of almost every securities case: that the defendants falsely issued overly *positive* statements to mislead investors.

the challenged statement, which states that Aerohive "*ha[d] experienced* . . . higher than normal turn-over," it "*continue[d] to replace* personnel," and turnover "*has had* and could continue to have an adverse effect on our revenue." ¶ 68 (emphasis added). Aerohive did not discuss turnover as a mere contingency. *Id*. And Plaintiff's allegations certainly do not make the statement actionable. *See In re Convergent Techs. Sec. Litig.*, 948 F.2d 507, 515–16 (9th Cir. 1991) (finding disclosures adequate though risk had already materialized to some extent where company "repeated[ly] emphas[ized] significant risk factors").

Second, the SAC claims that Aerohive did not disclose the "full scale" of the problems, ¶ 69, but this is just another way to say that it should have disclosed "more." As the Ninth Circuit has recognized, "No matter how detailed and accurate disclosure statements are, there are likely to be additional details that could have been disclosed but were not." *Brody*, 280 F.3d at 1006. Here Aerohive said nothing false or misleading about salesforce turnover, and thus it had no duty to say more, assuming more remained to be said.

Third, Plaintiff's claim that Aerohive's disclosure of salesforce turnover contradicted an earlier statement that "technology companies don't cost-cut their way to success," ¶ 37, is mere quibbling. The two statements are easily reconciled: a company can commit to controlling its operating costs while, at the same time, acknowledging that reduced costs alone will not make them successful. Plaintiff's snippeted statements do not satisfy the PSLRA's "exacting requirements" for pleading falsity. *Metzler*, 540 F.3d at 1070.

## III.   THE SAC FAILS TO ALLEGE WITH PARTICULARITY A STRONG INFERENCE OF SCIENTER

This Court held in its Order that it did not need to reach the element of scienter due to the deficiencies in the FAC's falsity allegations, but it provided guidance to Plaintiff regarding several obvious deficiencies in his scienter allegations. Order at 28–30. Specifically, the Court stated that Plaintiff had failed to adequately allege that the departure of Mr. Wilburn in late 2017 was indicative of fraud, and Plaintiff had failed to allege that any CW said anything about Mr. Flynn or Mr. Ritchie or knew anything about the individual defendants' states of mind at the time the challenged statements were made. *Id*.

The SAC does not come close to curing those deficiencies.  There are no new allegations regarding Mr. Wilburn, and no CW, not even the new one (CW2), has anything to say about Mr. Flynn or Mr. Ritchie, and that includes CW4 (former CW2), who is alleged to have reported to Mr. Flynn.  ¶ 48.  Plaintiff's sole new scienter allegation about 42-inch  televisions fails to even allege that the TVs displayed information inconsistent with Aerohive's public statements.  The SAC should be dismissed for failure to plead facts supporting a strong inference that the conduct of Mr. Flynn and Mr. Ritchie was "highly unreasonable" and constituted an "extreme departure from the standards of ordinary care." *Silicon Graphics*, 183 F.3d at 992.

### A.   CW Allegations Do Not Establish a Strong Inference of Scienter

Plaintiff's CW allegations continue to "fall flat" where scienter is concerned.  Order at 29.  No CW mentions Mr. Flynn or Mr. Ritchie in his/her statements or gives any indication that either executive engaged in duplicitous conduct, and no CW worked at Aerohive at the time that the challenged statements were made (indeed, they had all been gone for months).  Even the CW who alleged reported to Mr. Flynn had nothing bad to say about him.  Order at 16.  This does not support any inference of scienter at all.  *See In re Apple Comput., Inc.*, 127 F. App'x 296, 302 (9th Cir. 2005) (no scienter where CW statements "d[id] not establish exactly what [CEO] knew, nor when he knew it, to allege that [he] knew his predictions were false when he made them"); *City of Royal Oak Ret. Sys. v. Juniper Networks, Inc.*, 2013 WL 2156358, at *9 (N.D. Cal. May 17, 2013) (CW with no contact with defendants provided "little, if any, reliable basis" for scienter) (citation omitted); *Brodsky v. Yahoo! Inc.*, 630 F. Supp. 2d 1104, 1117 (N.D. Cal. 2009) (no "personal contact" with defendants).

CW5's new allegation—that, while CW5 was with Aerohive from August 2015 to September 2017, ¶ 51, two 42-inch televisions mounted in the sales area of the Aerohive office displayed "leaderboards" with "sales projections, internal rankings, deals closed to date and expected closings," ¶¶ 54, 80—comes nowhere near curing this deficiency.  Though the SAC claims that Mr. Flynn and Ritchie would have "access" to the TVs, ¶ 54, it does not state with particularity whether the sales projections shown to the sales staff for purposes of their internal competition were the same or different from external financial guidance.  More fundamentally,

while it alleges, in the vaguest possible way, the *type* of information displayed on the TVs, the SAC does not allege *what* the TVs actually said at any given point in time, let alone on or before November 1, 2017.  *See Intuitive Surgical*, 759 F.3d at 1063 (rejecting CW statements that did not detail "actual contents of the reports the executives purportedly . . . had access to").  It cannot do so, as every CW had left Aerohive by the end of September 2017.  *See In re Silicon Storage Tech.*, 2006 WL 648683, at *11 (N.D. Cal. Mar. 10, 2006) ("The statements regarding events that occurred [before the class period] cannot substitute for the required particularized showing of scienter [during the class period].").  Plaintiff also does not allege—and no CW says—that Mr. Flynn or Mr. Ritchie ever saw anything on those TVs inconsistent with their public statements.  As such, the TV allegations do nothing to contradict Aerohive's stated explanation that it saw "typical order linearity in October and November, but as December progressed orders came in well below forecast."  Ex. 5 at 3.

**B.      Existence of "Problems" Does Not Support a Strong Inference of Scienter**

Plaintiff claims, as he did in the FAC, that Mr. Flynn and Mr. Ritchie "should have known" Aerohive would miss its 4Q17 guidance.  But every company has "problems."  *Ronconi*, 253 F.3d at 434.  Here, "[t]he key question . . . is not whether defendants had knowledge of certain undisclosed facts, . . . but rather whether the defendants knew or should have known that their failure to disclose those facts  'present[ed] a danger of misleading buyers or sellers.'"  *City of Dearborn Heights Act 345 Police & Fire Ret. Sys. v. Waters Corp.*, 632 F.3d 751, 758 (1st Cir. 2011) (citation omitted); *see In re NVIDIA Corp. Sec. Litig.*, 768 F.3d 1046, 1056–57 (9th Cir. 2014) (same); *Colyer v. AcelRx Pharms., Inc.*, 2015 WL 7566809, at *13 (N.D. Cal. Nov. 25, 2015) ("[K]nowing about the existence of certain [problems] and knowing that one should report these [problems] to the public are two different things.").  Nothing in the SAC suggests— and no CW says—that Mr. Flynn or Mr. Ritchie "did not take [these] problems into account" in Aerohive's 4Q17 guidance.  *Zumiez*, 2009 WL 901934, at *11.  And while much of the SAC amounts to allegations that Aerohive made some unwise strategic choices or had a "failed business strategy," ¶¶ 49, 69, mere hindsight disagreement about the wisdom of shifting away from the E-Rate program is insufficient to prop up an attempted claim of securities fraud.  *See*

1    *Ronconi*, 253 F.3d at 437 (merely "[c]alling executives bad managers, or bad forecasters, does

2    not plead fraud"); *In re Downey*, 2009 WL 2767670, at *11 ("[T]he second-guessing of

3    management decisions by [CWs] does not provide a basis for securities fraud.").

4    **C.    Mr. Wilburn's Departure Does Not Support a Strong Inference of Scienter**

5    The "bare fact of resignation cannot support a strong inference of scienter." *City of*

6    *Dearborn Heights Act 345 Police & Fire Ret. Sys. v. Align Tech., Inc.*, 2013 WL 6441843, at *14

7    (N.D. Cal. Dec. 9, 2013), *aff'd*, 856 F.3d 605 (9th Cir. 2017).  The SAC adds nothing to the

8    allegations regarding Mr. Wilburn that the Court already held to be insufficient to plead scienter,

9    and thus those allegations continue to be unsupported "by any further facts, including an

10   allegation about the source of that information." Order at 29–30.  Thus the allegations regarding

11   Mr. Wilburn should not factor into the scienter analysis.

12   **D.    Voluntary Disclosures Undermine Inference of Scienter**

13   The SAC leans on a theory of omission but Aerohive's repeated disclosure of negative

14   information on the very topics they were supposedly concealing fundamentally undermines any

15   inference of deliberate omission.  *See In re Rigel Pharms., Inc., Sec. Litig.*, 697 F.3d 869, 885

16   (9th Cir. 2012) ("voluntarily publicly disclosed" information undermined scienter); *In re Worlds*

17   *of Wonder Secs. Litig.*, 35 F.3d 1407, 1424 (9th Cir. 1994) ("If [the company]'s officers were

18   bent on committing fraud, it is not likely that they would have provided such detailed risk

19   disclosure . . . ."); *Sterling*, 963 F. Supp. 2d at 1142 ("Robust disclosure of risks and problems

20   . . . 'negates an inference that the company acted with intent to defraud.'") (citation omitted).

21   The list of disclosures is dizzying.  Aerohive disclosed its cost-reduction measures earlier

22   in the year, Ex. 1 (4Q16 Call) at 6 ("lower cost"); Ex. 2 (2Q17 Call) at 6 ("cost-reduction

23   actions"); the reorganization of its sales organization, ¶¶ 4, 34, the "adverse" and "highly

24   disruptive" effects of salesforce turnover, Ex. 3 (3Q17 10-Q) at 46, and that "newly hired

25   personnel may also require several quarters to gain experience and develop their territories

26   before achieving capacities we have assumed in our sales forecasts," *id*. at 37.  As for its

27   programs and product releases, Aerohive openly discussed the problems with E-Rate, ¶¶ 33, 35;

28   Ex. 1 (4Q16 Call) at 5 ("troubled E-Rate program"); Ex. 2 (2Q17 Call) at 8 ("reducing the

dependence on the E-Rate"); Ex. 3 (3Q17 10-Q) at 22, 36–37 ("significantly slower pace" in "education business"); Ex. 4 (3Q17 Call) at 8 ("another bad E-Rate year"), and the problems with HiveManager NG and Connect to Select, Ex. 3 (3Q17 10-Q) at 22 (HiveManager NG); Ex. 2 (2Q17 Call) at 4 (Connect to Select); Ex. 3 (3Q17 10-Q) at 22 (Connect to Select).

Indeed, any increase or reduction in sales and marketing expenses would be found in Aerohive's regular financial reports, because Aerohive regularly disclosed this to investors. *See, e.g.*, ¶ 56 (Aerohive "proudly reported declines in expenses" "throughout 2017"); Ex. 2 (2Q17 Call) at 6 (disclosing year-over-year reduction in sales and marketing expenses); Ex. 4 (3Q17 Call) at 5 (disclosing quarter-over-quarter and year-over-year reductions in such expenses).

The foregoing demonstrates that Aerohive and the Individual Defendants made significant, voluntary disclosures about nearly every issue raised in the SAC. This fundamentally undermines any inference that Mr. Flynn or Mr. Ritchie intended to deceive or that their actions were highly unreasonable or an extreme departure from standards of ordinary care. *See Rigel*, 697 F.3d at 885; *WOW*, 35 F.3d at 1424; *Sterling*, 963 F. Supp. 2d at 1142.

### E.   Absence of Motive Allegations Undermines Inference of Scienter

The SAC is still devoid of any allegation that Mr. Flynn or Mr. Ritchie sold any stock during the class period. The motiveless, profitless nature of the alleged fraud undermines an inference of scienter. *See Tellabs*, 551 U.S. at 325 ("allegation of motive" relevant as is "lack thereof"); *In re Wet Seal, Inc. Sec. Litig.*, 518 F. Supp. 2d 1148, 1177–78 (C.D. Cal. 2007) (absence of stock sales weighs against scienter).

### F.   Considered Holistically, the More Plausible Inference Is Nonculpable

When considered holistically, the scienter allegations in the SAC fall far short of a "highly unreasonable" omission or an "extreme departure from standards of ordinary care." Just like the previous pleading, the SAC is bereft of any reason to think Mr. Flynn or Mr. Ritchie did not actually believe the 4Q17 revenue guidance, that the CWs provided them with information that they ignored, or that they engaged, in any way, in duplicitous behavior. No CW asserts that any challenged statement was false. The far more plausible inference is that Mr. Flynn and Mr. Ritchie were aware to some degree of problems, did their best to manage them, and took them

into account in forecasting future revenues.  Indeed, Aerohive overcame similar problems in 1Q17 and 2Q17, barely missed in 3Q17, and came within striking distance (8%) even in 4Q17. That Mr. Flynn and Mr. Ritchie repeatedly disclosed and discussed Aerohive's problems and risks as 2017 progressed further shows that there was no intent to deceive.  It is one thing to allege that Aerohive might have underestimated some of these problems.  It is quite another to allege that Mr. Flynn and Mr. Ritchie's conduct was "highly unreasonable" or an "extreme departure from the standards of ordinary care."  That is not—and cannot—be alleged here.

## IV.    THE SAC FAILS TO STATE A CLAIM UNDER SECTION 20(a)

As the Court noted, Plaintiff's Section 20(a) claim requires an underlying violation of Section 10(b).  Order at 30.  The SAC fails to allege such a violation and thus fails to state a Section 20(a) claim.  *Lipton v. Pathogenesis Corp.*, 284 F.3d 1027, 1035 n.15 (9th Cir. 2002).

## V.    THE SAC SHOULD BE DISMISSED WITH PREJUDICE

The SAC is Plaintiff's third attempt to turn Aerohive's missed guidance into securities fraud.  ECF Nos. 1, 44, 60.  Plaintiff drafted the SAC with the Order's detailed description of the earlier pleading's deficiencies in hand, and ample time to remedy them.  Because Plaintiff "fail[ed] to cure the deficiencies" this Court "addressed in [the] Order," his claims should be dismissed with prejudice.  Order at 30; *see Yelp*, 875 F.3d at 1228 (affirming dismissal with prejudice where district court "pointed out deficiencies" and provided "explicit warnings").

**CONCLUSION**

Defendants respectfully request that the SAC be dismissed with prejudice.

Dated:  March 28, 2019                    Respectfully submitted,

WILSON SONSINI GOODRICH & ROSATI
Professional Corporation


By:  /s/ Rodney G. Strickland
          Rodney G. Strickland

Attorneys for Defendants Aerohive Networks, Inc., David K. Flynn, and John Ritchie