United States District Court
Northern District of California

UNITED STATES DISTRICT COURT

NORTHERN DISTRICT OF CALIFORNIA

SAN JOSE DIVISION

JACOB MCGOVNEY, et al.,
Plaintiffs,
v.
AEROHIVE NETWORKS, INC., et al.,
Defendants.

Case No. 18-CV-00435-LHK

**ORDER GRANTING MOTION TO DISMISS CONSOLIDATED SECOND AMENDED CLASS ACTION COMPLAINT WITH PREJUDICE**

Re: Dkt. No. 63

Lead Plaintiff Andrew Moreau ("Plaintiff"), individually and on behalf of all other persons similarly situated, alleges that Defendants Aerohive Networks, Inc. ("Aerohive"), David Flynn, and John Ritchie (collectively, "Defendants") violated federal securities laws. Before the Court is Defendants' motion to dismiss the Consolidated Second Amended Class Action Complaint ("SAC"). ECF No. 63 ("Mot."). Having considered the parties' briefing, the relevant law, and the record in this case, the Court GRANTS Defendants' motion to dismiss the SAC with prejudice.

# I. BACKGROUND

## A. Factual Background

### 1. The Parties

Lead Plaintiff Andrew Moreau "purchased Aerohive common shares" and was allegedly damaged by false and misleading statements made by Defendants. ECF No. 60 ("SAC") ¶¶ 17–18, 23. Lead Plaintiff seeks to represent a putative class of "all persons other than Defendants who purchased or otherwise acquired Aerohive common shares between November 1, 2017 and January 16, 2018, both dates inclusive" (the "Class Period"). *Id.* ¶ 1.

Defendant Aerohive is a California corporation headquartered in Milpitas, California. *Id.* ¶ 24. Aerohive's common stock trades on the New York Stock Exchange under the symbol "HIVE." *Id.* Defendant David Flynn ("Flynn") has served as Aerohive's Chief Executive Officer ("CEO") since July 2007, as its President since November 2007, and as its Chairman since July 2013. *Id.* ¶ 25. Defendant John Ritchie ("Ritchie") has served as Aerohive's Chief Financial Officer ("CFO") and Senior Vice President since September 2015, and as its Chief Operating Officer ("COO") since February 2017. *Id.* ¶ 26. The Court refers to Flynn and Ritchie as the "Individual Defendants."

**2. Aerohive's Business**

Aerohive designs and develops cloud network and enterprise Wi-Fi solutions that enable customers to manage their network systems and to collect and analyze data. *Id.* ¶¶ 2, 29. Aerohive's products include hardware, such as routers and switches, network management and data collection applications, and maintenance and support services. *Id.* ¶ 29. Aerohive has over 30,000 end-user customers (organizations holding licenses to products and/or software subscriptions or services). *Id.* Aerohive services the healthcare, education, manufacturing, distribution, and retail industries in the United States, Europe, the Middle East, and Asia. *Id.* ¶ 2.

Aerohive reaches most of its end-user customer base through "channel partners," who are authorized to resell, distribute, and service Aerohive's technology platform. *Id.* ¶ 30. These channel partners are supported by Aerohive's sales organization, which is comprised of regional sales offices and inside sales teams. *Id.*

By the end of 2016, roughly 40% of Aerohive's total revenues came from the education

sector, and about half of those revenues were attributable to a government-funded program called E-Rate, which provides subsidies to educational institutions to purchase technology. *Id.* ¶ 31.

**3. Challenges Facing Aerohive in 2016**

Aerohive has had promising year-over-year increases in revenue from 2013 to 2016. *Id.* ¶ 32. Despite this, Aerohive has never achieved profitability. *Id.* ¶¶ 3, 32. By the end of 2016, Aerohive faced increasing pressure to prove it was a "real player in the industry" and to "maintain the value of its common stock." *Id.* ¶¶ 4, 32. According to Plaintiffs, however, Aerohive faced several "obstacles," including uncertainties surrounding the E-Rate program. *Id.* ¶¶ 3, 33. In addition, Aerohive launched the next generation of its cloud networking platform, HiveManager NG, and a lower priced, entry-level option called Aerohive Connect, which, due to delays in product updates, had created what Aerohive called "elongated sales cycles" while customers waited for features and capabilities to be added. *Id.* ¶¶ 3, 33.

**4. Aerohive's 2017 Sales Restructuring**

Around 2017, Defendants announced an overhaul of Aerohive's sales organization and sales strategy, which Defendants promised would improve revenues and profitability. *Id.* ¶¶ 4, 33–34. Specifically, Plaintiffs allege that these changes included: (1) installing new sales leadership; (2) "unbundling" Aerohive's product and service offerings; and (3) growing Aerohive's business with Dell. *Id.* ¶ 4. The Court provides further details about these changes in turn.

First, to overhaul Aerohive's sales organization and strategy, Defendants installed new sales leadership. Aerohive hired Ron Gill as Vice President of Americas Sales. *Id.* ¶ 34. Ron Gill previously worked for Ruckus, one of Aerohive's competitors. Ron Gill reported to Tom Wilburn, then-Senior Vice President of Worldwide Field Operations, "who possessed extensive experience in technology and networking sales and marketing." *Id.* Aerohive also added Alan Amrod, another industry veteran, to make Aerohive "faster and more nimble." *Id.* Under this new structure, Defendant Flynn would "continue to directly manage sales, marketing, and products." *Id.*

Second, Aerohive announced it would shift away and diversify its customer base from the

E-Rate program by "unbundling" Aerohive's product and service offerings. *Id.* ¶¶ 4, 33, 35. For instance, Aerohive announced a new offering consisting of a lower-priced, entry-level product called "Aerohive Connect," with additional features and upgrades that could be purchased as part of "Aerohive Select," a subscription service that would "generate deferred revenues on a going-forward basis." *Id.* ¶¶ 33, 35. Aerohive Connect was intended as a "catalyst" that would drive sales growth. *Id.* ¶ 35. However, Plaintiffs allege that Defendants' sales execution strategy was flawed and that Aerohive concealed these flaws from investors. *Id.* ¶ 40.

Third, Defendants placed emphasis on their plan to grow Aerohive's business with Dell, one of Aerohive's key strategic partners. *Id.* ¶¶ 4–5.

**5. Confidential Witness Allegations**

In support of their allegations, Plaintiffs rely on information from former Aerohive employees, identified by Plaintiffs as "Confidential Witnesses" ("CW"). One witness, identified as CW1,[1] was a former Sales Operations Renewals Coordinator at Aerohive from September 2016 to June 2017. *Id.* ¶ 41. CW1 initially reported to Aerohive's Director of Worldwide Sales Operations and Business, and ultimately reported to the Director of Sales, Eddie Ramirez. *Id.* According to CW1, on or about January 2017, Aerohive terminated half the members of its sales organization or 30 employees from a staff of, at least, 60 people. *Id.* ¶ 43. CW1 recounted that Aerohive's decision to transition to Aerohive Connect and upsell Aerohive Select had problems from the outset because new equipment included free support automatically, and the free support never expired. *Id.* According to CW1, this practice went on for nearly a decade, and Aerohive failed to discover the practice until November or December of 2016. *Id.* CW1 stated that the free support service cost Aerohive hundreds of thousands of dollars each year. *Id.* ¶ 44. The SAC alleges that CW1 knows these facts because CW1 was personally responsible for trying to rectify the problem. *Id.* According to CW1, Defendant Flynn was aware of this issue because Defendant Flynn worked

[1] Plaintiffs renumbered the CWs from their Consolidated Amended Class Action Complaint ("FAC"). CW1 was CW4 in the FAC. CW2 is new. CW3 was CW1 in the FAC. CW4 was CW2 in the FAC. CW5 was CW3 in the FAC.



United States District Court
Northern District of California

United States District Court
Northern District of California

closely with CW1's manager, the Vice President of Sales Operations and Head of Customer Support, who knew about the negative impact that the free support had on Aerohive's bottom line. *Id.* Ultimately, the sales teams were allowed to offer steep discounts on service contract renewals in order to secure deals, thereby generating lower-than-expected revenues. *Id.*

CW 2 was an inside sales territory manager on the commercial sales team at Aerohive from January 2016 to June 2017. *Id.* ¶ 45. According to CW2, after Ron Gill was hired as the Vice President of Sales for the Americas in the beginning of 2017, half of the inside territory managers, or 6 out of a total of 12, left Aerohive. *Id.*

CW3 was an Opportunity Development Representative ("ODR") in Aerohive's inside sales department from October 2016 to July 2017, and a Sales Operations Business Analyst from July 2017 to September 2017. *Id.* ¶ 46. CW3 stated that in the summer of 2017, Aerohive laid off a majority of ODRs, including CW3, and that there were only 2 ODRs out of a team of 9 that remained at Aerohive. *Id.* ¶ 47. CW3 alleges that these layoffs were precipitated by Aerohive's decision to shift away from E-Rate. *Id.*

CW4 was Aerohive's K-12 programs director who reported directly to the Senior Vice President and General Manager of Products and Marketing, Alan Amrod, and Defendant Flynn, from June 2015 to September 2017. *Id.* ¶ 48. CW4 alleged that Aerohive cut E-Rate experienced sales personnel. *Id.* CW4 stated that many sales teams' members lacked education-sales experience, and following the layoffs in early 2017, Aerohive did not have resources to train employees to grow the E-Rate business. *Id.* ¶ 49. As a result, CW4 alleges that the E-Rate business declined from $32.4 million in 2017 to $23.35 million in 2018. *Id.* CW4 also alleges that the firing of Aerohive's representatives meant there was no one to support Dell's business. *Id.* ¶ 50. According to CW4, Aerohive helped Dell grow its E-Rate business by 68% in 2016, but by the end of 2017, Dell had lost 72% of that business. *Id.*

CW5 was an inside sales territory manager on the commercial sales team from August 2016 to September 2017. *Id.* ¶ 51. CW5 alleges that Aerohive experienced attrition in the middle

United States District Court
Northern District of California

of 2017. *Id.* According to CW5, 6 of the 9 members of CW5's inside sales team left Aerohive in the middle of 2017, and by the end of fall 2017, the majority of Aerohive's 30 to 35 regional sales managers had been with Aerohive less than a year, and these new managers "did not understand Aerohive's products well enough to sell them deftly." *Id.*

CW5 stated that Aerohive released a "less-than-exciting iteration" of its wireless networking switch in 2016, followed by an "equally deficient" update in 2017, and that the product's "lackluster" reviews also compromised Aerohive's ability to meet its sales goals. *Id.* ¶ 52. CW5 explained Aerohive failed to implement a system that ensured accurate forecasting of sales revenues, which compounded employee turnover and weak product problems. *Id.* According to CW5, sales quotas became unrealistic because there was little accountability, sales representatives frequently inflated their projections, and deals almost never closed when promised. *Id.* ¶ 53. CW5 also stated that Craig Lockwood, Aerohive's Director of Commercial Sales, forecasted sales figures based only on deals that closed in the last two weeks of the quarter. *Id.* CW5 alleged that Craig Lockwood had a substance abuse disorder and would remain away from the office for most of the quarter but would return to the office in the final two weeks of each quarter. *Id.* When Lockwood returned, sales representatives showed him deals that were lined up in the final weeks of the quarter, and Lockwood forecasted sales figures based on that information and reported back to Ron Gill, who shared these figures with the executive leadership. *Id.*

CW5 described Aerohive as a small company where the Individual Defendants worked from a second-floor office that was only one hundred feet from the sales staff. *Id.* ¶ 54. CW5 explained that both the commercial and the public sector sales teams had two 42-inch televisions ("TVs") mounted prominently in each of the two sales sections, and that these TVs displayed a leaderboard that showed "sales projections, internal rankings, deals closed to date, and expected closings." *Id.* According to CW5, the Individual Defendants had access to the leaderboard and visited the teams each week and commented on the sales teams' progress and internal rankings. *Id.*

**6. Alleged False and Misleading Statements**

United States District Court
Northern District of California

Plaintiffs allege that between November 1, 2017 and January 16, 2018, Defendants made several false or misleading statements. *Id.* ¶¶ 59–75. Plaintiffs broadly categorize the statements as statements related to: (1) sales personnel issues; (2) Aerohive Connect, Aerohive Select, and HiveManager; (3) sales execution and business with Dell; (4) projected revenues; and (5) Aerohive's attempt to blunt impact of bad news. Opp'n at 6–8. These statements were made in Aerohive's quarterly report for 3Q17 on Form 10-Q ("3Q17 Form 10-Q") with the United States Securities and Exchange Commission ("SEC") and Aerohive's 3Q17 earnings call with investors ("3Q17 Earnings Call"). *Id.* ¶¶ 59, 70. The Court lists the statements below. Where necessary to the Court's discussion, the Court has provided the context for the statement and indicated the challenged statement itself in bold font. Any statements that are both italicized and bolded below are italicized and bolded in Plaintiffs' SAC.

> **Statement 1 (in *3Q17 Form 10-Q*):** "We also expect to continue to invest in our organization and our channel and strategic partnerships to meet the needs of our customers and to pursue opportunities in new and existing markets. ***In particular, we are investing to increase our sales capacity as well as our channel program.***"

> **Statement 2 (in *3Q17 Form 10-Q*):** "We believe that the **significantly slower pace of order volume** in our education vertical in the third and fourth quarters of our fiscal year 2016, specifically due to **slower pace of funding approvals under the federal E-Rate program**, was one of the primary drivers of lower-than-expected order volume and revenue performance in our third quarter and our lowered revenue outlook for our fourth quarter."

> **Statement 3 (in *3Q17 Form 10-Q*):** "In May 2017, we announced that our Aerohive Connect and Select offerings are available across our entire portfolio of access points and switches. We believe that separating our product line into these two offerings delivers compellingly priced cloud-managed hardware for connectivity-oriented deployments and enables us to capture more subscription and software license revenue from those customers who require a more advanced feature set and support. This program ***may*** reduce our revenue, or the rate of our revenue growth, as purchasers take advantage of the lower entry pricing for our products. In addition, it ***may*** be difficult and take time for us to adjust expenses sufficiently to compensate for a shortfall in revenue, even when we may anticipate the shortfall."

> **Statement 4 (in *3Q17 Form 10-Q*): "**We also believe that we introduced our new HiveManager NG product to some of our larger and more complex customers before its feature set was able to fully address their requirements, which resulted in

**elongated sales cycles** and reduced revenue opportunities, which specifically contributed to our lower revenue performance in the fourth quarter and our outlook for the first quarter of our fiscal year 2017."

**Statement 5 (by Defendant Flynn in *3Q17 Earnings Call*):** "In parallel, we continue to strengthen our go-to-market, both through our full OEM relationship with Dell EMC and through the initiative we launched at the start of this year to pivot to a more channel-centric go-to-market model to improve our sales efficiency and better address the mid-market. The foundation of this plan was the launch of our Connect-to-Select offering, and a launch of [a] number of channel recruitment and development end initiatives.

Our sales leader Tom Wilburn's strength and passion is around larger enterprise direct touch business[es] so when we launched this initiative in Q1, he augmented his team with channel-centric sales leaders who built much of Ruckus' channel as well as new leadership in APAC. With this new program and team, we recruited 600 new resellers in the first half of the year and added 300 more in Q3. In Q3, we moved fully to a 2-tier model by transitioning our direct VAR business through SYNNEX and we signed WAV as a distributor to help us develop the MSP and HSP channels. Now with this team in place and a program on the right trajectory, Tom has decided to move on to pursue opportunities that better align with his preferred go-to-market model.

***Having successfully restructured my leadership team under a COO organization, paired with a unified products and marketing organization, I now have the capacity to take on global sales leadership to drive this critical initiative working directly with our 3 theater sales leaders.***

. . .

I am encouraged by the significant progress of our product delivery and that this has given Dell EMC the confidence in us to expand into a full OEM relationship. ***Our results demonstrate that we are steadily improving our operating efficiency while positioning ourselves to resume growth.***"

**Statement 6 (by Defendant Ritchie in *3Q17 Earnings Call*):** "***We realized significant sales efficiencies with our non-GAAP sales and marketing costs*** coming in at 39% of revenue, driving this important metric to under 40% on a year-to-date basis.

. . .

During the quarter, we saw significant improvements in our sales efficiency as non-GAAP sales and marketing costs came in at $14.4 million or 39% of revenue in Q3, down $1.5 million from $15.9 million recognized in the second quarter. ***We are encouraged by several metrics that point to improved sales productivity.*** For the third quarter in a row, we have reported year-over-year declines in sales and marketing expenses. In addition, for the last two quarters and also on a year-to-date basis, our sales and marketing costs as a percentage of revenue were sub-40%."



United States District Court
Northern District of California

> **Statement 7 (by Defendant Ritchie in *3Q17 Earnings Call*):** "We are currently expecting Q4 revenue in the range of $40 million to $42 million."
>
> **Statement 8 (in *3Q17 Form 10-Q*): "**Our future success also depends on our ability to continue to attract, integrate and retain highly skilled personnel, especially skilled executives and sales and engineering employees. ***We have experienced in the past higher than normal turn-over, especially amongst our sales and engineering personnel, and continue to replace personnel where we think needed to improve our operations and product development capabilities and processes.*** We also continue to replace personnel as part of our ongoing performance and expense management initiatives. ***Turn-over is highly disruptive to our operations and has had and could continue to have an adverse effect on our revenue.***
> . . .
> ***Any failure to successfully attract, integrate or retain qualified personnel to fulfill our current or future needs may negatively impact our growth.*** Also, to the extent we hire personnel from our competitors, we may be subject to allegations that we have improperly solicited these employees, that they have divulged to us proprietary or other confidential information of their former employers, or that their former employers own their inventions or other work product. This may expose us to significant liability and litigation risk."

*Id.* ¶¶ 59–75; *see also* ECF No. 64-1.

**7. Aerohive's Share Price Falls**

On January 16, 2018, Aerohive issued a press release entitled "Aerohive Networks Announces Preliminary Fourth Quarter 2017 Financial Results," which revealed that Aerohive "expects net revenue to be approximately $37 million," which was below the stated guidance of $40 million to $42 million. SAC ¶ 83. Aerohive attributed the reduced guidance to "underlying sales execution issues" and stated: "[f]ollowing the change in our sales leadership at the end of our third quarter, we uncovered underlying sales execution issues." *Id.* On this news, Aerohive's share price fell $1.63, or 28.6%, to close at $4.07 on January 17, 2018. *Id.* ¶ 84. In a subsequent investor conference call, Defendants stated that Aerohive's missed earnings were caused by "overoptimistic assessments of closed dates for deals in the pipeline," "bad forecasting," and "serious execution problem[s]" caused by inexperienced sales staff. *Id.* ¶¶ 85–88.

**B. Procedural History**

On January 19, 2018, a group of Aerohive shareholders filed suit in the instant case captioned *McGovney et al. v. Aerohive Networks, Inc., et al.*, 5:18-CV-00435. *See* ECF No. 1. A

second suit was filed on January 25, 2018, in a case captioned *Beyerbach et al. v. Aerohive Networks, Inc.*, *et al.*, 5:18-CV-00544. A third suit was filed on January 30, 2018, in a case captioned *Panjabi et al. v. Aerohive Networks, Inc.*, *et al.*, 18-CV-00656. On February 15, 2018, the Court related the three cases. ECF No. 16. On August 9, 2018, the Court consolidated the three cases, and appointed Andrew Moreau as lead plaintiff. ECF No 42.

On September 28, 2018, Plaintiffs filed a Consolidated Amended Class Action Complaint. *See* ECF No. 44 ("FAC"). On October 26, 2018, Defendants filed a motion to dismiss the FAC. ECF No. 47 ("First Motion to Dismiss"). On December 5, 2018, Plaintiffs filed an opposition. ECF No. 52. On December 28, 2018, Defendants filed a reply. ECF No. 53.

On February 5, 2019, the Court granted Defendants' motion to dismiss the FAC without prejudice. ECF No. 58 ("February 5, 2019 Order").

On March 7, 2019, Plaintiffs filed the SAC. On March 28, 2019, Defendants filed the instant motion to dismiss the SAC. *See* Mot. On May 2, 2019, Plaintiffs filed an opposition. ECF No. 65 ("Opp'n"). On May 16, 2019, Defendants filed a reply. ECF No. 67 ("Reply").

**C. Request for Judicial Notice of Documents Incorporated by Reference**

In the First Motion to Dismiss, Defendants requested judicial notice of documents, which included (1) a transcript of Aerohive's 4Q16 earnings call, held on February 14, 2017 ("Exhibit 1"); (2) a transcript of Aerohive's 4Q17 earnings call, held on August 2, 2017; ("Exhibit 2"); (3) a copy of Aerohive's 3Q17 quarterly report on Form 10-Q, filed on November 1, 2017 ("Exhibit 3"); (4) a transcript of Aerohive's 3Q17 earnings call, held on November 1, 2017 ("Exhibit 4"); and (5) a transcript of Aerohive's 4Q17 earnings call, held on February 8, 2018 ("Exhibit 5"). In the February 5, 2019 Order, the Court took judicial notice of these five documents because these documents were incorporated by reference in Plaintiffs' FAC and because Plaintiffs did "not object" or "otherwise respond" to the request. February 5, 2019 Order at 10–11.

In the instant motion, Defendants again request judicial notice of Exhibits 1–5, which are incorporated by reference in Plaintiffs' SAC. ECF No. 64. However, Plaintiffs now object and

argue that (1) the Court should reject the request to take judicial notice of Exhibits 1 and 2; and (2) any judicial notice of the exhibits should be limited to the exhibits' existence and authenticity, not the truth of their contents. ECF No. 66. The Court addresses both arguments in turn.

First, Plaintiffs argue the Court should not consider Exhibits 1 and 2, even though Exhibits 1 and 2 are referenced in the SAC, because Exhibits 1 and 2 do not contain the statements that Plaintiffs alleged are false or misleading. The Court rejects Plaintiffs' argument because Plaintiffs misstate the incorporation by reference doctrine. The United States Supreme Court held in *Tellabs, Inc. v. Makor Issues & Rights, Ltd.*, that in assessing securities fraud claims, "courts must consider the complaint in its entirety, as well as other sources courts ordinarily examine when ruling on Rule 12(b)(6) motions to dismiss, in particular, documents incorporated into the complaint by reference, and matters of which a court may take judicial notice." 551 U.S. 308, 322 (2007). The incorporation by reference doctrine "prevents plaintiffs from selecting only portions of documents that support their claims, while omitting portions of those very documents that weaken—or doom—their claims." *Khoja v. Orexigen Therapeutics, Inc.*, 899 F.3d 988, 1002 (9th Cir. 2018), *cert. denied sub nom. Hagan v. Khoja*, 139 S. Ct. 2615 (2019) ("*Orexigen*"). In *Orexigen*, the Ninth Circuit clarified the standard for incorporation by reference. A document may be incorporated "if the plaintiff refers extensively to the document or the document forms the basis of the plaintiff's claim." *Id.* at 1002 (quoting *United States v. Ritchie*, 342 F.3d 903, 908 (9th Cir. 2003)). For reference to a document to be sufficiently "extensive," the complaint must refer to the document "more than once," or alternatively, must include a lengthy reference. *Id.* at 1002–04.

In the instant case, as Plaintiffs concede, Exhibits 1 and 2 are referenced "more than once" in the SAC. ECF No. 66 at 2. Specifically, the SAC quotes the 4Q16 earnings call (which is Exhibit 1) six times to allege that, on the 4Q16 earnings call, Aerohive "lauded" its new programs, "assured" investors that it would achieve growth, and discussed E-Rate, Aerohive Connect, and Aerohive Select. *See, e.g.*, SAC ¶¶ 34–36 (quoting 4Q16 earnings call).

Similarly, the SAC also quotes from the 2Q17 earnings call (which is Exhibit 2) six times

to allege that, on the 2Q17 earnings call, Defendants "repeatedly assured investors that the Company was on track." *See, e.g.*, SAC ¶¶ 5, 10 (quoting 2Q17 earnings call). Thus, Exhibits 1 and 2 satisfy *Orexigen*.

Second, Plaintiffs argue that the Court should decline to take judicial notice of the exhibits because the exhibits may not be used to prove the "truth of their contents." ECF No. 66 at 3–4. This argument simply recasts the well-accepted legal standard governing documents subject to judicial notice—that is, that the Court "may take judicial notice of publications introduced to indicate what was in the public realm at the time," but that the Court may not take judicial notice as to "whether the contents of those articles were in fact true." *Von Saher v. Norton Simon Museum of Art*, 592 F.3d 954, 960 (9th Cir. 2009); *In re Intel Corp. Sec. Litig.*, 2019 WL 1427660, at *6 & n.9 (N.D. Cal. Mar. 29, 2019) (considering exhibit for the purpose of "showing that particular information was available to the stock market," not for "the truth of its content"). The Court will bear this standard in mind with respect to all of the exhibits. Plaintiffs' objection, however, does not warrant rejection of Defendants' request for judicial notice. *See Colyer v. Acelrx Pharm., Inc.*, No. 14-CV-04416-LHK, 2015 WL 7566809, at *3 (N.D. Cal. Nov. 25, 2015) (rejecting plaintiffs' argument that the Court should decline to take judicial notice because the Court could not consider the exhibits for "the truth of their contents").

Accordingly, the Court again takes judicial notice of Exhibits 1–5, which are incorporated by reference in Plaintiffs' SAC, and thus GRANTS Defendants' request. ECF No. 64.

## II. LEGAL STANDARD

### A. Motion to Dismiss

Pursuant to Federal Rule of Civil Procedure 12(b)(6), a defendant may move to dismiss an action for failure to state a claim upon which relief may be granted. Because Plaintiffs have brought their claims as a federal securities fraud action, Plaintiffs are not subject to the notice pleading standards under Rule of Civil Procedure 8(a)(2), which require litigants to provide "a short and plain statement of the claim showing that the pleader is entitled to relief." Instead,

Plaintiffs must "meet the higher, [more] exacting pleading standards of Federal Rule of Civil Procedure 9(b) and the Private Securities Litigation Reform Act (PSLRA)." *Or. Pub. Emp. Ret. Fund v. Apollo Grp. Inc.*, 774 F.3d 598, 603–04 (9th Cir. 2014).

Under Rule 9(b), "[i]n alleging fraud or mistake, a party must state with particularity the circumstances constituting fraud or mistake." Plaintiffs must include "an account of the time, place, and specific content of the false representations" at issue. *Swartz v. KPMG LLP*, 476 F.3d 756, 764 (9th Cir. 2007) (internal quotation marks omitted). Rule 9(b)'s particularity requirement "applies to all elements of a securities fraud action." *Apollo Grp.*, 774 F.3d at 605. "PSLRA imposes additional specific pleading requirements, including requiring plaintiffs to state with particularity both the facts constituting the alleged violation and the facts evidencing scienter." *In re Rigel Pharm., Inc. Sec. Litig.*, 697 F.3d 869, 877 (9th Cir. 2012). In order to properly allege falsity, "a securities fraud complaint must . . . specify each statement alleged to have been misleading, [and] the reason or reasons why the statement is misleading." *Id.* (internal quotation marks and alteration omitted). In addition, in order to "adequately plead scienter under the PSLRA, the complaint must state with particularity facts giving rise to a strong inference that the defendant acted with the required state of mind." *Id.* (internal quotation marks omitted).

For purposes of ruling on a Rule 12(b)(6) motion, the Court "accept[s] factual allegations in the complaint as true and construe[s] the pleadings in the light most favorable to the nonmoving party." *Manzarek v. St. Paul Fire & Marine Ins. Co.*, 519 F.3d 1025, 1031 (9th Cir. 2008). Nonetheless, the Court is not required to "'assume the truth of legal conclusions merely because they are cast in the form of factual allegations.'" *Fayer v. Vaughn*, 649 F.3d 1061, 1064 (9th Cir. 2011) (quoting *W. Mining Council v. Watt*, 643 F.2d 618, 624 (9th Cir. 1981)). Mere "conclusory allegations of law and unwarranted inferences are insufficient to defeat a motion to dismiss." *Adams v. Johnson*, 355 F.3d 1179, 1183 (9th Cir. 2004). Furthermore, "'a plaintiff may plead [him]self out of court'" if he "plead[s] facts which establish that he cannot prevail on his . . . claim." *Weisbuch v. Cty. of L.A.*, 119 F.3d 778, 783 n.1 (9th Cir. 1997) (citation omitted).

**B. Leave to Amend**

Under Rule 15(a) of the Federal Rules of Civil Procedure, leave to amend "shall be freely granted when justice so requires," bearing in mind "the underlying purpose of Rule 15 to facilitate decision on the merits, rather than on the pleadings or technicalities." *Lopez v. Smith*, 203 F.3d 1122, 1127 (9th Cir. 2000) (en banc) (internal quotation marks and alterations omitted). Generally, leave to amend shall be denied only if allowing amendment would unduly prejudice the opposing party, cause undue delay, or be futile, or if the moving party has acted in bad faith. *Leadsinger, Inc. v. BMG Music Publ'g*, 512 F.3d 522, 532 (9th Cir. 2008).

## III. DISCUSSION

Plaintiffs allege two causes of action: (1) violation of § 10(b) of the Exchange Act and Rule 10b-5 against all Defendants, and (2) violation of § 20(a) of the Exchange Act against the Individual Defendants. *See* SAC ¶¶ 103–117. The Court addresses each cause of action in turn.

**A. Violation of § 10(b) of the Exchange Act and Rule 10b-5**

"To plead a claim under section 10(b) and Rule 10b-5, the Plaintiffs must allege: (1) a material misrepresentation or omission; (2) scienter; (3) a connection between the misrepresentation or omission and the purchase or sale of a security; (4) reliance; (5) economic loss; and (6) loss causation." *Apollo Grp.*, 774 F.3d at 603. Defendants argue (1) the CWs lack personal knowledge and reliability; (2) the SAC fails to allege a false or misleading statement; and (3) the SAC fails to allege scienter. The Court addresses each argument below.

**1. Confidential Witnesses**

"[A] complaint relying on statements from confidential witnesses must pass two hurdles to satisfy the PSLRA pleading requirements." *Zucco Partners, LLC v. Digimarc Corp.*, 552 F.3d 981, 995 (9th Cir. 2009), *as amended* (Feb. 10, 2009). "First, the confidential witnesses whose statements are introduced to establish scienter must be described with sufficient particularity to establish their reliability and personal knowledge." *Id.* "Second, those statements which are reported by confidential witnesses with sufficient reliability and personal knowledge must themselves be indicative of scienter." *Id.* As to the first prong, for a CW allegation to be credited

at the pleading stage, the CW must be described "with sufficient particularity to support the probability that a person in the position occupied by the source would possess the information alleged." *Id.* (quoting *In re Daou Sys., Inc.*, 411 F.3d 1006, 1015 (9th Cir. 2005)). To determine whether a CW has the requisite knowledge, courts look to the "level of detail provided by the confidential sources, the corroborative nature of the other facts alleged (including from other sources), the coherence and plausibility of the allegations, the number of sources, the reliability of the sources, and similar indicia." *Id.* (quoting *Daou*, 411 F.3d at 1015).

In the First Motion to Dismiss, Defendants challenged each of Plaintiffs' CWs on the grounds that, inter alia, the FAC failed to allege the CWs had personal knowledge. *See* February 5, 2019 Order at 14. The Court agreed that the FAC lacked important details about the CWs' employment information, including their job description and responsibilities, and held that without describing the particular responsibilities of each of the CWs, the FAC failed to adequately allege that the CWs were in a position to have the knowledge they professed. *Id.* at 14–16.

In the instant motion to dismiss the SAC, Defendants again assert that the CW allegations are deficient. Mot. at 7–9. Specifically, Defendants argue that Plaintiffs "might have now pled the 'bare minimum' of job titles and responsibilities, but Plaintiff[s] ha[ve] in no way rectified that second more significant deficiency. Like its dismissed predecessor, the SAC simply does not allege that the CWs had personal knowledge of what matters most in this case—Company-wide financials, the forecasting process, 4Q17 guidance and events, and the state of mind of Mr. Flynn and Mr. Ritchie at the time the challenged statements were issued." *Id.* at 8.

Because Defendants agree that the SAC alleges the "bare minimum" of the CWs' job titles and responsibilities, the Court need not discuss these allegations further. Instead, the Court focuses on the sufficiency of the SAC's allegations as to the CWs' personal knowledge of specific information.

**2. False or Misleading Statement**

Plaintiffs allege that between November 1, 2017 and January 16, 2018, Defendants made

false or misleading statements in Aerohive's 3Q17 Form 10-Q and 3Q17 Earnings Call. SAC ¶¶ 59–75. Defendants argue that these statements are nonactionable because, among other things, they are true and not misleading, and because Plaintiffs' allegations are not particular. Defendants also again argue that Statement 7 is a forward-looking statement protected by the PSLRA's "Safe Harbor" provision. The Court discusses Defendants' challenges to each of the statements in turn and finds that none of the alleged statements are actionable.

**a. Failure to Allege False or Misleading Statements**

To assert a claim under the PSLRA, a plaintiff must plead with particularity the element of falsity. *Zucco*, 552 F.3d at 990–91. "The PSLRA has exacting requirements for pleading 'falsity.'" *Metzler Inv. GMBG v. Corinthian Colleges, Inc.*, 540 F.3d 1049, 1070 (9th Cir. 2008). To satisfy these "exacting requirements," a plaintiff must plead "specific facts indicating why" the statements at issue are false. *Id.* Moreover, a statement must be false "at [the] time by the people who made them." *Ronconi v. Larkin*, 253 F.3d 423, 430 (9th Cir. 2001). "The fact that [a] prediction proves to be wrong in hindsight does not render the statement untrue when made." *In re VeriFone Sec. Litig.*, 11 F.3d 865, 871 (9th Cir. 1993).

Plaintiffs largely challenge the statements at issue for being misleading because, according to Plaintiffs, Defendants knew but omitted material information concerning sales personnel issues and sales strategy failures. Opp'n at 13–21. Thus, Plaintiffs largely do not contest that Defendants' statements are technically true, but instead that the statements are incomplete.

However, as the United States Supreme Court has held, "§ 10(b) and Rule 10b-5(b) do not create an affirmative duty to disclose any and all material information." *Matrixx Initiatives, Inc. v. Siracusano*, 563 U.S. 27, 44–45 (2011) (citing 17 C.F.R. § 240.10b-5(b)). Indeed, "[s]ilence, absent a duty to disclose, is not misleading under Rule 10b-5." *Basic Inc. v. Levinson*, 485 U.S. 224, 239 n.17 (1988). Rather, "[t]o be actionable under the securities laws, an omission must be misleading." *Brody v. Transitional Hosps. Corp.*, 280 F.3d 997, 1006 (9th Cir. 2002). That is to say, the omission "must affirmatively create an impression of a state of affairs that differs in a

material way from the one that actually exists." *Id.* "[T]o fulfill the materiality requirement 'there must be a substantial likelihood that the disclosure of the omitted fact would have been viewed by the reasonable investor as having significantly altered the 'total mix' of information made available.'" *Basic*, 485 U.S. at 231–32 (citation omitted).

Below, the Court addresses the pleading deficiencies with regards to Statements 1–8.

**i. Statements 1 and 2**

Statement 1 is a statement in the 3Q17 Form 10-Q regarding Aerohive's "expect[ation]" that it would "continue to invest" in the organization and that Aerohive is "investing to increase [its] sales capacity as well as [its] channel program." SAC ¶ 60. Statement 2 is a statement in the 3Q17 Form 10-Q regarding Aerohive's "significantly slower pace of order volume" attributable to the "slower pace of funding approvals under the federal E-Rate Program." *Id.* ¶ 62.

In the FAC, Plaintiffs alleged that Statements 1 and 2 are misleading because they omit information, including that "Defendants replaced knowledgeable, experienced sales personnel and implemented cost-cutting measures that left the sales organization understaffed and ill-equipped to service existing customers and develop new opportunities." FAC ¶ 53. In the February 5, 2019 Order, the Court found Plaintiffs' allegations regarding the falsity of Statements 1 and 2 insufficient because Plaintiffs alleged only incomplete statements about Aerohive's sales personnel issues, not statements that are "misleading or untrue." February 5, 2019 Order at 18–19 (quoting *Police Retirement Sys. of St. Louis v. Intuitive Surgical* ("*Intuitive Surgical*"), 759 F.3d 1051, 1061 (9th Cir. 2014)). Further, the Court found that Aerohive actually disclosed sales personnel issues in the 3Q17 Form 10-Q, which contains Statements 1 and 2 and is incorporated by reference in the Plaintiffs' complaint. *Id.* at 19. The Court also found insufficient Plaintiffs' allegations about the extent of the staffing problems and that Plaintiffs failed to allege with particularity salesforce understaffing as opposed to salesforce turnover. *Id.* at 20.

In the SAC, Plaintiffs again allege that Statements 1 and 2 are misleading for failing to provide more complete statements. However, it is well-settled that securities laws prohibit "only

misleading and untrue statements, not statements that are incomplete." *Intuitive Surgical*, 759 F.3d at 1061 (quoting *Brody*, 280 F.3d at 1006). Thus, even accepting Plaintiffs' allegation that the statements are incomplete, Plaintiffs must still state why the statements are misleading or untrue.

Here, Plaintiffs argue that Statements 1 and 2 are misleading because the statements failed to disclose that: (1) "Aerohive dramatically reduced its entire sales staff by 50% months before the Class Period began;" (2) Aerohive's decision to shift away from education-sales and lay off experienced education-sales related personnel caused the E-Rate business, which was responsible for nearly 40% of Aerohive's revenues, to decline by over $9 million, or from $32.4 million to $23.5 million in 2018; and (3) "Aerohive's channel program was negatively impacted by a weak product launch and the Company's failure to accurately forecast salves revenues." SAC ¶¶ 61, 63. In the instant motion to dismiss, Defendants argue that Plaintiffs have again failed to allege that Statements 1 and 2 are misleading. Mot. at 10–15.

The SAC's allegations regarding Statements 1 and 2 are again insufficient. First, as to Plaintiffs' salesforce understaffing allegation, Plaintiffs argue that they have quantified the number of employees terminated at the beginning of 2017 (nearly a year before the class period and the November 1, 2017 3Q17 Form 10-Q). Opp'n at 13 (citing SAC ¶ 43). However, Plaintiffs isolate the terminations and ignore that the SAC alleges that many of the terminated or departed employees were actually replaced by new hires. *See, e.g.*, SAC ¶¶ 7, 41, 51–52, 75 (alleging "replace[ments]"; new "hiring[s]"; "new" managers; the "majority of the Company's 30 to 35 regional sales managers" were new; "employee turnover"; new people brought in "from Ruckus"; and the hiring of "former Ruckus employees"). Thus, in total, the SAC alleges salesforce turnover, not understaffing. As the Court previously found in its February 5, 2019 Order, Aerohive disclosed turnover in the same document—the 3Q17 Form 10-Q—which contains Statements 1 and 2. In this document, Aerohive informed investors of "higher than normal turn-over, especially amongst our sales and engineering personnel"; that Aerohive "continue[s] to replace personnel where we think needed to improve our operations and product development"; that "[w]e also



United States District Court
Northern District of California

continue to replace personnel as part of our ongoing performance and expense management initiatives"; and that "[t]urn-over is highly disruptive to our operations and has had and could continue to have an adverse effect on our revenue." Ex. 3 ("3Q17 Form 10-Q") at 45–46. Therefore, Aerohive disclosed exactly what Plaintiffs allege Aerohive omitted. *See Apollo Grp.*, 774 F.3d at 607 ("Plaintiffs' omissions theory fails to state a claim because the Defendants clearly disclosed material information to investors."); *Paskowitz v. Pac. Capital Bancorp*, 2009 WL 4911850, at *5 (C.D. Cal. Nov. 6, 2009) (finding statements not misleading where information "actually disclosed").

Second, Plaintiffs' explanation as to why Statements 1 and 2 are misleading, i.e. that Aerohive's decision to shift away from E-Rate and to lay off E-Rate personnel caused the E-Rate business to decline by over $9 million, is also insufficient. Plaintiffs' explanation comes from an allegation by CW4, who left Aerohive in September 2017, that E-Rate revenues declined from "$32.4 million in 2017 to $23.35 million in 2018." SAC ¶¶ 48–49. As an initial matter, it is not clear how CW4 would have access to 2018 E-Rate revenue figures after leaving Aerohive in September 2017. *See Zucco*, 552 F.3d at 996 (explaining CW testimony should not be based on "secondhand information"). Nonetheless, even crediting CW4's allegation, the 2018 decline in E-Rate revenue does not make Statements 1 or 2 misleading. The SAC concerns 2017 guidance, and post-class-period declines in E-Rate revenue do not establish that Aerohive should have disclosed additional information about the E-Rate program on November 1, 2017. *See Ronconi*, 253 F.3d at 430 (To be actionable, a statement must be false "at [the] time by the people who made them"); *City of Roseville Employees' Ret. Sys. v. Sterling Fin. Corp.*, 963 F. Supp. 2d 1092, 1144 (E.D. Wash. 2013), *aff'd*, 691 F. App'x 393 (9th Cir. 2017) ("[W]hat Plaintiff knows *now* about Sterling's practices has no bearing on what Defendants knew *then*."). Further, the SAC fails to allege how actual 4Q17 E-Rate results differed from the E-Rate projections, which also renders Plaintiffs' allegation insufficient. *See City of Dearborn Heights Act 345 Police & Fire Ret. Sys. v. Align Tech., Inc.*, 856 F.3d 605, 618 (9th Cir. 2017) (finding plaintiff's failure to allege the "actual

assumptions that Defendants relied upon" made it impossible to determine whether "events" alleged in complaint were ignored); *In re Zumiez Inc. Sec. Litig.*, 2009 WL 901934, at *11 (W.D. Wash. Mar. 30, 2009) ("[N]othing in the Complaint suggests that Defendants did not take such problems into account when generating the Company's projections.").

Moreover, Aerohive repeatedly disclosed problems with the E-Rate program. For instance, the SAC alleges that Aerohive announced its strategic decision to shift away from E-Rate well in advance of 3Q17: "Defendants acknowledged that [Aerohive] had become overly dependent on E-Rate" and "needed to diversify"; and that "Aerohive Connect was lauded as a key component to expanding and diversifying [Aerohive's] customer base away from the E-Rate program." SAC ¶¶ 33, 35; *see also* Ex. 1 ("4Q16 Call") at 5 ("As mentioned last quarter, we have accelerated our plans to lessen this dependency" on the "troubled E-Rate program"); Ex. 2 ("2Q17 Call") at 8 ("E-Rate is a troubled program" and "[w]e are clearly focused on . . . reducing the dependence on the E-Rate"). Aerohive also disclosed that problems with the E-Rate program were negatively affecting its financials. *See* Ex. 1 ("4Q16 Call") at 5 ("[O]ur results continued to highlight our overdependence on the troubled E-Rate program."); Ex. 3 ("3Q17 10-Q") at 4 ("expected Q3 weakness in education"). Aerohive also disclosed on November 1, 2017, the same day that Statements 1 and 2 were made, that it predicted "another bad E-Rate year." Ex. 4 ("3Q17 Call") at 8. Therefore, Aerohive disclosed what Plaintiffs allege Aerohive omitted, namely the problems with the E-Rate program. *See Apollo Grp.*, 774 F.3d at 607 ("Plaintiffs' omissions theory fails to state a claim because the Defendants clearly disclosed material information to investors.").

Third, Plaintiffs' allegation that Statements 1 and 2 are misleading because Aerohive failed to disclose that a "weak product launch" in 2016 "negatively impacted" Aerohive's channel program is insufficient because the allegation is not particularized. This allegation is an allegation by CW5 that "Aerohive released a less-than exciting iteration of its wireless networking switch in 2016, which was followed by an equally deficient update in 2017," and "lackluster reviews." SAC ¶ 52. However, Plaintiffs do not quantify the severity of these problems, which makes it difficult

to assess the falsity of Defendants' statements. *In re Silicon Graphics*, 183 F.3d 970, 985 (9th Cir. 1999) (affirming dismissal where allegations lacking "specifics" invited the court to "speculate" as to the "severity of the problems"), *superseded by statute on other grounds*; *Ronconi*, 253 F.3d at 434 ("Plaintiffs' complaint was required to allege specific facts to show how these 'problems' and 'difficulties' translated into decreasing revenues. It fails to do so."); *In re Vantive Corp. Sec. Litig.*, 283 F.3d 1079, 1086–87 (9th Cir. 2002) ("lengthening" sales cycles and "slow sales" not pled with particularity), *abrogation on other grounds recognized by Gebhart v. S.E.C.*, 595 F.3d 1034 (9th Cir. 2010); *In re Solarcity Corp. Sec. Litig.*, 274 F. Supp. 3d 972, 999 (N.D. Cal. 2017) (finding plaintiffs did not allege with particularity information about "low quality contracts"). Indeed, Plaintiffs fail to allege why the omission of this additional information renders Statements 1 and 2 misleading as opposed to merely incomplete. *Brody*, 280 F.3d at 1006 (To "survive a motion to dismiss under the heightened pleading standards of the [PSLRA], the plaintiffs' complaint must specify the reason or reasons why the statements made by [defendant] [are] misleading or untrue, not simply why the statements [are] incomplete.").

Accordingly, for the reasons stated above, the Court finds that Plaintiffs fail to plead falsity with respect to Statements 1 and 2 as required by the PSLRA. Therefore, the Court GRANTS Defendants' motion to dismiss Statements 1 and 2.

In the February 5, 2019 Order, the Court found that Plaintiffs' allegations regarding Statements 1 and 2 failed to plead falsity and thus were insufficient. The Court granted leave to amend, but warned that failure to cure this deficiency would result in dismissal of Plaintiffs' claim with prejudice. On amendment, Plaintiffs have yet again failed to plead falsity. Thus, further leave to amend would be both futile and unduly prejudicial to Defendants. The SAC is Plaintiffs' third complaint, and Defendants have already briefed two motions to dismiss. Accordingly, Statements 1 and 2 are dismissed with prejudice. *See Leadsinger, Inc.*, 512 F.3d at 532.

**ii. Statements 3 and 4**

Statement 3 is a statement in the 3Q17 Form 10-Q regarding the Aerohive Connect and

United States District Court
Northern District of California

Aerohive Select program offerings and the fact that the "program may reduce [Aerohive's] revenue, or the rate of [Aerohive's] revenue growth, as purchasers take advantage of the lower entry pricing for [Aerohive's] products. In addition, it may be difficult and take time for [Aerohive] to adjust expenses sufficiently to compensate for a shortfall in revenue, even when we may anticipate the shortfall." SAC ¶ 64. Statement 4 is a statement in the 3Q17 Form 10-Q that the introduction of Aerohive's HiveManager NG resulted in "elongated sales cycles." *Id.* ¶ 66.

In the February 5, 2019 Order, the Court found insufficient Plaintiffs' contentions that Statements 3 and 4 are misleading. February 5, 2019 Order at 21–22. Specifically, the Court found Plaintiffs failed to specify why Statements 3 and 4 are misleading as opposed to incomplete, especially when Statement 3 "cautioned investors about potential problems with the Aerohive Connect and Aerohive Select program itself, and when Aerohive disclosed in the 3Q17 Form 10-Q that '[i]t is difficult for us to forecast our future operating results' or engage in 'accurate financial planning.'" *Id.* at 22. Further, the Court found that "the factual allegations regarding any failures with the Aerohive Connect and Aerohive Select program do not meet particularity requirements because the complaint does not provide details about the severity of the problems with the Aerohive Connect and Aerohive Select program, including the revenue impact of customers who were not converting to service subscriptions, the timing of such actions, as well as what 'substantial discounts' means." *Id.* The Court also found Plaintiffs' allegations regarding Statement 4 vague because "Plaintiffs just state in a conclusory manner that the sales projections were constantly overinflated but did not explain precisely what that meant." *Id.*

In the SAC, Plaintiffs now allege that Statements 3 and 4 are misleading because Aerohive's practice of providing "free support" services cost Aerohive "hundreds of thousands of dollars a year"; Aerohive had to offer "steep discounts on service contract renewals" to rectify this problem; and Aerohive's revenue opportunities and operating results were negatively impacted by "lackluster" reviews of the wireless networking switch and sales representatives routinely inflating their sales projections. SAC ¶¶ 65, 67.

Plaintiffs' allegations regarding the falsity of Statements 3 and 4 are again insufficient. First, as in the February 5, 2019 Order, Plaintiffs fail to specify why Statements 3 and 4 are "misleading" as opposed to "incomplete," *Brody*, 280 F.3d at 1006, especially when Statements 3 and 4 cautioned investors about potential problems with Aerohive Connect, Aerohive Select, and HiveManager NG, and when Aerohive disclosed in 3Q17 Form 10-Q that "[i]t is difficult for us to forecast our future operating results" or engage in "accurate financial planning." 3Q17 Form 10-Q at 33; *see Intuitive Surgical*, 759 F.3d at 1061 ("[T]o be actionable under the securities laws, an omission must be misleading . . . it must affirmatively create an impression of a state of affairs that differs in a material way from the one that actually exists." (citation omitted)).

Second, Plaintiffs' allegation that Aerohive's practice of providing "free support" services costs Aerohive "hundreds of thousands of dollars a year" is an allegation made by CW1. SAC ¶¶ 42, 44. However, Plaintiffs fail to explain how CW1 arrived at this vague figure. *See Zucco*, 552 F.3d at 996 (explaining CW testimony should not be based on "secondhand information"). Thus, because Plaintiffs have failed to establish CW1's reliability and personal knowledge about this allegation, the Court cannot credit CW1's allegation. *Zucco*, 552 F.3d at 995 ("[T]he confidential witnesses whose statements are introduced to establish scienter must be described with sufficient particularity to establish their reliability and personal knowledge.").

Third, as to the "lackluster reviews," Plaintiffs' allegation again fails because Plaintiffs do not quantify the severity of these problems, which makes it difficult to assess the falsity of Defendants' statements. *In re Silicon Graphics*, 183 F.3d at 985 (affirming dismissal where allegations lacking "specifics" invited the court to "speculate" as to the "severity of the problems"); *Ronconi*, 253 F.3d at 434 ("Plaintiffs' complaint was required to allege specific facts to show how these 'problems' and 'difficulties' translated into decreasing revenues. It fails to do so."); *In re Vantive*, 283 F.3d at 1086–87 ("lengthening" sales cycles and "slow sales" not pled with particularity); *In re Solarcity*, 274 F. Supp. 3d at 999 (finding plaintiffs did not allege with particularity information about "low quality contracts"). In any event, in the same document that

contains Statements 3 and 4, Aerohive disclosed that customers were disappointed with the new HiveManager NG product: "we introduced our new HiveManager NG product to some of our larger and more complex customers before its feature set was able to fully address their requirements, which resulted in elongated sales cycles and reduced revenue opportunities, which specifically contributed to our lower revenue performance." Ex. 3 ("3Q17 10-Q") at 22; *see also id.* at 38 (announcing that delay in transition to HiveManager NG had "affected revenue from our switch products"). Thus, "Plaintiffs' omissions theory fails to state a claim because the Defendants clearly disclosed material information to investors." *Apollo Grp.*, 774 F.3d at 607.

Finally, Plaintiffs argue that they cured the FAC's deficiencies by alleging that sales representatives frequently inflated projections, and that this problem was exacerbated by the fact that Craig Lockwood, Aerohive's Director of Commercial Sales, who had a substance abuse disorder and remained absent from the office until the last two weeks of the quarter, forecasted sales figures based on deals that closed only in the last two weeks of the quarter. Opp'n at 17 (citing SAC ¶¶ 52–53). However, this allegation does not cure the FAC's deficiencies because it fails to quantify what overinflated means or how that made Defendants' statements misleading. *See, e.g.*, *In re Vantive*, 283 F.3d at 1087 ("Even when the complaint eventually indicates that 'Vantive's sales cycles were lengthening substantially,' the complaint gives no indication of what it means for a sales cycle to lengthen 'substantially,' or what the actual length of the cycle was at the time of the statement."); *Ronconi*, 253 F.3d at 431 ("Plaintiffs must state with particularity all facts upon which their belief that sales were not accelerating was based.").

Thus, for the reasons stated above, the Court finds that Plaintiffs fail to plead falsity with respect to Statements 3 and 4 as required by the PSLRA. Therefore, the Court GRANTS Defendants' motion to dismiss these statements.

In the February 5, 2019 Order, the Court found that Plaintiffs' allegations regarding Statements 3 and 4 failed to plead falsity and thus were insufficient. The Court granted leave to amend, but warned that failure to cure this deficiency would result in dismissal of Plaintiffs' claim

with prejudice. On amendment, Plaintiffs have yet again failed to plead falsity. Thus, further leave to amend would be futile and unduly prejudicial to Defendants. The SAC is Plaintiffs' third complaint, and Defendants have already briefed two motions to dismiss. Accordingly, Statements 3 and 4 are dismissed with prejudice. *See Leadsinger, Inc.*, 512 F.3d at 532.

**iii. Statement 5**

Statement 5 is Defendant Flynn's statement in the 3Q17 Earnings Call that Aerohive sales leader Tom Wilburn departed Aerohive, and that "[h]aving successfully restructured my leadership team under a COO organization, paired with a unified products and marketing organization, I now have the capacity to take on global sales leadership to drive this critical initiative working directly with our 3 theater sales leaders." SAC ¶ 70. Defendant Flynn also said that the progress Aerohive made with product delivery had "given Dell EMC the confidence in us to expand into a full OEM relationship" and that "[o]ur results demonstrate that we are steadily improving our operating efficiency while positioning ourselves to resume growth." *Id.*

In the February 5, 2019 Order, the Court found Plaintiffs' Statement 5 allegations insufficient because, among other things: (1) Plaintiffs' argument that Tom Wilburn's departure was due to dysfunction of the sales organization was not supported by any further facts, including an allegation about the source of the information; and (2) the portion of the statement about restructuring of the leadership team in February 2017 under a COO organization is "quite literally true." February 5, 2019 Order at 23–24.

Plaintiffs' opposition to the instant motion focuses on the new allegation regarding Defendant Flynn's statement that "there was significant progress of our product delivery and this has given Dell EMC the confidence in us to expand into a full OEM relationship." Opp'n at 17–18 (citing SAC ¶ 70). Plaintiffs contend that this statement is misleading because, according to CW4, Aerohive helped Dell grow its business by 68% in 2016, but by the end of 2017 Dell had lost 72% of that business directly due to lack of adequate support from Aerohive. *Id.* (citing SAC ¶ 50).

Even with this new allegation, Plaintiffs' Statement 5 allegations are still insufficient. As

an initial matter, the allegation about Dell comes from CW4, but it is unclear how CW4 knows that information. *See Zucco*, 552 F.3d at 996 (explaining CW testimony should not be based on "secondhand information"). Even crediting CW4's allegation, the SAC lacks particular details about Aerohive's relationship with Dell. CW4 alleges that Dell had lost 72% of its business due to lack of adequate support from Aerohive. SAC ¶ 50. However, the SAC does not allege that Aerohive ultimately did not enter into an OEM agreement with Dell EMC or that Dell EMC did not "have confidence" in Aerohive. Indeed, the SAC fails to allege what was expected from Dell in terms of FY17 returns, making it impossible to assess whether expectations were being met or not. *City of Royal Oak Ret. Sys. v. Juniper Networks, Inc.*, 880 F. Supp. 2d 1045, 1064 (N.D. Cal. 2012) ("Plaintiffs fail to allege facts that provide an analytical link between the particular facts supplied by the confidential witness and the ultimate conclusion that Juniper could not meet its overall revenue and growth goals."). Nor does the SAC allege that Aerohive executives did not consider this information when they created the 4Q17 guidance. *Align Tech., Inc.*, 856 F.3d at 618 (finding plaintiff's failure to allege the "actual assumptions that Defendants relied upon" made it impossible to determine whether "events" alleged in complaint were ignored); *Zumiez*, 2009 WL 901934, at *11 ("[N]othing in the Complaint suggests that Defendants did not take such problems into account when generating the Company's projections.").

Thus, for the reasons stated above, the Court finds that Plaintiffs fail to plead falsity with respect to Statement 5 as required by the PSLRA. Therefore, the Court GRANTS Defendants' motion to dismiss Statement 5.

In the February 5, 2019 Order, the Court found that Plaintiffs' allegations regarding Statement 5 failed to plead falsity and thus were insufficient. The Court granted leave to amend, but warned that failure to cure this deficiency would result in dismissal of Plaintiffs' claim with prejudice. On amendment, Plaintiffs have yet again failed to plead falsity. Thus, further leave to amend would be futile and unduly prejudicial to Defendants. The SAC is Plaintiffs' third complaint, and Defendants have already briefed two motions to dismiss. Accordingly, Statement 5

is dismissed with prejudice. *See Leadsinger, Inc.*, 512 F.3d at 532.

**iv. Statement 6**

Statement 6 is Defendant Ritchie's statement in the 3Q17 Earnings Call that made references to "sales efficiency" and "sales productivity." SAC ¶ 72. The statement reflected that Aerohive had seen significant improvements in efficiency "as non-GAAP sales and marketing costs came in at $14.4 million or 39% of revenue in Q3, down $1.5 million from $15.9 million recognized in the second quarter." *Id.*

In the FAC, Plaintiffs alleged that Statement 6 is misleading because "Aerohive's sales force was neither productive nor efficient, and Defendants merely had implemented severe cost cutting measures to create the appearance of operating efficiency and to disguise shortfalls in revenue." FAC ¶ 62. In the February 5, 2019 Order, the Court found that Plaintiffs' Statement 6 allegations insufficient because, "as even Plaintiffs admit," the "'sales efficiency and productivity metrics were technically accurate.'" February 5, 2019 Order at 24. The Court also found that Plaintiffs' allegations regarding Defendants' purported sales execution failures lack particularity to support the assertion that Defendants' Statement 6 is misleading. *Id.*; *see also In re Silicon Graphics*, 183 F.3d at 985 (affirming dismissal where allegations lacking "specifics" invited court to "speculate" as to the "severity of the problems").

The SAC makes no material amendments to Statement 6. Thus, for the reasons given in its February 5, 2019 Order, including because Statement 6 is "literally true," the Court again finds that Plaintiffs fail to plead falsity with respect to Statement 6 as required by the PSLRA. Accordingly, the Court GRANTS Defendants' motion to dismiss Statement 6.

In the February 5, 2019 Order, the Court found that Plaintiffs' allegations regarding Statement 6 failed to plead falsity and thus were insufficient. The Court granted leave to amend, but warned that failure to cure this deficiency would result in dismissal of Plaintiffs' claim with prejudice. On amendment, Plaintiffs have yet again failed to plead falsity. Thus, further leave to amend would be futile and unduly prejudicial to Defendants. The SAC is Plaintiffs' third

United States District Court
Northern District of California

complaint, and Defendants have already briefed two motions to dismiss. Accordingly, Statement 6 is dismissed with prejudice. *See Leadsinger, Inc.*, 512 F.3d at 532.

**v. Statement 7**

Statement 7 is Defendant Ritchie's statement in the 3Q17 Earnings Call that "[w]e are currently expecting Q4 revenue in the range of $40 million to $42 million." SAC ¶ 74. In the February 5, 2019 Order, the Court found that Statement 7 was protected by the PSLRA's "Safe Harbor" provision because it is a forward-looking statement accompanied by meaningful cautionary statements. February 5, 2019 Order at 25– 27 (citing 15 U.S.C. § 78u–5(c)(1)(A)(i)).

First, in the February 5, 2019 Order, the Court explained that Statement 7's revenue forecast is, by definition, forward looking under the PSLRA because it is a "statement containing a projection of revenues." *Id.* at 26 (citing 15 U.S.C. § 78u–5(i)(1)(A)). Second, the Court explained that Statement 7 is accompanied by "meaningful cautionary statements identifying important facts that could cause actual results to differ materially from those in the forward-looking statement." *Id.* (15 U.S.C. § 78u–5(c)(1)(A)(i)). The Court emphasized, for instance "at the beginning of the call, Aerohive warned investors that the call would contain 'forward-looking statements' that involve a 'number of risks and uncertainties' and that investors should reference the 'Risk Factors and Management's Discussion and Analysis of Financial Condition and Results of Operations in our recent annual report on Form 10-K and quarterly report on Form 10-Q.'" *Id.* Moreover, "in the 3Q17 Form 10-Q, Defendants had warned that 'the timing and size of sales,' were 'highly variable'; that Aerohive had 'slowing rate of [ ] revenue growth' that 'may continue, and may even become negative'; that Aerohive had experienced a 'higher than normal turn-over, especially amongst our sales and engineering personnel'; that '[t]urn-over is highly disruptive to our operations and has had and could continue to have an adverse effect on [Aerohive's] revenue'; and that 'the lower-level of E-Rate funded transactions and lengthier sales cycle associated with our HiveManager NG [(Aerohive's next generation of cloud networking platform)] offering continued to affect our revenue opportunities and operating results in 2017.'" *Id.* at 26–27. Third, the Court

rejected Plaintiffs' argument that these cautionary statements are "boilerplate." *Id.* In *In re Cutera Sec. Litig.*, 610 F.3d 1103, 1111–12 (9th Cir. 2010), the Ninth Circuit held that similar language in another case constituted meaningful cautionary statements. Thus, in the February 5, 2019 Order, the Court found Statement 7 was protected by the PSLRA's "Safe Harbor" provision. *Id.*

The SAC makes no material amendments to Statement 7. Because Statement 7 is a forward-looking statement accompanied by meaningful cautionary statements, the Court again finds that Statement 7 is protected by the PSLRA's "Safe Harbor" provision. Accordingly, the Court GRANTS Defendants' motion to dismiss Statement 7.

The February 5, 2019 Order specifically held the "Safe Harbor" provision applied because of the forward-looking nature of Statement 7, the accompanying cautionary language, and the governing law. *See* February 5, 2019 Order. Plaintiffs were unable to cure these deficiencies on amendment. Thus, the Court finds that further leave to amend would be futile. *In re Computerized Thermal Imaging, Inc., Sec. Litig.*, 2003 U.S. Dist. LEXIS 26500, *35 (D. Or. Apr. 17, 2003), *aff'd* 104 F. App'x 655 (9th Cir. 2004) (finding that re-pleading as to statements protected by the Safe Harbor would be "futile"). Furthermore, leave to amend would be unduly prejudicial to Defendants because the SAC is Plaintiffs' third complaint, and Defendants have already briefed two motions to dismiss. Accordingly, Statement 7 is dismissed with prejudice. *See Leadsinger, Inc.*, 512 F.3d at 532.

**vi. Statement 8**

While the FAC contained 7 statements, the SAC adds Statement 8. Statement 8 is a statement in the 3Q17 Form 10-Q that Aerohive had "experienced in the past higher than normal turn-over, especially amongst our sales and engineering personnel, and continue to replace personnel where we think needed to improve our operations and product development capabilities and processes"; that "[t]urn-over is highly disruptive to our operatives and has had and could continue to have an adverse effect on our revenue"; and that "[a]ny failure to successfully attract, integrate or retain qualified personnel to fulfill our current or future needs may negatively impact

our growth." SAC ¶ 68. Although Plaintiffs did not allege Statement 8 in the FAC, in the February 5, 2019 Order, the Court took judicial notice of the entire 3Q17 Form 10-Q document, which contains Statement 8. In the February 5, 2019 Order, the Court specifically cited the language of Statement 8 to show that Aerohive disclosed the sales personnel issues that Plaintiffs alleged Defendants omitted. *See* February 5, 2019 Order at 19. In the instant Order, the Court again cites the language of Statement 8 to show that Aerohive disclosed the sales personnel issues that Plaintiffs alleged Defendants omitted. *See* Section IIIA.2.a.i. Nonetheless, in the SAC, Plaintiffs allege that Statement 8 itself is misleading. SAC ¶ 69.

Plaintiffs' Statement 8 allegations are insufficient for several reasons. First, Plaintiffs allege that Statement 8 failed to disclose a "then-existing" problem regarding sales personnel, which "already had" a "negative impact on Aerohive's "financial outlook." SAC ¶ 69. However, Plaintiffs' allegations ignore the text of Statement 8 itself. Statement 8 disclosed that Aerohive had experienced "higher than normal turn-over"; that Aerohive "continue[d] to replace personnel"; and that "[t]urn-over is highly disruptive to our operations and has had and could continue to have an adverse effect on our revenue." *Id.* ¶ 69. Plaintiffs' allegations do not make Statement 8 actionable because Statement 8 repeatedly emphasized significant risk factors and disclosed the sales personnel issues. *See, e.g.*, *In re Convergent Techs. Sec. Litig.*, 948 F.2d 507, 515 (9th Cir. 1991), *as amended on denial of reh'g* (Dec. 6, 1991) (finding disclosures adequate though risk had already materialized to some extent where company "repeated[ly] emphas[ized] significant risk factors").

Second, Plaintiffs argue that Aerohive should have "quantif[ied] the turnover, Opp'n at 19–20, or disclosed the "full scale of the problems," SAC ¶ 69. However, as the Ninth Circuit has held, "[n]o matter how detailed and accurate disclosure statements are, there are likely to be additional details that could have been disclosed but were not." *Brody*, 280 F.3d at 1006. "To be actionable under the securities laws, an omission must be misleading," not just incomplete. *Id.*; *Matrixx Initiatives*, 131 S. Ct. at 1321 ("§ 10(b) and Rule 10b–5(b) do not create an affirmative

duty to disclose any and all material information.”). Here, Plaintiffs’ Statement 8 allegations are also insufficient because they fail to specify why Defendant’s omissions are misleading and not just incomplete.

Thus, for the reasons stated above, the Court finds that Plaintiffs fail to plead falsity with respect to Statement 8 as required by the PSLRA. Therefore, the Court GRANTS Defendants’ motion to dismiss Statement 8.

The Court dismisses Statement 8 with prejudice. Although Statement 8 is newly alleged in the SAC, in the February 5, 2019 Order, the Court nonetheless considered Statement 8 in evaluating why Plaintiffs’ other allegations were insufficient. Specifically, the Court found in the February 5, 2019 Order that Statement 8 disclosed significant risk factors, including the sales personnel issues, that Plaintiffs alleged are missing from the other disputed statements. Thus, Plaintiffs were on notice that the Court found Statement 8 not false or misleading. In the instant Order, the Court again cites the language of Statement 8 to show that Aerohive disclosed the sales personnel issues that Plaintiffs alleged Defendants omitted. Therefore, the Court finds that Plaintiffs would be unable to plead falsity with respect to Statement 8, and thus, further leave to amend would be futile. Furthermore, leave to amend would be unduly prejudicial to Defendants because the SAC is Plaintiffs’ third complaint, and Defendants have already briefed two motions to dismiss. Accordingly, Statement 8 is dismissed with prejudice. *See Leadsinger, Inc.*, 512 F.3d at 532.

**3. Scienter**

In the February 5, 2019 Order, the Court granted Defendants’ motion to dismiss because it found none of the statements actionable. Nonetheless, in anticipation of the SAC, the Court identified deficiencies in Plaintiffs’ scienter allegations. February 5, 2019 Order at 28. The Court noted that the CWs’ statements lacked reliability; that Plaintiffs failed to adequately allege that Tom Wilburn’s departure was indicative of fraud;[2] and that the CWs failed to allege what

---

[2] Plaintiffs’ opposition makes no mention of the allegation about Tom Wilburn’s departure or why



United States District Court
Northern District of California

United States District Court
Northern District of California

Defendants Flynn or Ritchie knew. *Id.* at 29. The Court noted that "any amended complaint shall cure the scienter deficiencies that the Court has identified as well as any deficiencies properly identified by the Defendants in their motion." *Id.* at 29–30. In the SAC, Plaintiffs have added the following new scienter allegation: 42-inch TVs were in the sales area of the Aerohive office and displayed "leaderboards" with "sales projections, internal rankings, deals closed to date and expected closings." SAC ¶ 80. Defendants argue that the SAC again fails to raise a strong inference of scienter and that the voluntary disclosures undermine any inferences of scienter. Mot. at 20–25. For the reasons given below, the Court agrees with Defendants, and thus dismisses the SAC in its entirety for failure to plead scienter.

To state a claim for securities fraud under the PSLRA, a complaint must create a strong inference of the Defendants' scienter. *See* 15 U.S.C. § 78u–4(b)(2) ("[The complaint must] state with particularity facts giving rise to a strong inference that the defendant acted with the required state of mind."). With respect to the strong inference requirement, "the inference of scienter must be more than merely 'reasonable' or 'permissible'—it must be cogent and compelling." *Tellabs*, 551 U.S. at 324. As to the meaning of "scienter," the Ninth Circuit has held that a plaintiff's complaint must show that "the defendants made false or misleading statements either intentionally or with deliberate recklessness." *Zucco*, 552 F.3d at 990–91 (internal quotation marks omitted). "[F]acts showing mere recklessness or a motive to commit fraud and [the] opportunity to do so" are insufficient. *Id.* "To meet this pleading requirement, the complaint must contain allegations of specific contemporaneous statements or conditions that demonstrate the intentional or the deliberately reckless false or misleading nature of the statements when made." *Ronconi*, 253 F.3d at 432 (internal quotation marks and citation omitted). When an omission is at issue, "the plaintiff must plead a highly unreasonable omission, involving not merely simple, or even inexcusable negligence, but an extreme departure from the standards of ordinary care, and which presents a

this allegation supports a finding of scienter. Nonetheless, for the reasons given in the February 5, 2019 Order, the Court again finds this allegation fails to support a finding of scienter.

danger of misleading buyers or sellers that is either known to the defendant or is so obvious that the actor must have been aware of it." *Zucco*, 552 F.3d at 991 (internal quotation marks omitted).

Plaintiffs' allegations of scienter are based on: (1) the CW allegations; and (2) the "core operations" doctrine. Opp'n at 21–25. In evaluating the sufficiency of Plaintiffs' allegations, the Court first determines "whether any of the plaintiff's allegations, standing alone, [are] sufficient to create a strong inference of scienter." *In re NVIDIA Corp. Sec. Litig.*, 768 F.3d 1046, 1056 (9th Cir. 2014). If none are sufficient alone, the court must "then consider the allegations holistically to determine whether they create a strong inference of scienter taken together." *Id.* Below the Court discusses first the CW allegations and second the core operations doctrine. Finally, the Court analyzes the allegations holistically.

**a. Confidential Witness Allegations**

Plaintiffs assert that the CW allegations establish a strong inference of scienter. Opp'n at 22–23. In the paragraphs below, the Court considers Plaintiffs' CW allegations and whether they raise a "cogent and compelling" inference of scienter. *Tellabs*, 551 U.S. at 324.

As an initial matter, none of the CWs were employed at Aerohive at the time the statements were made, and thus their allegations are entitled to little weight. For instance, in *Police Ret. Sys. of St. Louis v. Intuitive Surgical, Inc.* ("*Intuitive Surgical*"), this Court found that where several of the witnesses "were not employed at Intuitive during the entire Class Period (or not at all during the Class Period, as in the case of Mr. Folliott)," the witnesses' statements were "entitled to little weight." No. 10-CV-03451-LHK, 2012 WL 1868874, at *20 (N.D. Cal. May 22, 2012), *aff'd*, 759 F.3d 1051 (9th Cir. 2014); *see also Brodsky v. Yahoo! Inc.*, 630 F. Supp. 2d 1104, 1115 (N.D. Cal. 2009) ("[B]ecause CW 3 and CW 5 were not Yahoo! employees for most of the Class Period, the Court cannot rely on their statements to support claims of false revenue reporting for the entire Class Period.").

Moreover, in the instant case, Plaintiffs do not allege that CW1, CW2, CW3, or CW5 even reported to or had direct personal contact with Defendants Flynn or Ritchie. Thus, the CWs'





United States District Court
Northern District of California

allegations provide little reliable basis to support an inference of the Defendants' scienter because the CWs do not have personal knowledge as to what the Defendants knew or did not know. *See, e.g.*, *City of Royal Oak Ret. Sys. v. Juniper Networks, Inc.*, 2013 WL 2156358, at *9 (N.D. Cal. May 17, 2013) (finding CW with no contact with defendants provided "little, if any, reliable basis from which to infer scienter"); *Brodsky*, 630 F. Supp. 2d at 1117 (finding CW statements failed "to support an inference of scienter" when the CW did not describe "any personal contact" with any of the defendants). Therefore, the CWs' allegations provide little reliable basis for finding scienter.

Moreover, even considering the CWs' allegations, they do not create a strong inference of scienter. Plaintiffs primarily rely on the allegations of CW5, an inside sales territory manager on the commercial sales team at Aerohive from August 2015 to September 2017. Plaintiffs argue that CW5's allegations create a strong inference of scienter because CW5 described Aerohive as a small company where the Individual Defendants worked from a second-floor office only one hundred feet away from the sales staff. Opp'n at 23 (citing SAC ¶ 54). CW5 alleges that the sales teams had two 42-inch TVs mounted prominently in each of the two sales sections, and these TVs displayed a leaderboard that showed "sales projections, internal rankings, deals closed to date and expected closings." *Id.* According to CW5, Defendants Flynn and Ritchie visited the sales teams each week and commented on the sales teams' progress and internal rankings displayed on the leaderboards. According to Plaintiffs, this shows that the two Individual Defendants had actual access to specific sales data. *Id.*

CW5's allegations about the TVs do not create a strong inference of scienter. First, and foremost, CW5 does not allege that the TVs showed any information rendering the Individual Defendants' statements false or misleading. CW5 does not allege that Defendants Flynn or Ritchie ever saw anything on the TVs inconsistent with their public statements. Second, although the SAC alleges that Defendants Flynn and Ritchie would have had "access" to the TVs, SAC ¶ 54, the SAC does not allege with particularity what the TVs said, when the TVs said it, and whether

Defendants Flynn and Ritchie saw it. *Intuitive Surgical*, 759 F.3d at 1063 (rejecting CW accounts because "they do not detail the actual contents of the reports the executives purportedly referenced or had access to;" and because "the statements provide only snippets of information."). Nor does the SAC allege whether the unparticularized information on the TVs was shown on or before the Class Period date. *Id.*; *see also In re Silicon Storage Tech., Inc.*, 2006 WL 648683, at *11 (N.D. Cal. Mar. 10, 2006) ("The statements regarding events that occurred [before the class period] cannot substitute for the required particularized showing of scienter [during the class period]."). As such, the TV allegations are not particularized enough to show scienter under the PSLRA. *See, e.g.*, *In re Silicon*, 2006 WL 648683, at *16 (finding CW allegations did not "not plead the particularized facts required to show scienter under the PSLRA.").

Plaintiffs also cite allegations from CW1 and CW4 in an attempt to plead scienter. CW1 is a former Sales Operations Renewals Coordinator who was at Aerohive from September 2016 to June 2017. SAC ¶ 42. Plaintiffs argue that CW1's allegations create a strong inference of scienter. Specifically, CW1 stated that there was a problematic transition from Aerohive Connect to Aerohive Select months before the Class Period. CW1 stated that Defendant Flynn "was aware of this issue" because Defendant Flynn worked closely with CW1's manager, the Vice President of Sales Operations and Head of Customer Support, who knew about the negative impact that unlimited free support had on Aerohive's bottom line. Opp'n at 22 (citing SAC ¶ 44). However, Plaintiffs do not allege how CW1 knew the Vice President of Sales Operations and Head of Customer Support or Defendant Flynn were "aware of this issue." *Zucco*, 552 F.3d at 995 ("[T]he complaint must provide an adequate basis for determining that the witnesses in question have personal knowledge of the events they report."). Moreover, the Court cannot credit CW1's allegation as to Defendant Flynn's knowledge because CW1 does not allege CW1 had any personal contact with Defendant Flynn. *See, e.g.*, *Brodsky*, 630 F. Supp. 2d at 1117 (finding CW statements failed "to support an inference of scienter" when the CW did not describe "any personal contact" with any of the defendants).



United States District Court
Northern District of California

Moreover, as discussed above, Plaintiffs fail to specify why Defendants' statements about Aerohive Connect and Aerohive Select were "misleading" as opposed to "incomplete," *Brody*, 280 F.3d at 1006, especially when the statements cautioned investors about potential problems with the Aerohive Connect and Aerohive Select program, and when Aerohive disclosed in 3Q17 Form 10-Q that "[i]t is difficult for us to forecast our future operating results" or engage in "accurate financial planning." 3Q17 Form 10-Q at 33; *see Intuitive Surgical*, 759 F.3d at 1061 ("[T]o be actionable under the securities laws, an omission must be misleading . . . it must affirmatively create an impression of a state of affairs that differs in a material way from the one that actually exists." (citation omitted)); *Intuitive Surgical*, 2012 WL 1868874, at *15 ("Courts may analyze falsity and scienter together, even though they are separate elements, because they generally depend upon the same set of facts." (citing *Daou*, 411 F.3d at 1015)). As such, CW1's allegations do not create a strong inference of scienter.

Finally, CW4 was Aerohive's K-12 programs director, who was alleged to report directly to Defendant Flynn and General Manager Alan Amrod. SAC ¶ 48. Plaintiffs argue that all of CW4's knowledge about the E-Rate program can be attributed to Defendant Flynn. Opp'n at 22–23. However, CW4's allegations make no mention of Defendant Flynn. Thus, CW4's allegations do not establish exactly what the Individual Defendants knew nor when they knew it, and they do not establish that the Individual Defendants knew their statements were false when they made them. *See, e.g.*, *In re Apple Computer, Inc.*, 127 F. App'x 296, 302 (9th Cir. 2005) (finding no scienter where CW statements "d[id] not establish exactly what [CEO] knew, nor when he knew it, to allege that [he] knew his predictions were false when he made them."). As such, CW4's allegations do not create a strong inference of scienter.

In sum, the Court finds that Plaintiffs' allegations, regardless of whether they are viewed individually or in combination do not raise a "cogent and compelling" inference of scienter, *Tellabs*, 551 U.S. at 324, nor do they create a strong inference that the conduct of Defendants Flynn and Ritchie was "highly unreasonable" or constituted an "extreme departure from the

standards of ordinary care," *Zucco*, 552 F.3d at 991.

**b. Core Operations**

Plaintiffs also argue that they have alleged scienter based on the "core operations" doctrine. The core operations doctrine—the theory that "facts critical to a business's 'core operations' . . . are known to a company's key officers"—"can be one relevant part of a complaint that raises a strong inference of scienter." *South Ferry LP, No. 2 v. Killinger*, 542 F.3d 776, 784 (9th Cir. 2008). The Ninth Circuit has explained that the doctrine on its own may support a strong inference of scienter in two circumstances: (1) the allegations are particular and suggest that defendants had actual access to the disputed information; or (2) the allegations may conceivably satisfy the PSLRA standard in a more bare form, without accompanying particularized allegations, in rare circumstances where the nature of the relevant fact is of such prominence that it would be "absurd" to suggest that management was without knowledge of the matter. *Id.* at 785–86.

Defendants' actions do not fall under either of these circumstances. Both circumstances require Defendants to have "at a minimum, made false or misleading statements." *Colyer*, 2015 WL 7566809, at *13. As the Court has held in the instant Order, however, Defendants did not make any such statements. Thus, the core operations doctrine is inapplicable. The Court also rejects Plaintiffs' invocation of the core operations doctrine for the further reasons given below.

As to the first circumstance—whether the allegations are particular and suggest that defendants had actual access to the disputed information—the Court finds that the first circumstance is not present in the instant case. The SAC pleads general allegations about Mr. Flynn being a "hands-on manager," but the Ninth Circuit has already found such allegations insufficient in the absence of other allegations about the defendants' involvement. *See Webb v. Solarcity Corp.*, 884 F.3d 844, 858 (9th Cir. 2018) ("Webb has alleged that [defendants] had a hands-on style and general accounting acumen, but not that they were involved in accounting decisions as minute as the calculation of the burden ratio and inclusion of prior period direct costs in the ratio's denominator. Webb has not alleged that [defendants] had actual access to the

accounting formula, but only generalized access to reports that may have documented its application."); *Intuitive Surgical*, 759 F.3d at 1062 (holding that proof under the core operations doctrine "is not easy," and requires "either specific admissions by one or more corporate executives of detailed involvement in the minutia of a company's operations, such as data monitoring, . . . or witness accounts demonstrating that executives had actual involvement in creating false reports"); *Zucco*, 552 F.3d at 1000 (finding "allegations that senior management . . . closely reviewed the accounting numbers generated . . . and that top executives had several meetings in which they discussed quarterly inventory numbers" insufficient to establish scienter).

As for the second circumstance—whether the nature of the relevant fact is of such prominence that it would be "absurd" to suggest that management was without knowledge of the matter—Plaintiffs cite *In re Zillow Grp., Inc. Sec. Litig.*, 2019 WL 1755293 (W.D. Wash. Apr. 19, 2019), to assert that it would be "absurd" to assume that the Individual Defendants did not know that their statements are false and misleading. However, *In re Zillow Grp.* is inapposite because in that case the individual defendants repeatedly made false or misleading statements that they "don't break out the amount of the revenue that comes from co-marketing efforts," and that "it continues to be the case that [co-marketing efforts is] *a small portion of overall revenue*." *Id.* at *19 (emphasis added). However, a financial analysis in that case actually suggested that "in excess of 10% of Zillow's revenue was exposed to illegal co-marketing, and that revenues from co-marketing are *highly profitable*." *Id.* (emphasis added).

In the instant case, by contrast, Plaintiffs have failed to allege that the statements the Individual Defendants made about the E-Rate program are in any way false or misleading. Indeed, as discussed above, Aerohive repeatedly disclosed problems with the E-Rate program. For instance, the SAC alleges that Aerohive announced its strategic decision to shift away from E-Rate well in advance of 3Q17: "Defendants acknowledged that [Aerohive] had become overly dependent on E-Rate" and "needed to diversify"; and that "Aerohive Connect was lauded as a key component to expanding and diversifying [Aerohive's] customer base away from the E-Rate

program." SAC ¶¶ 33, 35; *see also* Ex. 1 ("4Q16 Call") at 5 ("As mentioned last quarter, we have accelerated our plans to lessen this dependency" on the "troubled E-Rate program"); Ex. 2 ("2Q17 Call") at 8 ("E-Rate is a troubled program" and "[w]e are clearly focused on . . . reducing the dependence on the E-Rate"). Aerohive also disclosed that problems with E-Rate were negatively affecting its financials. *See* Ex. 1 ("4Q16 Call") at 5 ("[O]ur results continued to highlight our overdependence on the troubled E-Rate program."); Ex. 3 ("3Q17 10-Q") at 4 ("expected Q3 weakness in education"). Aerohive also disclosed on November 1, 2017, the same day the statements were made, that it predicted "another bad E-Rate year." Ex. 4 ("3Q17 Call") at 8. Thus, unlike in *In re Zillow Grp.*, the Court cannot find it would be "absurd" to assume the Individual Defendants did not know their statements are false and misleading because their statements are not in fact false or misleading. *Solarcity Corp.*, 884 F.3d at 858 ("These facts preclude us from holding that the falsity of the erroneous financials was necessarily "immediately obvious" to Defendants–Appellees") (quoting *Zucco*, 552 F.3d at 1001). As such, the second circumstance—whether the nature of the relevant fact is of such prominence that it would be "absurd" to suggest that management was without knowledge of the matter—is not present in the instant case. *See Colyer*, 2015 WL 7566809, at *13 (Both circumstances require Defendants to have "at a minimum, made false or misleading statements.").

Thus, the Court rejects Plaintiffs' invocation of the core operations doctrine.

**c. Holistic Evaluation**

In assessing whether Plaintiffs have sufficiently pled scienter, the Court must also consider "whether the total of plaintiffs' allegations, even though individually lacking, are sufficient to create a strong inference that defendants acted with deliberate or conscious recklessness." *No. 84 Employer-Teamster Joint Council Pension Tr. Fund v. Am. W. Holding Corp.*, 320 F.3d 920, 938 (9th Cir. 2003). When reviewing the totality of plaintiffs' allegations, "[g]eneral allegations of defendants' 'hands-on' management style, their interaction with other officers and employees, their attendance at meetings, and their receipt of unspecified weekly or monthly reports are



United States District Court
Northern District of California

insufficient." *Daou*, 411 F.3d at 1022 (citing *In re Vantive*, 283 F.3d at 1087). On the other hand, "specific admissions from top executives that they are involved in every detail of the company and that they monitored portions of the company's database are factors in favor of inferring scienter in light of improper accounting reports." *Id.* (citation omitted).

As previously discussed, Plaintiffs' theories of scienter independently fall short of creating the requisite strong inference of scienter. But even when viewed collectively, Plaintiffs' allegations do not create a strong inference that either Aerohive or the Individuals Defendants' were "highly unreasonable" or that their alleged omissions constituted an "extreme departure from the standards of ordinary care." *Zucco*, 552 F.3d at 991. Below, the Court discusses why Defendants' voluntary disclosures collectively undermine any inference of scienter.

As discussed, the SAC relies on a theory of omission. However, Aerohive's repeated disclosure of negative information on the very topics they supposedly concealed undermines an inference of a deliberate omission. *Rigel*, 697 F.3d at 885 (finding that "voluntarily publicly disclosed" information undermined scienter); *In re Worlds of Wonder Sec. Litig.*, 35 F.3d 1407, 1424 (9th Cir. 1994) ("If [the company's] officers were bent on committing fraud, it is not likely that they would have provided such detailed risk disclosure."); *City of Roseville Employees' Ret. Sys.*, 963 F. Supp. 2d at 1142 ("Robust disclosure of risks and problems further 'negates an inference that the company acted with intent to defraud.'").

As discussed throughout the instant Order, Aerohive disclosed its cost-reduction measures. Ex. 1 ("4Q16 Call") at 6 ("lower cost"); Ex. 2 ("2Q17 Call") at 6 ("cost-reduction actions"). Aerohive disclosed the sales personnel issues, including the reorganization of its sales organization; the "adverse" and "highly disruptive" effects of salesforce turnover; and that "newly hired personnel may also require several quarters to gain experience and develop their territories before achieving capacities we have assumed in our sales forecasts." SAC ¶¶ 4, 34; Ex. 3 ("3Q17 10-Q") at 37, 46. Aerohive also disclosed problems with the E-Rate program. SAC ¶¶ 33, 35; Ex. 1 ("4Q16 Call") at 5 ("As mentioned last quarter, we have accelerated our plans to lessen this



United States District Court
Northern District of California

dependency" on the "troubled E-Rate program"; *id.* ("[O]ur results continued to highlight our overdependence on the troubled E-Rate program."); Ex. 3 ("3Q17 10-Q") at 4 ("expected Q3 weakness in education"); Ex. 2 ("2Q17 Call") at 8 ("E-Rate is a troubled program" and "[w]e are clearly focused on . . . reducing the dependence on the E-Rate"). Aerohive further disclosed problems with HiveManager NG and Aerohive Connect and Aerohive Select. Ex. 3 ("3Q17 10-Q") at 22; (announcing that delay in transition to HiveManager NG had "affected revenue from our switch products"); *id.* (explaining that the Aerohive Connect and Aerohive Select offerings may reduce revenue or the rate of revenue growth).

Moreover, as discussed in the instant order, Plaintiffs have failed to allege that Defendants made any false or misleading statements. *Intuitive Surgical*, 2012 WL 1868874, at *15 ("Courts may analyze falsity and scienter together, even though they are separate elements, because they generally depend upon the same set of facts." (citing *Daou*, 411 F.3d at 1015)). In sum, the Court finds that Defendants' voluntary disclosures undermine any inference that the Defendants intended to deceive or that their conduct was "highly unreasonable" or constituted an "extreme departure from the standards of ordinary care." *Zucco*, 552 F.3d at 991.

In sum, Plaintiffs have failed to plead scienter. The Court therefore GRANTS Defendants' motion to dismiss the SAC on this basis.

The Court grants Defendants' motion to dismiss the SAC on the basis that Plaintiffs failed to plead scienter with prejudice. Although the Court dismissed Plaintiffs' FAC for failure to adequately plead a false or misleading statement in the February 5, 2019 Order, the Court also found that Plaintiffs' scienter allegations were insufficient. February 5, 2019 Order at 28–30. The Court identified the deficiencies and stated that "any amended complaint shall cure the scienter deficiencies that the Court has identified as well as any deficiencies properly identified by the Defendants in their motion." *Id.* at 29–30. "The fact that [Plaintiffs] failed to correct these deficiencies in [their] [SAC] is 'a strong indication that the [P]laintiffs have no additional facts to plead.'" *Zucco*, 552 F.3d at 1007 (quoting *In re Vantive*, 283 F.3d at 1098). Thus, the Court finds

United States District Court
Northern District of California

that further leave to amend would be futile. Furthermore, leave to amend would be unduly prejudicial to Defendants because the SAC is Plaintiffs' third complaint, and Defendants have already briefed two motions to dismiss. Accordingly, Plaintiffs' SAC is dismissed with prejudice. *See Leadsinger, Inc.*, 512 F.3d at 532.

**B. Violation of § 20(a) of the Exchange Act**

Congress has established liability in § 20(a) for "[e]very person who, directly or indirectly, controls any person liable" for violations of the securities laws. 15 U.S.C. § 78t(a). To prove a prima facie case under Section 20(a), a plaintiff must prove: (1) "a primary violation of federal securities law;" and (2) "that the defendant exercised actual power or control over the primary violator." *See Howard v. Everex Sys., Inc.*, 228 F.3d 1057, 1065 (9th Cir. 2000). Because Plaintiffs have failed to plead a primary securities law violation, Plaintiffs have also failed to plead a violation of § 20(a). *In re Cutera Sec. Litig.*, 610 F.3d 1103, 1113 n. 6 (9th Cir. 2010). Accordingly, Defendants' motion to dismiss the § 20(a) claim is also GRANTED with prejudice. *See Leadsinger, Inc.*, 512 F.3d at 532.

**IV. CONCLUSION**

For the foregoing reasons, Defendants' motion to dismiss the SAC is GRANTED with prejudice.

**IT IS SO ORDERED.**

Dated: August 7, 2019

Lucy H. Koh

LUCY H. KOH
United States District Judge